IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHARLES P. RIPLEY | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | **CASE NO. 3:19-CV-00577-S** |
| | § | |
| BOK FINANCIAL CORPORATION, and | § | |
| BOK FINANCIAL SECURITIES, INC. | § | |
| | § | |
| *Defendants*. | § | |

**APPENDIX TO DEFENDANT BOK FINANCIAL SECURITIES, INC.'S MOTION FOR
SUMMARY JUDGMENT**

BOK Financial Securities, Inc. hereby files its Appendix with supporting documents.

Respectfully Submitted,

Erica Anne Dorwart, OBA #18367
Admitted to practice in the
Northern District of Texas on May 1, 2018
FREDERIC DORWART, LAWYERS
124 East Fourth Street
Tulsa, Oklahoma 74103
edorwart@fdlaw.com
(918) 583-9922 (Tel.)
(918) 584-2729 (Fax)

-and-

Worthy Walker
Texas Bar No. 24033308
wwalker@shackelford.law
SHACKELFORD, BOWEN,
   MCKINLEY & NORTON, LLP
9201 N. Central Expressway, Fourth Floor
Dallas, Texas 75231
Telephone:  (214) 780-1400
Facsimile:   (214) 780-1401

ATTORNEYS FOR DEFENDANT
BOK Financial Securities, Inc.

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing instrument has been served upon all known parties and counsel of record in accordance with the Federal Rules of Civil Procedure, this 1st day of June, 2021.


 */s/  Erica Anne Dorwart*
Erica Anne Dorwart





## 2021-06-01 Nick Polyak Business Affidavit.pdf

| | |
|---|---|
| DocVerify ID: | C62F0862-1B0A-430B-8DB5-AE94115ACD77 |
| Created: | June 01, 2021 17:41:16 -8:00 |
| Pages: | 2 |
| Remote Notary: | Yes / State: OK |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means this document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Nicholas E Polyak Jr (NEP)**
June 01, 2021 17:53:56 -8:00 [DEDC7B8AA008] [47.185.186.30]
NPolyak@bokf.com (Principal) (Personally Known)

**E-Signature Notary: Kelly M. Collins (KMC)**
June 01, 2021 17:53:56 -8:00 [D1D7815372BF] [98.178.134.40]
kcollins@fdlaw.com
I, Kelly M. Collins, did witness the participants named above electronically sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat. All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLES P. RIPLEY                  §
                                   §
*Plaintiff*,                       §
                                   §
vs.                                §          **CASE NO. 3:19-CV-00577-S**
                                   §
BOK FINANCIAL CORPORATION, and     §
BOK FINANCIAL SECURITIES, INC.     §
                                   §
*Defendants*.                      §

**AFFIDAVIT OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
PURSUANT TO RULES OF EVIDENCE**

State of Texas        §
                      § ss.
County of Dallas      §

  I, Nicholas E Polyak, Jr., upon being duly sworn and under oath, that I am an individual over the age of twenty-one years of age and am fully competent to make this Affidavit.

  I hereby certify that I am employed by BOK Financial Securities, Inc. as a Senior Vice President. I state that each of Exhibits 3, 4, 5, 6, 7, 8, 10, 11 and 13 submitted by BOK Financial Securities, Inc. in support of its Motion for Summary Judgment is a true and correct duplicate of the original record in the custody of BOK Financial Securities, Inc. (the "BOKFS Exhibits").  I am qualified based upon my job responsibilities with BOK Financial Securities, Inc. to certify that each of the BOKFS Exhibits is maintained as a business record.

  I further state that:

  1.  The BOKFS Exhibits were made, or obtained, at or near the time of the occurrence of the matters set forth by, or from information transmitted or provided by, a

C62F0862-1B0A-430B-8DB5-AE94115ACD77 — 2021/06/01 17:41:16 -8:00 — Remote Notary

person with knowledge of, or having responsibility for the collection and maintenance of these business records;

     2.     The BOKFS Exhibits were kept in the course of the regularly conducted business activities of BOK Financial Securities, Inc. and;

     3.     The BOKFS Exhibits were made by BOK Financial Securities, Inc. as a part of its regular practice as a national banking association.

I further state that this Affidavit is intended to satisfy the applicable rules of evidence in accordance with the evidentiary rules of the Federal Rules of Evidence.

I hereby certify under penalty of perjury that the aforesaid is true and correct.

Executed on the 1<u>st</u> day of June, 2021.

BOK Financial Securities, Inc.

By:  _____
Nicholas E Polyak, Jr.
Senior Vice President

SWORN TO AND SUBSCRIBED before me, this 1<u>st</u> day of June 2021.



**Kelly M. Collins**
**Commission # 06008615**
Notary Public - State of Oklahoma
My Commission Expires Aug 31, 2022

 ___ LIC in and for the State of Oklahoma

My commission expires: <u>08-31-2022</u>

C62F0862-1B0A-430B-8DB5-AE94115ACD77 — 2021/06/01 17:41:16 -8:00 --- Remote Notary

**Appendix**

| Exhibit Number | Title and Description |
|---|---|
| Ex. 1 | Mr. Charles Ripley's annotated deposition taken on March 31, 2021 |
| Ex. 2 | EEOC Charge Complaint filed by Mr. Ripley on August 13, 2018 |
| Ex. 3 | Rena Connor Resignation Letter |
| Ex. 4 | Counseling Report for Mr. Ripley dated April 20, 2018 |
| Ex. 5 | Mr. Ripley's current PeopleNet Job History |
| Ex. 6 | BOSC (BOKFS) Offer Letter to Mr. Ripley dated June 30, 2010 |
| Ex. 7 | BOSC (BOKFS) Representative Agreement signed by Mr. Ripley dated June 30, 2010 |
| Ex. 8 | BOSC (BOKFS) Representative Agreement signed by Ms. Connor dated March 31, 2010 |
| Ex. 9 | Intentionally withheld |
| Ex. 10 | Email from Mr. Polyak regarding the Ripley/Connor commission split dated August 31, 2017 |
| Ex. 11 | Email from Mr. Polyak to Mr. Ripley regarding account reassignment dated January 30, 2018 |
| Ex. 12 | Mr. Polyak's annotated deposition taken on March 29, 2021 |
| Ex. 13 | Mr. Ripley's W2s from 2010-2020 |
| Ex. 14 | EEOC Dismissal and Right to Sue Letter dated November 1, 2018 |

EXHIBIT 1

Charles P. Ripley                                    3/31/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLES P. RIPLEY,              )
                                )
              Plaintiff,        )
                                )
VS.                             ) Case No. 3:18-CV-00794-N
                                )
BOK FINANCIAL CORPORATION,      )
et al.,                         )
                                )
              Defendants.       )


---------------------------------
ORAL AND VIDEOTAPED REALTIME DEPOSITION OF

CHARLES P. RIPLEY

MARCH 31, 2021

VOLUME 1
---------------------------------


     ORAL AND VIDEOTAPED REALTIME DEPOSITION OF CHARLES

P. RIPLEY, produced as a witness at the instance of the

Defendants, and duly sworn, was taken in the

above-styled and numbered cause on March 31, 2021, from

9:10 a.m. to 4:16 p.m., before Christy Cortopassi, CSR

in and for the State of Texas, reported by machine

shorthand, at the law offices of Shackelford, Bowen,

McKinley & Norton, LLP, 9201 N. Central Expressway,

Fourth Floor, Dallas, Texas 75231, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

Charles P. Ripley                                    3/31/2021

```
                                                              2
 1                  A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        Ms. Marilyn K. Lahr
          LAW OFFICES OF MARILYN LAHR
 5        3131 McKinney Avenue
          Suite 600
 6        Dallas, Texas 752014
          214.528.4545
 7        mimilahr@yahoo.com

 8
     FOR THE DEFENDANTS BOK FINANCIAL CORPORATION:
 9
          Ms. Erica Anne Dorwart
10        FREDERIC DORWART, LAWYERS PLLC
          124 East Forth Street
11        Tulsa, Oklahoma 74103
          918.583.9922
12        edorwart@fdlaw.com

13

14   ALSO PRESENT:
          Mr. Ryan Wigzell, Videographer
15

16

17

18

19

20

21

22

23

24

25
```

**STRYKER REPORTING SERVICES**                **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

3

1                              INDEX
                                                      PAGE
2    Appearances........................................  2

3    Stipulations.....................................211

4    CHARLES P. RIPLEY

5        EXAMINATION BY MS. DORWART......................  4

6
     Changes and Signature............................ 214
7    Reporter's Certification......................... 216

8                             EXHIBITS

9    NO.          DESCRIPTION                           PAGE

10   Exhibit 41      Notice of Deposition.................. 5
     Exhibit 42      Counseling report, letter & documents..172
11   Exhibit 43      Hostile Work Environment folder -
                     composite of documents.................196
12   Exhibit 44      Color photocopy of box of folders
                     containing documents...................213
13   Exhibit 96      Mr. Ripley's W-2, year 2017...........117
     Exhibit 97      Mr. Ripley's W-2, year 2018...........118
14   Exhibit 110     August 31, 2017 email string..........113
     Exhibit 122     Counseling report.....................108
15   Exhibit 123     Composite of documents................148
     Exhibit 129     April 30, 2018 email..................157
16   Exhibit 147     September 12, 2019 email string.......135

17

18                  CERTIFIED/MARKED QUESTIONS

19   NO.                                         PAGE/LINE

20   "Instruction not to answer" requested to be
     marked by Ms. Dorwart........................ 196  10
21

22

23

24

25

**STRYKER REPORTING SERVICES**                 **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

4

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  We are

3  now on the record.  Today's date is March 31, 2021.  The

4  time on the monitor is 9:10 a.m.

5              My name is Ryan Wigzell.  I'm the

6  videographer for the video deposition of Charles P.

7  Ripley in the matter of Charles P. Ripley versus BOK

8  Financial Corporation, et al. in the United States

9  District Court for the Northern District of Texas,

10  Dallas Division, Case Number 3:18-CV-00794-N.

11              Will counsel present please identify

12  themselves and state any stipulations for the record.

13              MS. LAHR:  Yes.  Marilyn Lahr for the

14  plaintiff.  Under the Federal Rules of Civil Procedure.

15              MS. DORWART:  Erica Dorwart for BOK

16  Financial Securities, Inc. formerly BOSC, Inc., the

17  defendant.

18              THE VIDEOGRAPHER:  Christy Cortopassi is

19  our reporter and will now swear in the witness.

20              CHARLES P. RIPLEY,

21  having been first duly sworn, testified as follows:

22              EXAMINATION

23  BY MS. DORWART:

24      Q.  Could you state your full name for the record?

25      A.  Charles Peyton Ripley.

**STRYKER REPORTING SERVICES**          **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

6

1  litigation.

2      Q.  And what documents do you remember reviewing,

3  if any?

4      A.  Documents that we presented.

5      Q.  Can you identify any of the documents that you

6  presented?

7      A.  Conversations with Mr. Polyak, conversations

8  with Mr. Watson.

9      Q.  And when you say you presented these documents,

10  where were those documents presented, if you know?

11      A.  My attorney presented them in -- wherever the

12  correct place was.

13          MS. LAHR:  And actually, for the record, I

14  responded that they were available for inspection and

15  copying and no one has asked to look at them, so.

16      Q.  (BY MS. DORWART)  Mr. Ripley, do you have an

17  understanding that your counsel stated the documents

18  would be made available for inspection and copying?

19      A.  I do.

20      Q.  And do you understand when that occurred?

21      A.  No.

22      Q.  Did it occur in 2021?

23      A.  I don't know.

24      Q.  Do you know if it occurred in 2020?

25      A.  I would presume in 2020 but I have nothing to

Charles P. Ripley                                  3/31/2021

7

1   document that.

2        Q.   Is there any reason why you did not arrange for

3   documents to be produced, for example, electronically to

4   BOK Financial Securities, Inc. in this case?

5             MS. LAHR:   Because we are not required to.

6   We have met with the Federal Rules of Civil Procedure

7   requirement to make them available to you for an

8   inspection and copying.

9             MS. DORWART:   Counsel, I'm asking the

10  questions of Mr. Ripley.  You may object to the form.

11            MS. LAHR:   You may, Mr. Ripley -- I object

12  to the form of the question.  If you know the answer,

13  you can answer her.

14       A.   Could you repeat the question, please?

15       Q.   (BY MS. DORWART)  Sure.  Is there any reason

16  why you did not arrange for documents to be produced,

17  for example, electronically to BOK Financial Securities,

18  Inc. in this case?

19       A.   I left all of the -- of that to my attorney.

20       Q.   Where did the documents that you believe were

21  made available for inspection come from?

22       A.   They came from documents that were presented to

23  the Court.  I don't understand your question fully.

24       Q.   Sure.  It sounds like you have as a result of

25  this litigation made certain documents available for

Charles P. Ripley                                    3/31/2021

8

1  inspection; is that fair?

2       A.  I made those documents available to my

3  attorney.

4       Q.  Okay.  And where did you get those documents in

5  order to make them available to your attorney?

6       A.  Documents that were available and presented to

7  me from BOK Financial and notes that I had made from

8  time to time regarding the litigation.

9       Q.  Did you get any documents from any paper

10 records of BOSC to give to your counsel?

11      A.  That was the prior name.  Yes.

12      Q.  Okay.  Did you get any documents from BOK

13 Financial Securities to present to your counsel?

14      A.  They were the same organization.  They just

15 changed the name.

16      Q.  Okay.  So the question is, did you get any

17 documents from BOK Financial Securities to present to

18 your counsel?  It's a yes or no.

19           MS. LAHR:  If you can answer it yes or no.

20 If you can't, say so.

21      A.  I can't answer that.

22      Q.  (BY MS. DORWART)  Where did you get documents

23 to give to your attorney in this case?

24           MS. LAHR:  Object to the question as asked

25 and answered.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

9

1       Q.  (BY MS. DORWART)  Where did you get documents

2  to give to your attorney in this case?

3              MS. LAHR:  Object to the question, asked

4  and answered.

5       Q.  (BY MS. DORWART)  You can answer,

6       A.  I answered the question.

7       Q.  You have to answer it again.

8              MS. LAHR:  He did.  He doesn't.  If you

9  don't want to answer again, you don't have to.  You have

10 answered it.

11      Q.  (BY MS. DORWART)  Mr. Ripley, did you go into

12 electronic email at BOK Financial Securities, Inc. to

13 gather documents to present to your attorney?

14      A.  Yes.

15      Q.  Did you go on to Bloomberg to present documents

16 to your attorney?

17      A.  Yes.

18      Q.  Did you gather paper documents from BOK

19 Financial Securities, Inc. to present to your attorney?

20      A.  No.

21      Q.  How did you transmit electronic email to your

22 attorney?

23      A.  I printed them and gave them to her.

24      Q.  How did you present Bloomberg email to give to

25 your attorney?

**STRYKER REPORTING SERVICES**                **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              10

1          A.  In the same manner.

2          Q.  Approximately, what volume of printed documents

3    did you give to your attorney?

4                MS. LAHR:  Approximately, this volume right

5    here.

6                MS. DORWART:  Counsel, I'm going to

7    instruct you again, the federal rules require and the

8    local rules require that you object to the form, not

9    testify for plaintiff.

10               MS. LAHR:  Oh my goodness, that's ironic

11   coming from you.  But here is the documents he has

12   provided if you would like to look at them.

13         Q.  (BY MS. DORWART) Mr. Ripley, I am going to --

14               MS. DORWART:  May I touch them?

15               MS. LAHR:  You may.

16               MS. DORWART:  Thank you.

17         Q.  (BY MS. DORWART)  I'm going to hand you what

18   looks like a Redweld folder.  Can you see that on the

19   video?

20               THE VIDEOGRAPHER:  Yes.

21               MS. DORWART:  Okay.

22         Q.  (BY MS. DORWART)  Is this the volume of

23   documents that you printed out to give to your attorney

24   for production in this case?

25               MS. LAHR:  Object to the form of the

**STRYKER REPORTING SERVICES**                  **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              12

1        Q.   And what was the first date that you engaged

2   Ms. Lahr?

3        A.   I don't remember.

4        Q.   Do you recall what year you engaged Ms. Lahr?

5        A.   2020.

6        Q.   To approximately -- do you recall approximately

7   what time of year you engaged Ms. Lahr in 2020?

8        A.   I believe in the spring.

9        Q.   Would it be fair to say that you had not

10  engaged Ms. Lahr in 2019?

11       A.   No.  I did speak to her in 2019.

12       Q.   When is the first time you spoke to Ms. Lahr?

13       A.   I believe the -- approximately the first or

14  second quarter of 2019.

15       Q.   Okay.  Did you have unhindered access to your

16  electronic email at BOK FS?

17       A.   Yes.

18       Q.   Did you have unhindered access to your

19  Bloomberg email at BOK FS?

20       A.   Yes.

21       Q.   What are the claims you are raising in this

22  litigation, if any?

23       A.   The claims that I'm raising are breach of

24  contract and age discrimination.

25       Q.   And when do you -- and do you allege that a

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

13

1   contract was entered with you?

2        A.   I don't understand the question.

3        Q.   Are you alleging that you entered into a

4   contract with BOK Financial Securities, Inc.?

5        A.   When I was employed, yes.

6        Q.   And what is the date of this contract that you

7   are alleging you entered into with BOK Financial

8   Securities, Inc.?

9        A.   It was known by another name at that point but

10  my date of employment was the last week of June of 2010.

11       Q.   And is this contract that you are alleging you

12  entered into with BOK Financial Securities, Inc., which

13  was -- strike that.

14            Was BOK Financial Securities, Inc. formally

15  known as BOSC, Inc.?

16       A.   That's correct.

17       Q.   And did you enter into a contract with BOSC,

18  Inc.?

19       A.   Yes.

20       Q.   And is that the contract that you are stating

21  you entered into in the last week of June 2010?

22       A.   Yes.

23       Q.   Was that a written contract?

24       A.   Yes.

25       Q.   Are you alleging that written contract was

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                                    14

1    breached by BOK Financial Securities, formally known as

2    BOSC, Inc. in this case?

3         A.   I don't have a copy of that contract.

4         Q.   Are you alleging that that written contract was

5    breached by BOK Financial Securities, Inc. formally

6    known as BOSC, Inc. in this case?

7              MS. LAHR:   Object to the form of the

8    question.

9         A.   Possibly.

10        Q.   (BY MS. DORWART)  Other than the written

11   contract that you had mentioned that you had with BOSC,

12   Inc. in approximately June of 2010, are you alleging

13   there's any other contract at issue in this case?

14             MS. LAHR:   Object to the form of the

15   question.

16        A.   Are you going to restate the question?

17        Q.   (BY MS. DORWART)  No.  I can --

18             MS. LAHR:   You can answer.

19        Q.   (BY MS. DORWART)  I can reread it if you would

20   like me to.

21        A.   Please.

22        Q.   Other than the written contract you mentioned

23   you had with BOSC, Inc. in approximately June of 2010,

24   are you alleging that there's any other contract at

25   issue in this case?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

15

```
 1              MS. LAHR:  Object to the form of the
 2    question.
 3        A.   Yes.
 4        Q.   (BY MS. DORWART)  Well, what other contract is
 5    that?
 6        A.   It was a verbal contract with Meredith Watson.
 7              MS. LAHR:  I'm sorry.  Move that out of the
 8    camera view.  It's blocking the camera.
 9        Q.   (BY MS. DORWART)  Describe to me any alleged
10    verbal contract with Meredith Watson.
11        A.   It was in reference to his request on behalf of
12    the firm for me to accept Rena Connor in a partnership
13    whereby I was to mentor her and so she could act in the
14    capacity or the role of an institutional fixed income
15    salesperson.
16        Q.   And when do you allege that Mr. Watson
17    requested on behalf of the firm for you to enter into a
18    partnership with Rena Connor?
19        A.   I believe it was in the latter part of 2012.
20        Q.   Okay.  Who is Rena Connor?
21        A.   She was an employee of BOSC, Inc.
22        Q.   What role, if any, did Ms. Connor have as an
23    employee of BOSC, Inc.?
24        A.   She was hired to be an administrative
25    assistant.
```

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

16

1       Q.  When was Ms. Connor hired to be an

2   administrative assistant for BOSC, Inc.?

3       A.  In 2011.

4       Q.  Did Ms. Connor ever have any other position at

5   BOK FS -- I'm sorry.

6              Did Ms. Connor ever have any other position

7   at BOSC, Inc. other than as administrative assistant?

8              MS. LAHR:  Object to the form of the

9   question.

10      Q.  (BY MS. DORWART)  Strike that.

11             Did Ms. Connor have any -- any -- was

12  Ms. --  strike that.

13             Did Ms. Connor ever perform any other roles

14  other than administrative assistant for BOSC, Inc.?

15             MS. LAHR:  Object to the form of the

16  question.

17      A.  Yes.

18      Q.  (BY MS. DORWART)  And what role is that?

19      A.  She assisted the trading and underwriting desk.

20      Q.  When did Ms. Connor start assisting the trading

21  and underwriting desk?

22      A.  When she was employed.

23      Q.  Starting in 2011?

24      A.  Yes.

25      Q.  Okay.  Was there a name of the position held by

Charles P. Ripley                                    3/31/2021

18

1       Q.  (BY MS. DORWART)  Other than vice president

2   institutional fixed income sales, did you hold any other

3   positions for BOSC, Inc.?

4       A.  No.

5       Q.  Did you ever apply for a position other than

6   the vice president institutional fixed income sales for

7   BOSC, Inc.?

8       A.  No.

9       Q.  Did you ever apply for a position other than

10  vice president institutional fixed income sales for BOK

11  Financial Securities, Inc.?

12      A.  No.

13      Q.  Do you know when -- strike that.

14          Was there a name change between BOSC, Inc.

15  and BOK Financial Securities, Inc.?

16      A.  Yes.

17      Q.  Do you know when that occurred?

18      A.  No.

19      Q.  For purposes of today would it be fair to

20  interchangeably use BOSC, Inc. and BOK Financial

21  Securities, Inc.?

22      A.  Yes.

23      Q.  Do you have a preference as to which we call

24  the firm for which you have been employed and are

25  currently employed as we sit here today?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                        3/31/2021

19

 1      A.  No.
 2      Q.  Okay.  Did Ms. Connor ever become a sales
 3  officer?
 4      A.  Yes.
 5      Q.  When did Ms. Connor become a sales officer?
 6      A.  After she took her Series 7 and passed the
 7  examination.
 8      Q.  Do you know when Ms. Connor took her Series 7
 9  and passed the examination?
10      A.  No.
11      Q.  Do you know what year Ms. Connor took her
12  Series 7 and became -- strike that.
13          Do you know what year Ms. Connor took her
14  Series 7 and passed the examination?
15      A.  I believe 2011.
16      Q.  What words did Mr. Watson say, if any, that you
17  believe constituted a verbal contract?
18      A.  When we had the meeting in -- well, when I had
19  the meeting with Mr. Watson and he came to Dallas to
20  present a proposition to me that if I would train and be
21  Rena's mentor so that upon my retirement she would have
22  an introduction to the accounts that I had and were
23  being covered.
24          That the firm would always pay her
25  compensation, that my compensation would never change

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                              3/31/2021

20

1   until the date -- from the date of the agreement until

2   the time of my retirement.

3       Q.  Did Mr. Watson use the words, the firm would

4   always pay Ms. Connor's compensation and that your

5   compensation would never change until the time of your

6   retirement?

7       A.  Yes.

8       Q.  Did you expect the allegation that you have

9   made, that Mr. Watson stated your compensation would

10  never change until the time of your retirement to last

11  more than a year?

12      A.  Yes.

13      Q.  Did you expect the allegation that Mr. Watson

14  stated that your compensation would never change until

15  the time of your retirement to last more than two years?

16      A.  Yes.  I had no plans to retire.

17      Q.  Did you expect your allegation that Mr. Watson

18  stated that your compensation would never change to last

19  in perpetuity?

20      A.  I expected it to last until my retirement.

21      Q.  At the time that Mr. Watson allegedly said that

22  the firm would never change your compensation, did you

23  ever have any plans to retire?

24      A.  No.

25      Q.  At the time that you allege Mr. Watson said

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

21

1   that the firm would never change your compensation, did

2   you plan on working for ten years?

3       A.  I did not set a time limitation to my

4   retirement.

5       Q.  So it's fair to say that the time that you

6   allege Mr. Watson said the firm would never change your

7   compensation, there was no end in sight for your

8   retirement, correct?

9               MS. LAHR:  Object to the form of the

10  question.

11      A.  There was no date set for my retirement.

12      Q.  (BY MS. DORWART)  So it's fair to say that you

13  planned on working for more than ten years at that time,

14  correct?

15              MS. LAHR:  Object to the form of the

16  question.

17      A.  I never set a time limitation.

18      Q.  (BY MS. DORWART)  And did you consider that

19  Mr. Watson made a promise to you that the firm would

20  never change your compensation the entire time you were

21  employed with the firm?

22      A.  Absolutely.

23      Q.  And is that promise that you are attempting to

24  enforce by means of this litigation?

25      A.  Yes.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

22

```
 1        Q.  Is there any writing memorializing that alleged
 2   promise by Mr. Watson in the latter part of 2012?
 3               MS. LAHR:  Object to the form of the
 4   question.
 5        A.  My own personal notes.
 6        Q.  (BY MS. DORWART)  Other than your own personal
 7   notes is there any writing memorializing the alleged
 8   promise by Mr. Watson that the firm would never change
 9   your compensation the entire time you were employed with
10   the firm?
11        A.  I don't know.
12        Q.  So it's fair to say that you don't have a
13   writing memorializing the alleged promise by Mr. Watson
14   that the firm would never change your entire -- your
15   compensation the entire time you are employed with the
16   firm?
17               MS. LAHR:  Object to the form of the
18   question.  Mischaracterizes his previous testimony.
19        A.  That's correct.
20        Q.  (BY MS. DORWART)  Okay.  Where are your own
21   personal notes that you allege you wrote regarding any
22   promise from Mr. Watson that the firm would never change
23   your compensation?
24        A.  They are in documents that we presented.
25        Q.  Are they in this Redweld folder then?
```

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

23

1        A.   I don't know if they are all in there or not.

2        Q.   Is there some other location that your

3    documents might be?

4        A.   I'm in possession of documents.

5        Q.   Where do you have documents?

6        A.   In my home.

7        Q.   Are there any documents in your home that you

8    have not given to your counsel that pertain to this

9    litigation?

10       A.   No.

11       Q.   How do you maintain those documents in your

12   home?

13       A.   In folders.

14       Q.   Are they in a safe?

15       A.   No.

16       Q.   Where are they located in your home?

17       A.   In a room that I use for an office.

18       Q.   Does anybody else live in your home?

19       A.   No.

20       Q.   When is the last time someone else lived in

21   your home?

22       A.   Since I have owned this home I'm the only

23   person that has ever lived there.

24       Q.   And how long have you owned your current home?

25       A.   Approximately five-and-a-half years.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

24

1       Q.  Did BOSC ever memorialize in a writing this

2   alleged promise from Mr. Watson that the firm would

3   never change your compensation?

4       A.  I don't know.

5       Q.  Is it fair that -- strike that.

6               Have you ever seen a document written by

7   any person employed by BOSC memorializing an alleged

8   promise from Mr. Watson that the firm would never change

9   your compensation?

10      A.  No.

11      Q.  Did you ever present to BOSC, Inc. any notes

12  memorializing an alleged promise from Mr. Watson that

13  BOSC would never change your compensation?

14      A.  Yes.

15      Q.  When?

16      A.  I believe, beginning in 2013.

17      Q.  And how did you present these notes to BOSC in

18  2013?

19      A.  In an email to Nick Polyak.

20      Q.  Did you attach your notes to the email to Nick

21  Polyak?

22      A.  What notes?  I'm not sure I understand your

23  question.

24      Q.  Do you recall testifying earlier today that you

25  took notes memorializing an alleged promise by

Charles P. Ripley                                           3/31/2021

25

1   Mr. Watson?

2        A.  Yes.

3        Q.  When did you take those notes?

4        A.  At the time, shortly after my conversation with

5   Mr. Watson.

6        Q.  Okay.  Were they handwritten?

7        A.  Yes.

8        Q.  Did you ever present those handwritten notes

9   that you allegedly wrote down shortly after your

10  conversation with Mr. Watson to BOSC?

11       A.  No, I never presented the notes.

12       Q.  Do you allege that you provided consideration

13  to BOSC for an alleged promise to never change your

14  compensation?

15            MS. LAHR:  Object to the form of the

16  question.

17       A.  Could you repeat the question, please?

18       Q.  (BY MS. DORWART)  Sure.  Do you allege that you

19  provided consideration to BOSC for an alleged promise to

20  never change your compensation?

21            MS. LAHR:  Object to the form of the

22  question.

23       A.  I -- yes.  I did exactly what Mr. Watson asked

24  me to do in mentoring Mrs. Connor.

25       Q.  (BY MS. DORWART)  Okay.  Was mentoring

Charles P. Ripley                                    3/31/2021

41

1      Q.   Okay.  And was there a point in time -- at the

2  time Ms. Connor received an override of ten percent on

3  total gross commissions, did she have any other comp- --

4  were you aware of any other compensation being paid to

5  Ms. Connor?

6      A.   No.

7      Q.   Is it your belief that the only compensation

8  paid to Ms. Connor at that time period was the ten

9  percent override?

10     A.   I don't know.

11     Q.   Do you know if Ms. Connor received a salary

12 while she was receiving the ten percent override on

13 total gross commissions?

14     A.   I don't know.

15     Q.   Was there ever a time that Ms. Connor received

16 compensation other than a ten percent override on total

17 gross commissions?

18     A.   Can you repeat the question, please?

19     Q.   Was there ever a time that Ms. Connor received

20 compensation other than a ten percent override on total

21 gross commissions?

22     A.   There was a point in time that the commission

23 that was paid to her became in excess of the ten

24 percent.

25     Q.   And when did that occur?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

43

1        A.   No.

2        Q.   It wasn't 50/50, correct?

3        A.   That is correct.

4        Q.   Okay.  Do you recall if it was 70/30?

5        A.   Somewhere in that range, probably.

6        Q.   Do you recall approximately when the range of a

7   70/30 commission split first occurred?

8        A.   2013 or later.

9        Q.   Approximately, how long do you believe there

10  was an approximate range of 70/30 commission split?

11       A.   Possibly nine months to a year.

12       Q.   How did you learn that there was to be a 50/50

13  commission split effective January 1 of 2018?

14       A.   Polyak gave me documentation to that affect.

15       Q.   And when did Mr. Polyak give you that

16  documentation?

17       A.   The fall of '17.

18       Q.   Was that documentation in an email?

19       A.   Yes.

20       Q.   Now you mentioned there were three to four

21  different changes.  We talked about a 70/30 range

22  approximately 2013.  What was the next time -- occasion

23  that the compensation split changed between you and

24  Ms. Connor?

25       A.   Polyak was constantly changing the split.  And

Charles P. Ripley                                    3/31/2021

44

1   I don't remember exactly what they split to.  There were

2   several changes and I don't remember the exact splits

3   and then what time they occurred.

4        Q.  Do you remember approximately when in relation

5   to -- strike that.

6             Do you remember the approximate split

7   change?

8        A.  Can you repeat that question, please?

9        Q.  Sure.  Do you remember the approximate split

10  change after the 70/30 range?

11       A.  No.  It just kept going up.  She kept getting a

12  higher percentage and I kept getting a lower percentage.

13       Q.  Did you feel that the change to the 70 -- that

14  first -- strike that.

15            Do you consider that the change to an

16  approximately 70/30 commission split was a breach of

17  Mr. Watson's promise to you?

18       A.  Yes.

19       Q.  And you believe that occurred sometime in 2013?

20       A.  That was the first instance.

21       Q.  And when was -- you had mentioned there was a

22  first instance.  Was there a second instance of breach?

23       A.  During a period of approximately three to four

24  years, yes, there were constant changes to where our

25  compensation -- Rena's compensation was increased and my

**STRYKER REPORTING SERVICES**                  **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

45

 1    compensation was lowered.

 2          Q.  Okay.  And what was the second -- strike that.

 3                What was the breach after the 2013 breach

 4    when there was a 70/30 split between you and Rena that

 5    you believe occurred?

 6          A.  Probably sometime in '14.

 7          Q.  When do you believe -- was there a next breach?

 8          A.  Yes.

 9          Q.  Okay.

10          A.  There were several breaches.

11          Q.  Okay.  I'm good with that.

12          A.  Yes.

13          Q.  So I just want to get the dates on those.  So

14    when do you believe the next breach occurred?

15          A.  Six to nine months later after the first one.

16          Q.  Okay.  So the first one was in 2013; is that

17    fair?

18          A.  Yeah.  I think that's fair.

19          Q.  And you think the second one was probably in

20    2014?

21          A.  Yes.  Probably.

22          Q.  When was the next breach after 2014?

23          A.  It could have been in '14, it could have been

24    in '15.

25          Q.  And what after the breach in -- when you said

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                                50

1   as a result of splitting commissions with Ms. Connor?

2               MS. LAHR:  Object to the form of the

3   question.

4        A.  I still don't understand that question.

5        Q.  (BY MS. DORWART)  Did you receive commission as

6   a result of splitting commissions with Ms. Connor?

7               MS. LAHR:  Object to the form of the

8   question.

9        A.  No.

10       Q.  (BY MS. DORWART)  Did you receive any

11  compensation as a result of splitting commissions with

12  Ms. Connor?

13              MS. LAHR:  Object to the form of the

14  question.

15       A.  No.

16       Q.  (BY MS. DORWART)  Did you receive the benefit

17  of any work of Ms. Connor when she was splitting

18  commissions with you?

19              MS. LAHR:  Object to the form of the

20  question.

21       A.  Yes.

22       Q.  (BY MS. DORWART)  Do you recall approximately

23  how much compensation you received from the firm in

24  2010?

25       A.  I only worked for the firm six months in 2010

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

53

1      Q.  Okay.  Did you have any years that were better

2   than others as far as higher compensation while you

3   worked for the firm?

4      A.  Yes.

5      Q.  What years were those?

6      A.  I believe the peak years were in '15 and '16

7   but I am not sure of those dates.

8      Q.  In those peak years that you had, was

9   Ms. Connor splitting commissions with you at that time?

10     A.  She was, yes.

11     Q.  Was Ms. Connor splitting the workload at that

12  time?

13     A.  We had a partnership.  Yes.

14     Q.  When you say you had a partnership, was there a

15  written agreement?

16     A.  No.  Unless Meredith Watson had one.  Since he

17  proposed it.

18     Q.  As you sit here today, are you aware of any

19  written document regarding a partnership?

20     A.  No.

21     Q.  Would it be fair to say that you made more

22  money during the years that you split commissions with

23  Ms. Connor?

24              MS. LAHR:  Object to the form of the

25  question.

Charles P. Ripley                                    3/31/2021

54

1      A.  That my income was higher than hers?

2      Q.  (BY MS. DORWART)  No.  Would it be fair to say

3  that you made more money during the years that you split

4  commissions with Ms. Connor?

5              MS. LAHR:  Object to the form of the

6  question.

7      A.  Yes.

8      Q.  (BY MS. DORWART)  Do you allege that any of the

9  breaches of the alleged promise that you have described

10 from Mr. Watson regarding your commission never -- your

11 compensation never changing while you were at BOSC are

12 related to age?

13     A.  I don't understand your question.

14     Q.  Do you allege --

15     A.  It's not very succinct.

16     Q.  You have alleged breaches of an alleged promise

17 each time Ms. Connor received a higher commission,

18 correct?

19     A.  Yes.  Because it was taken from me.

20     Q.  Do you allege that that constituted age

21 discrimination?

22              MS. LAHR:  Object to the form of the

23 question.

24     A.  Absolutely.

25     Q.  (BY MS. DORWART)  So in 2013 you allege that

Charles P. Ripley                                    3/31/2021

55

1   when Ms. Connor started splitting commissions with you,

2   that constituted age discrimination?

3            MS. LAHR:  Object to the form of the

4   question.

5      A.  When we first started splitting commissions her

6   commission was paid for by the firm, not out of my

7   pocket.

8      Q.  (BY MS. DORWART)  It's -- the question is, in

9   2013 do you allege that when Ms. Connor started

10  splitting commissions with you that that act of having

11  Ms. Connor split commissions with you constituted age

12  discrimination?

13           MS. LAHR:  Object to the form of the

14  question.

15     A.  No.  Because the firm was paying her

16  compensation.

17     Q.  (BY MS. DORWART)  Was that when she was

18  receiving overrides?

19     A.  All sales assistants received overrides.  But I

20  don't think she received any override once the

21  partnership was formed.

22     Q.  Okay.  And you think that partnership was

23  formed in 2013, correct?

24     A.  Yes.

25     Q.  Are you alleging that you, starting -- can we

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

56

1  refer to the partnership as splitting commissions with

2  Ms. Connor?

3              MS. LAHR:  Object to the form of the

4  question.

5       A.  No.

6       Q.  (BY MS. DORWART)  Why not?

7       A.  Because when we established the partnership we

8  were not splitting commissions.

9       Q.  Okay.

10      A.  She was being paid ten percent override on the

11  gross production by the firm.

12      Q.  Okay.  I want to talk about the difference

13  between that, the ten percent override and when this

14  approximate 70/30 split happened.  There were no more

15  overrides when she started doing a 70/30 split with you,

16  correct?

17      A.  I don't know that it was 70/30 but at one point

18  the ten percent override did go away.

19      Q.  Okay.  Let's talk about that.  When did the ten

20  percent override go away?

21      A.  I believe in 2013.

22      Q.  And that's when you allege the first breach

23  occurred, correct?

24      A.  Yes.

25      Q.  Okay.  Do you allege that the change from the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

57

1    ten percent override being paid by BOSC to you then

2    splitting commissions with Ms. Connor is an act of

3    discrimination?

4         A.  Yes.

5         Q.  When did you first report that act of

6    discrimination that you believe is the change from the

7    ten percent override paid by BOSC to the split of

8    commissions with Ms. Connor, to a state agency, if ever?

9         A.  I did not report it to a state agency.

10        Q.  When did you first report this 2013 change from

11   a ten percent override to a splitting of commissions

12   with Ms. Connor to the Equal Employment Opportunity

13   Commission?

14        A.  When the suit was filed.

15        Q.  And when was that?

16        A.  I don't have the exact date.

17        Q.  Approximately, when?

18        A.  2019.

19        Q.  What facts support your allegation that the

20   change from the ten percent override being paid by BOSC

21   to a split of commissions with Ms. Connor is related to

22   your age?

23        A.  Because the commissions that were taken away

24   from me, my -- it was a breach of the contract.  I had

25   performed my duties under the contract and I was told

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

58

1   that my commissions would not be affected in any way

2   until my retirement.  So as I aged, the commissions were

3   taken away from me and given to a younger person.

4        Q.   What facts do you have to support that the

5   change in that compensation structure was related to

6   your age?

7        A.   The fact that it happened.

8        Q.   Other than the fact that there was a change to

9   split commissions with Ms. Connor, what facts supports

10  the allegation that that change to splitting commissions

11  with Ms. Connor was related to your age?

12       A.   I thought I answered your question regarding

13  that.

14       Q.   Do you have any other facts other than the fact

15  that you had the change in the split of commissions to

16  relate that change to your age?

17       A.   Well, I was intimidated to do that by

18  Mr. Polyak, that I -- there would be serious

19  consequences and I felt like that that was related to my

20  age.

21       Q.   Did anyone use the words, we're going to have

22  you split commissions with Rena because you are old?

23            MS. LAHR:  Object to the form of the

24  question.

25       A.   No.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                           3/31/2021

59

1        Q.   (BY MS. DORWART)  Did anyone use the words we

2   are going to have you split commissions with Rena Connor

3   because you are not young?

4             MS. LAHR:  Object to the form of the

5   question.

6        A.   No.

7        Q.   (BY MS. DORWART)  Did anyone in any way explain

8   to you that the change in your split of commissions with

9   Rena Connor was in any way related to your age?

10       A.   No.

11            MS. LAHR:  Object to the form of the

12   question.

13       Q.   (BY MS. DORWART)  What facts do you have to

14   relate the change from a ten percent override being paid

15   by BOSC to splitting commissions with Ms. Connor as

16   related to age?

17       A.   The fact that it occurred.

18       Q.   Did any employee of the firm tell jokes about

19   your age while you were employed at BOSC?

20       A.   Not to my knowledge.

21       Q.   Are you still employed at BOSC, Inc.?

22       A.   Excuse me?

23       Q.   Are you still employed at BOSC, Inc.?

24       A.   Yes.

25       Q.   Did anyone at BOSC, Inc. do anything to express

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

60

1  to you comments related to age?

2      A.  Could you repeat that question, please?

3      Q.  Did anyone at BOSC, Inc. do anything to express

4  to you comments related to age?

5      A.  There were comments made about when I was going

6  to retire and I assume that that means because of age

7  indirectly.

8      Q.  Other than alleged comments regarding when you

9  were going to retire, were there any comments made to

10  you related to age?

11      A.  Not to my knowledge.

12      Q.  Who allegedly made a comment to you regarding

13  you retiring?

14      A.  Polyak made several comments, many comments.

15      Q.  When did Polyak first make a comment to you

16  regarding you retiring?

17      A.  At the time that he was basically asking me to

18  accept a reduction in my commission structure and pay

19  whatever that difference was to Ms. Connor.

20      Q.  Was that in 2013?

21      A.  It was every time we met about compensation.

22      Q.  Is it your allegation that every time you met

23  regarding compensation that Mr. Polyak used the word

24  retire?

25              MS. LAHR:  Object to the form of the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

61

1    question.

2        A.  Yes.

3        Q.  (BY MS. DORWART)  And you believe that started

4    in 2013?

5        A.  Whatever date it was that he decided to change

6    my compensation.

7        Q.  And what words did Mr. Polyak use that you

8    believe constitute to the age discrimination?

9                MS. LAHR:  Object to the form of the

10   question.

11       Q.  (BY MS. DORWART)  If any?

12       A.  Just as -- just to retirement, I guess.

13       Q.  And how many conversations do you think you had

14   with Mr. Polyak in which the word retirement was used?

15       A.  Many.

16       Q.  How many is many?

17       A.  12, 15.

18       Q.  Approximately, when did these 12 to 15

19   conversations occur?

20       A.  Between 2013 and -- 2013 up until the year

21   ending in 2019.

22       Q.  Did your compensation change approximately 12

23   to 15 times between 2013 and 2019?

24       A.  No.

25       Q.  Did this alleged reference to retirement only

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

62

1    occur in respect to a conversation regarding a change in

2    compensation?

3          A.   Yes.

4          Q.   And how many times do you think your

5    compensation structure changed between 2013 and 2019?

6          A.   Approximately, four to five times.

7          Q.   Would it be fair to say then, that you had

8    approximately four to five conversations during which

9    you allege Mr. Polyak mentioned the word retirement?

10               MS. LAHR:   Object to the form of the

11   question.

12         A.   As far as it revolved around the change in

13   compensation, yes.

14         Q.   (BY MS. DORWART)  Other than discussing a

15   change in compensation did Mr. Polyak ever mention

16   retirement?

17         A.   He would drop it occasionally.

18         Q.   How often is occasionally?

19         A.   Maybe two or three times a year.

20         Q.   Two or three times a year in addition to that

21   conversation regarding a change in compensation?

22         A.   Yes.

23         Q.   Are there any writings from Mr. Polyak

24   mentioning the word retirement, as far as you are aware?

25         A.   Not that I'm aware.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              63

1       Q.   Did anyone other than Mr. Polyak ever use the

2   word retirement with you in their role for BOSC, Inc.?

3       A.   Watson, Meredith Watson.

4       Q.   And when did Mr. Watson use the word retirement

5   with you?

6       A.   He used the word retirement when we first

7   initially met about forming the partnership and between

8   then and when he retired in conversations occasionally

9   at a BOSC function or over the phone he would throw the

10  term out.

11      Q.   Now when you first met about forming the

12  partnership, you're referring to that forming the

13  partnership as the time period when Ms. Connor was

14  getting a ten percent override, correct?

15      A.   When the partnership was formed, as I

16  understood it, Mr. Watson agreed to pay her ten percent

17  of the override on the gross commissions that were

18  generated by the partnership.  And that she would no

19  longer be a salaried employee and that her compensation

20  would be based upon the total revenue of the

21  partnership.

22      Q.   Did Mr. Watson ever promise to pay -- strike

23  that.

24           When Mr. Watson made the promise to you did

25  he mention anything other than the ten percent override?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

64

```
1      A.  As far as compensation?
2      Q.  Yes.
3      A.  No.
4      Q.  So it's fair to say that Mr. Watson only
5  promised that BOSC would pay the ten percent override,
6  correct?
7              MS. LAHR:  Object to the form of the
8  question, mischaracterizes prior testimony.
9      A.  Watson promised that he was going to pay that
10 override for a certain period of time.  But that was an
11 agreement between him and Connor.
12     Q.  (BY MS. DORWART)  What period of time did
13 Mr. Watson promise?
14     A.  I don't know.  I wasn't --
15     Q.  Okay.
16     A.  I wasn't privy to the conversations that he and
17 Rena had regarding her compensation.
18     Q.  When you had the conversation with Mr. Watson
19 that you allege was a promise, that was when Mr. Watson
20 promised to pay ten percent overrides, correct?
21             MS. LAHR:  Object to the form of the
22 question.
23     A.  Yes.
24     Q.  (BY MS. DORWART)  Did Mr. Watson ever promise
25 to pay any kind of split commission with Ms. Connor?
```

Charles P. Ripley                                    3/31/2021

65

1           MS. LAHR:  Object to the form of the

2    question.

3        A.  No.

4        Q.  (BY MS. DORWART)  Was there any discussion

5    during this alleged meeting regarding the promise of

6    Mr. Watson to you regarding Ms. Connor having a pure

7    split of commissions with you such as the range of 70/30

8    that we discussed earlier today?

9        A.  Absolutely not.

10       Q.  Was the promise of Mr. Watson to pay ten

11   percent overrides to Ms. Connor made for a time period

12   longer than a year?

13       A.  I have no idea.

14       Q.  Was there any kind of time limit on this

15   alleged promise of Mr. Watson to pay ten percent

16   overrides to Rena Connor?

17       A.  I don't know.

18       Q.  Do you allege that Mr. Polyak's alleged

19   reference to retirement constituted age discrimination?

20       A.  Yes.

21       Q.  Okay.  Do you think that happened 12 to 15

22   times between 2013 and 2019?

23       A.  Yes.  They --

24       Q.  Did you --

25       A.  Excuse me?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                           3/31/2021

66

1          Q.  Did you report the first instance that
2     Mr. Polyak used a reference to retirement with you to
3     HR?
4          A.  No.
5          Q.  Did you report the first reference that
6     Mr. Polyak used a reference to retirement with you to
7     the Equal Employment Opportunity Commission?
8          A.  I didn't understand the question.
9          Q.  Sure.  Did you report the very first reference
10    that Mr. Polyak used a reference to retirement with you
11    to the Equal Employment Opportunity Commission?
12         A.  I'm not sure.
13         Q.  How many times have you reported alleged age
14    discrimination to the Equal Employment Opportunity
15    Commission?
16         A.  In our original filing only.
17         Q.  Do you allege any acts of discrimination have
18    occurred after your original filing with the EEOC?
19         A.  Yes.
20         Q.  And what are those alleged acts?
21         A.  Multiple accounts were taken away from me and
22    reassigned to other people within the organization that
23    were in sales.
24         Q.  What accounts have been taken away from you
25    after your original filing with the EEOC?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

67

1     A.  I have a list that I have provided but I can't

2  name them off.

3     Q.  Are you able to identify any account that was

4  taken away from you after your original filing with the

5  EEOC?

6     A.  AIG, UBS, Wealth Management, Goldman Sachs

7  Asset Management, Southside Bank, First Financial Trust,

8  Belle Haven Investment Management.  And Vining Sparks.

9     Q.  Can you spell that, please?

10    A.  V-i-n like victory V-i-n-i-n-g comma Sparks,

11  S-p-a-r-k-s.  Deutsch Asset Management, D-e-u-t-s-c-h.

12  Merrill Lynch ARB, First New York Securities, Scarsdale.

13  That's all I can remember but there are more.

14    Q.  Okay.  Are you alleging that -- strike that.

15              When are you alleging that AIG was

16  transferred away from you?

17    A.  2019.

18    Q.  And UBS?

19    A.  All of these account reassignments were between

20  January of 2018 and throughout 2019 extending into 2020

21  at various times.

22    Q.  What account was removed from you in 2020, if

23  any?

24    A.  I can't tell you exact times of when these

25  accounts were removed.  I gave you a time frame and

Charles P. Ripley                                    3/31/2021

68

1   that's the best I can do.

2        Q.   Were some of these accounts removed after you

3   made the filing with the EEOC?

4        A.   Yes.

5        Q.   Okay.  Which ones of those were after you made

6   the filing?

7        A.   I don't have that information available.

8        Q.   Were the bulk of accounts that were removed

9   from you removed from you during the first half of 2018?

10       A.   I don't know.

11       Q.   Okay.  Did you ever agree to transfer any of

12  the accounts away from you?

13            MS. LAHR:  Object to the form of the

14  question.

15       A.   I had no say-so in the matter.  It was done by

16  Polyak and Jerry Williams.

17       Q.   (BY MS. DORWART)  Did Ms. Connor leave BOS- --

18  strike that.

19            Did Ms. Connor leave the firm at any point

20  in time during your employment?

21       A.   I believe her resignation date was January the

22  4th of 2018.

23       Q.   Did you have any meetings with anyone in the

24  Dallas office regarding account assignments following

25  the resignation of Ms. Connor?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

69

1       A.   There were numerous meetings with Polyak.   Some
2   other salespeople were involved and some of them
3   one-on-one with Polyak.

4       Q.   And when did these numerous meetings with
5   Polyak --

6       A.   Beginning after the -- Rena's departure --

7       Q.   Okay.

8       A.   -- in -- up until the present.

9       Q.   Prior to Rena's departure did any accounts that
10  you were handling transfer to other sales personnel?

11      A.   Not to my knowledge.

12      Q.   Did anyone share with you -- strike that.

13           Did anyone share with you why any accounts
14  were transferring to another sales officer after Rena
15  Connor's departure?

16      A.   Yes.

17      Q.   And who was that?

18      A.   Polyak and Williams.

19      Q.   And what, if anything, did Polyak and Williams
20  share with you?

21      A.   They said I had too many accounts.   And Polyak
22  said that Rena told her or told him, excuse me, that I
23  was not capable of handling the whole account package
24  supposedly after her resignation.

25           Which I questioned and Polyak acquiesced

Charles P. Ripley                                    3/31/2021

72

1  against a person, taking away revenue from the firm and

2  reassigning it to someone else.

3      Q.  Now the accounts that you had in 2017, you were

4  working as a team with Rena Connor on, correct?

5      A.  Yes.

6      Q.  And the two of you were performing that work,

7  correct?

8      A.  Correct.

9      Q.  So the accounts -- were those accounts

10 maintained under a rep code?

11     A.  Yes.

12     Q.  And what was that rep code?

13     A.  CXR.

14     Q.  Okay.  And that rep code was a shared rep code

15 between you and Rena Connor, correct?

16     A.  That's how the split in our commission revenue

17 was paid to us.

18     Q.  Okay.

19     A.  Correct.

20     Q.  And both you and Ms. Connor worked those

21 accounts in 2017, correct?

22     A.  As a partnership, yes.

23     Q.  And both you and Ms. Connor had been working

24 those accounts since at least 2013, correct?

25     A.  Correct.

**STRYKER REPORTING SERVICES**                **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

73

1      Q.   Okay.   And so when Ms. Connor left that shared

2  set of accounts was reviewed by members of BOSC,

3  correct?

4                MS. LAHR:   Object to the form of the

5  question.

6      A.   The account -- the accounts were reviewed by

7  Polyak.

8      Q.   (BY MS. DORWART)   Okay.   So it's fair to say

9  that the accounts that you and Ms. Connor had been

10  jointly servicing were reviewed by Mr. Polyak after

11  Ms. Connor left, correct?

12      A.   Correct.

13      Q.   And some accounts were redistributed, correct?

14      A.   Correct.

15      Q.   To whom was AIG distributed, if you know?

16      A.   I believe to Glenn Smith.

17      Q.   Where did Glenn Smith work?

18      A.   Little Rock.

19      Q.   Okay.   Approximately, how old was Glenn Smith,

20  if you know?

21      A.   I don't know.

22      Q.   Approximately, how many years had Glenn Smith

23  worked at BOS- -- at the firm, if you know?

24      A.   I don't know.   Quite sometime, though, I do

25  know that.   I believe that he and Jerry Williams came to

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

74

1   work about the same time.

2       Q.   And approximately when did Jerry Williams come

3   to work at BOSC?

4       A.   I actually don't know.  He was employed

5   there -- already employed there when I went to work in

6   2010.

7       Q.   So it's fair to say that Glenn Smith had at

8   least ten years tenure with the firm when the AIG

9   account was transferred to him, correct?

10      A.   Yes.

11      Q.   Okay.  Do you think Mr. Smith was under 40?

12      A.   No.

13      Q.   Do you think Mr. Smith was under 50?

14      A.   Yes.

15      Q.   And to whom was the UBS account transferred, if

16  you know?

17      A.   I believe John Monaghan.

18      Q.   Where did Mr. Monaghan work?

19      A.   Dallas.

20      Q.   Approximately, how many years had Mr. Monaghan

21  worked in the industry, if you know?

22      A.   I don't know.

23      Q.   Approximately, how old is Mr. Monaghan, if you

24  know?

25      A.   50ish.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

75

1        Q.   To whom was the Goldman Sachs account
2    transferred?
3        A.   Monaghan.
4        Q.   Did anyone explain to you why the Goldman Sachs
5    account was being transferred to Mr. Monaghan?
6        A.   Yes.
7        Q.   And what was that explanation?
8        A.   Their -- Goldman Sachs under their wealth
9    management division had a private -- Goldman Sachs
10   Private Wealth was a term that was used for one division
11   and Goldman Sachs Asset Management was the other
12   division.  Monaghan covered Private Wealth.  I covered
13   GSAM which was a very profitable account.
14              And Goldman Sachs decided to combine the
15   two entities under another division in some way.  I
16   don't know the internal explanation.  But they
17   specifically declared what they were doing was that one
18   account Private Wealth and Goldman Sachs Asset
19   Management GSAM could -- neither one of those divisions
20   could know what the other one was doing.
21              There was a -- basically a separation
22   between the two, to Asset Management ARMS, I guess for
23   lack of a better term.  But since they had combined them
24   Polyak decided there would be -- that Monaghan was more
25   qualified to cover the account than I was.

**STRYKER REPORTING SERVICES**              **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

76

1       Q.   Do you have --

2       A.   And that's the explanation I was given by

3  Polyak.  But it was a very distinct that in

4  conversations that there was to be a very clear

5  distinction in talking to Goldman Sachs Asset

6  Management.

7            Normally the two accounts were -- the other

8  firms that covered them, the same person did not cover

9  them from the same account, keep them separate.

10      Q.   Okay.  So prior to the combination of Private

11 Wealth and GSAM Goldman Sachs kept them separate,

12 correct?

13      A.   They were not under the same umbrella.

14      Q.   Okay.  And then Goldman Sachs at some point in

15 time determined to combine Private Wealth and GSAM,

16 correct?

17      A.   Yes.  For -- it was explained to me just from

18 an operational standpoint.

19      Q.   Do you have any reason to dispute that Goldman

20 Sachs determined to combine Private Wealth and GSAM?

21      A.   I didn't understand that question.

22      Q.   Do you have any reason to dispute that Goldman

23 Sachs determined to combine Private Wealth and GSAM?

24      A.   No.  We had correspondence from them saying

25 that they were going to do that.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

77

1        Q.   Was the Goldman Sachs GSAM account transferred

2    from you prior to receiving information from Goldman

3    Sachs?

4              MS. LAHR:   Object to the form of the

5    question.

6        Q.   (BY MS. DORWART)   Saying that they were going

7    to combine Private Wealth and GSAM?

8        A.   No.   All the communication or the assignment --

9    the reassignment was made after the announcement by

10   Goldman.

11       Q.   What facts do you have to support the

12   allegations that a reassignment of GSAM to John Monaghan

13   was based upon your age?

14       A.   There was no other reason for the reassignment.

15   It was a highly-productive account and there was no

16   reason to assign it to someone else.

17       Q.   Did you believe that you should have received

18   the portion of Private Wealth that was prior to Goldman

19   Sachs' combination handled by Monaghan?

20       A.   No.   I believed that Goldman's wishes to keep

21   the two accounts very separate and for one not to know

22   what the other was doing -- to keep that efficiently

23   managed it should be by two people.

24       Q.   Did you talk to Goldman Sachs after Goldman

25   Sachs sent to BOS- -- strike that.

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

80

1    allegation that the account being moved to Mr. Monaghan

2    was age discrimination?

3          A.    That's a hundred percent why it was done.

4          Q.    Only because it was moved?

5          A.    Pardon me?

6          Q.    You think the account -- strike that.

7                The only fact that you have to support your

8    age discrimination claim with respect to a move of the

9    Goldman Sachs GSAM account is the fact that the account

10   moved, correct?

11               MS. LAHR:  Object to the form of the

12   question.

13         A.    Correct.  I -- correct.  Because I don't know

14   that it was -- that -- I don't think it was an advantage

15   from a revenue standpoint of BOSC to combine them like

16   they did.

17               (Reporter clarification.)

18         A.    I don't think it was to the benefit of revenue

19   to BOK Financial.

20         Q.    (BY MS. DORWART)  Okay.  What facts do you have

21   other than the fact that the account was -- the GSAM

22   portion of the account was assigned to Mr. Monaghan to

23   support your allegation that the move of the GSAM

24   account to John Monaghan constituted age discrimination?

25         A.    The fact that it occurred.

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

82

1          (Break taken from 11:21 a.m. to 11:31 a.m.)

2          THE VIDEOGRAPHER:  We are back on the

3   record at 11:38.

4      Q.  (BY MS. DORWART)  Did you tell Mr. Polyak that

5   Mr. Kim had said he was fine leaving the split of duties

6   between GSAM and Private Wealth after BOK FS received

7   notice from Goldman Sachs that Goldman Sachs was

8   combining their side of the business?

9      A.  I either told him or gave him a copy of the

10  Bloomberg message that was between, you know, between

11  the two of us.

12     Q.  (BY MS. DORWART)  Is that Bloomberg message in

13  the Redweld folder that you brought today?

14     A.  I don't know.

15     Q.  Did you print the Bloomberg message for

16  purposes of this deposition?

17     A.  I did.

18     Q.  To whom -- strike that.

19          To whom did the Southside Bank account --

20  strike that.

21          To whom was the Southside Bank account

22  transferred after you, for handling?

23     A.  I don't know.

24     Q.  Do you know if you offered the Southside Bank

25  account up for reassignment?

**STRYKER REPORTING SERVICES**                      **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

83

1          A.   I don't understand your question.

2          Q.   Did you ever offer the Southside Bank account

3    up for reassignment?

4          A.   No.

5          Q.   Did you offer any accounts up for reassignment

6    following the departure of Rena Connor?

7          A.   At Polyak's request all of us had to submit a

8    few accounts that -- not only accounts that Rena and I

9    covered but just out of the whole universe of accounts

10   that were assigned to the institutional salespeople in

11   our office.

12         Q.   And as part of Polyak's request to all of the

13   institutional sales officers in the office to submit a

14   few accounts for reassignment, did you submit accounts

15   for reassignment?

16         A.   Yes.

17         Q.   And what accounts were those?

18         A.   I don't remember.

19         Q.   Was there an email where you submitted those

20   accounts for reassignment?

21         A.   Polyak would have that.  Yes.

22         Q.   Are you as part of your lawsuit today seeking

23   damages with respect to accounts that you submitted to

24   Polyak for reassignment?

25         A.   No.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

92

1  that the transfer of the account for handling by another

2  sales officer was based upon your age?

3       A.   Just that it was done.  Yes.

4       Q.   And when you say just that it was done, it's

5  the mere fact that the account was transferred you

6  believe constitutes age discrimination?

7       A.   Yes.  There was no reason to transfer the

8  accounts if they were productive.

9       Q.   Now you mentioned that there was a tranche of

10 accounts that transferred in the first quarter of 2018

11 after Rena Connor left, correct?

12      A.   That was the initial -- yeah.  That was the

13 initial transfer of accounts by Nick.

14      Q.   Okay.

15      A.   It all started -- it all began when Rena left.

16      Q.   And you mentioned there may have been a second

17 tranche of accounts that transferred?

18      A.   The first big tranche was all the salesmen in

19 the office were included.  And in theory it was to share

20 different accounts' information and see if some of those

21 accounts could be reassigned to other people that could

22 be more productive and increase the revenue to the bank.

23            And there were numerous accounts that were

24 swapped within the group, except I had -- I was the only

25 one that had to give up accounts and not receive

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

93

1  anything in return.

2              After that meeting and after those

3  transfers of those accounts I had probably, you know, I

4  had several meetings with Polyak where he was inquiring

5  about other accounts and then transferring them to other

6  people within the firm.

7       Q.  Were you the only one in 2017 who shared a rep

8  code with another sales officer in the Richardson

9  office?

10      A.  I don't know.

11      Q.  Are you aware of anyone else who shared a rep

12  code in the Richardson officer in 2017, other than you

13  and Rena Connor?

14      A.  I don't know of anybody.  I can't answer that

15  question.

16      Q.  Now you mentioned a few accounts that

17  transferred in 2019.

18      A.  There was a list of ten at one point and then

19  Merrill Lynch was an outside event, as you mentioned.

20  First New York was an outside event I believe.

21      Q.  Did you go to human resources in 2019 regarding

22  the list of ten accounts that transferred?

23      A.  No.

24      Q.  Did you go to the EEOC in 2019 regarding the

25  list of ten accounts that transferred?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

94

1              MS. LAHR:  Object to the form of the

2    question.

3       A.  I don't know if they were included in our

4    filing or not.

5       Q.  (BY MS. DORWART)  And you're only aware of one

6    filing with the EEOC, correct?

7       A.  That's correct.

8       Q.  Did you seek any relief from a state agency

9    with respect to the ten -- list of ten accounts that

10   transferred in 2019?

11      A.  Not to my knowledge.

12      Q.  Are you alleging that the transfer of the list

13   of ten accounts that occurred in 2019 was an adverse

14   action with respect to your age?

15              MS. LAHR:  Object to the form of the

16   question.

17      A.  Yes.

18      Q.  (BY MS. DORWART)  Are you alleging that the

19   transfer of accounts following Rena Connor's departure

20   in 2018 constituted an adverse action with respect to

21   your age?

22              MS. LAHR:  Object to the form of the

23   question.

24      A.  Yes.

25      Q.  (BY MS. DORWART)  What facts do you have to

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

95

1    support your allegation that the transfer of the ten

2    accounts in 2019 was based upon your age?

3         A.   The act itself.

4         Q.   Simply the transfer of the accounts?

5         A.   Yes.

6         Q.   No other facts?

7         A.   Correct.

8              MS. LAHR:  Object to the form of the

9    question.

10        Q.   (BY MS. DORWART)  And what facts do you have to

11   support your allegation that the transfer of accounts in

12   2018 following the resignation of Rena Connor was based

13   upon your age?

14             MS. LAHR:  Object to the form of the

15   question.

16        A.   The fact that the event occurred.

17        Q.   (BY MS. DORWART)  Did you contact BOK FS human

18   resources with respect to the transfer of accounts

19   following the departure of Rena Connor?

20        A.   Yes.

21        Q.   Did you mention the word age when you contacted

22   human resources regarding the transfer of accounts

23   following the departure of Rena Connor?

24        A.   Yes.

25        Q.   Is there a writing in which you used the word

Charles P. Ripley                                    3/31/2021

96

1  age when you contacted HR at BOK FS following the

2  transfer of accounts following the departure of Rena

3  Connor?

4        A.   I presume so because I contacted them and there

5  were emails going back and forth between myself and Kari

6  Goins.

7        Q.   Did you use the word age in your emails?

8        A.   I believe so.

9        Q.   Did you orally use the word age in

10  conversations with Kari Goins?

11        A.   Yes.

12        Q.   Other than the transfer of accounts following

13  the departure of Rena Connor, are you alleging that you

14  suffered any adverse action based upon your age?

15              MS. LAHR:  Object to the form of the

16  question.

17        A.   Yes.

18        Q.   (BY MS. DORWART)  And what is that?

19        A.   Income loss.

20        Q.   Other than this income -- the income loss was

21  associated with the transfer of accounts, correct?

22              MS. LAHR:  Object to the form of the

23  question.

24        A.   Yes.

25        Q.   (BY MS. DORWART)  And other than income loss

Charles P. Ripley                                    3/31/2021

                                                              102

1        Q.  Did you do anything to equalize the payout

2   between you and Rena Connor?

3              MS. LAHR:  Object to the form of the

4   question.

5        A.  It was forced upon me.  Yes.

6        Q.  (BY MS. DORWART)  And when was it forced upon

7   you to equalize the payouts between you and Rena Connor?

8        A.  Every time we had a discussion with Nick about

9   it.

10       Q.  Do you think Nick was attempting to equalize

11  the payouts to Rena Connor when he asked you to take

12  less commission?

13             MS. LAHR:  Object to the form of the

14  question.

15       A.  That was obvious.

16             MS. DORWART:  Probably a good time to take

17  lunch since it's noon, see you guys back here at 1:00.

18             THE VIDEOGRAPHER:  We are off the record at

19  12:01 p.m.

20             (Break taken from 12:03 p.m. to 1:03 p.m.)

21             THE VIDEOGRAPHER:  We are back on the

22  record at 1:03 p.m.

23       Q.  (BY MS. DORWART)  Mr. Ripley, did you have a

24  chance to get lunch?

25       A.  I grabbed a cup of coffee and something with

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

103

1  calories in it, yes.

2      Q.   Okay.

3      A.   Thank you.

4      Q.   Have you sufficiently nutritioned yourself?

5      A.   Probably not in a very healthy way.

6             MS. LAHR:  That's a questionable question

7  about it.

8      A.   But yes.

9      Q.   (BY MS. DORWART)  And did you talk to anybody

10 about this case over lunch?

11     A.   No.  I did ask my attorney one question.

12     Q.   And what question?

13     A.   About when we filed -- when I hired her and

14 when we filed with the EEOC.

15     Q.   And you hired --

16     A.   Because I was confused between '18 and '19.

17 And she said we filed -- I hired her in '18.

18     Q.   Okay.  You hired her in '18 and she told you

19 that?

20     A.   Yeah.

21     Q.   And you filed with the EEOC in '18?

22     A.   Yes.

23     Q.   Did you actually write out your EEOC charge or

24 did someone else write it out for you and you just sign

25 it?

**STRYKER REPORTING SERVICES**              **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              104

1        A.  I allowed my attorney to write it out.

2        Q.  So knowing that you filed with the EEOC in 2018

3    do you remember the exact -- closer to the month or the

4    year?

5        A.  No.

6        Q.  You didn't talk to her about the date, just the

7    year?

8        A.  No.  No, I just asked her about the year.

9        Q.  And knowing now that you filed the EEOC charge

10   that Ms. Lahr wrote and you signed in 2018, does that

11   refresh your recollection as to when you met Ms. Lahr?

12       A.  Prior to -- a few months prior to our filing.

13       Q.  Did you first meet Ms. Lahr in 2018?

14       A.  Yes.

15       Q.  Okay.  How did you come to find Ms. Lahr?

16            MS. LAHR:  It's actually Lahr, FYI.

17            MS. DORWART:  Sorry.

18            MS. LAHR:  That's okay.

19       A.  An attorney that was a friend of mine

20   recommended her.

21       Q.  (BY MS. DORWART)  And who is that friend?

22       A.  Steve Cooper.

23       Q.  Cooper, C-o-o-p-e-r?

24       A.  Yes.  Correct.

25       Q.  And how long have you known Mr. Cooper?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

105

1        A.   Seven to ten years I guess.

2        Q.   Did you speak to Mr. Cooper about this case?

3        A.   I told him what the basics were so that he

4   could recommend someone.

5        Q.   And when did you speak to Mr. Cooper about the

6   basics?

7        A.   The spring of '18.

8        Q.   Had you been counseled by anyone at BOK FS

9   regarding any performance issues prior to the spring of

10  2018?

11       A.   No.

12       Q.   Had you been counselled by BOK FS with respect

13  to sending out confidential information?

14       A.   Yes.

15       Q.   Was that prior to the spring of 2018?

16       A.   Yes.  Well, I believe so, yes.

17       Q.   Had you been counseled regarding activity

18  levels with customers, by BOSC?

19       A.   In the form of complaint, whatever complaint

20  form that they have.

21       Q.   Did you get a counseling report from BOK FS

22  regarding activity levels with customers?

23       A.   I don't know.  What -- I'm not sure what it was

24  called.

25       Q.   Okay.  Well, tell me what you think you saw.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

106

1       A.   I received a report from HR about three

2   different incidents that Mr. Polyak was questioning my

3   performance on.

4       Q.   And when did you receive that report from HR?

5       A.   I believe April or May of 2019.

6       Q.   2019?  Or 2018?

7       A.   2018, I'm sorry.  I think it was -- I mean, I

8   was -- I had my date confused about when Rena resigned.

9       Q.   And how did you come to receive a report from

10  HR about three different incidents that Mr. Polyak was

11  questioning your performance on?

12      A.   How did I receive it?

13      Q.   Yes.

14      A.   I presume that I received an email with an

15  attachment.

16      Q.   Did a person come down and talk to you about

17  it?

18      A.   No.

19      Q.   Did Mr. Polyak speak to you about the

20  counseling report?

21      A.   He and I did speak about it, yes.

22      Q.   Okay.  And when did you speak to Mr. Polyak

23  about it?

24      A.   At the time he was filing it.

25      Q.   Was Mr. Polyak filing the report in

Charles P. Ripley                                    3/31/2021

107

1  approximately the same time that you were looking at

2  transferring of accounts?

3       A.  No. He didn't.

4       Q.  Did you ever talk to Kari Goins regarding the

5  report that Mr. Polyak --

6       A.  Yes.

7       Q.  Okay.  And when did you talk to Ms. Goins?

8       A.  After the report was filed.

9       Q.  Approximately, what time of the year?

10      A.  Shortly after the report was filed.

11      Q.  Had you ever spoken to Ms. Goins before talking

12  to her about the report?

13      A.  I don't think so.

14      Q.  Did she come down to Texas?

15      A.  She did.  But it was not related to the report.

16      Q.  What's your best memory of what the contents of

17  the report were, if any?

18      A.  It was -- one was a report about a position we

19  had, an underwriting position, Richardson ISD.  The

20  second report was on a transaction over -- transactions

21  over a couple of days with an account called Hopwood.

22           And I think the other one was sending out a

23  customer offering.

24      Q.  Did you take any action in response to

25  receiving the report from Mr. Polyak?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                            3/31/2021

                                                                    108

1              MS. LAHR:  Object to the form of the

2     question.

3          A.  After a discussion with Kari Goins I filed a

4     rebuttal to all accusations.

5          Q.  (BY MS. DORWART)  And in what form did that

6     rebuttal take?

7          A.  In what form?

8          Q.  Yes.  With the rebuttal?

9          A.  It was channeled back to the same source that I

10    received the report from.  So I assumed it went to HR,

11    Kari, etcetera.

12         Q.  Was it an email?

13         A.  Pardon me?

14         Q.  Was it an email?

15         A.  Yes.  It was an email.

16         Q.  Did that email rebuttal pertaining to

17    performance issues contain the word age in it?

18         A.  I don't believe so.

19              (Exhibit No. 122 was marked.)

20         Q.  (BY MS. DORWART)  Okay.  I'm going to hand you

21    what's been marked as Exhibit 122.

22              MS. LAHR:  122?

23              MS. DORWART:  Yes, ma'am.  Skipping around.

24              MS. LAHR:  Okay.

25              MS. DORWART:  Oops, sorry everybody.  Hold

Charles P. Ripley                                    3/31/2021

                                                              110

1        Q.  Did Mr. Polyak talk to you about discussing

2    levels of communications with customers in 2018?

3        A.  No.

4        Q.  Is there a person by the name of Jordan at

5    Merrill?

6        A.  Yes.

7        Q.  How was your relationship with Jordan?

8        A.  Excellent.  We had developed a close personal

9    and professional relationship over a period of years.

10       Q.  Did you ever tell anyone that Jordan had you in

11   the quote, penalty box?

12       A.  He basically told me that.

13       Q.  Jordan did?

14       A.  Yes.  That our firm was in the penalty box,

15   yes, he told me.

16       Q.  And when did Jordan tell you that?

17       A.  I don't recall the exact date.

18       Q.  Approximately, when did Mr. Jordan tell you

19   that the firm was in the penalty box?

20       A.  2018/19.

21       Q.  Did Mr. Jordan tell you that --

22       A.  His name was Jordan Culbreath, I think.  Jordan

23   is his first name.

24       Q.  Thank you.  Did Jordan Culbreath tell you that

25   BOSC was in the penalty box about the same time that the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                                3/31/2021

111

1    Merrill Lynch account was reassigned?

2          A.  He told me that before the account was

3    reassigned.  And we're not providing the level of

4    service that he expected because we were not supporting

5    our own deals.  And we had no interest in the bonds he

6    was trading in.

7                    That our trading desk was not supporting of

8    what he was trying to establish.

9          Q.  Did you tell Mr. -- did you communicate to

10   Mr. Polyak that Jordan Culbreath at Merrill had told you

11   that we were not providing -- strike that.

12                   That the firm was not providing the level

13   of service that Jordan expected?

14         A.  Yes.

15         Q.  Did you communicate to Mr. Polyak that

16   Mr. Jordan Culbreath had said the firm was not providing

17   the level of service that Jordan Culbreath expected

18   prior to the account transferring from you to another

19   sales officer?

20         A.  Yes.

21         Q.  Was the account transferred roughly around the

22   same time that you told Mr. Polyak that Mr. Jordan had

23   stated that the firm was not providing the level of

24   service expected?

25         A.  Yes.

**STRYKER REPORTING SERVICES**                      **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

113

1         A.   That Polyak had made the decision and he
2    supported it.
3         Q.   Is that all that he told you?
4         A.   Yes.
5         Q.   Did he send you an email?
6         A.   I believe so but I'm not sure.
7         Q.   Do you recall the contents of the email?
8         A.   If there was an email what I just described
9    would be the accurate description of what was in the
10   email.
11        Q.   Okay.  Have you been doing any secondary
12   business on the Merrill account before it was
13   transferred?
14        A.   Yes.
15        Q.   Did Mr. Williams tell you that he was
16   transferring the account to see if he could get more
17   secondary business out of Merrill?
18        A.   Yes.
19        Q.   Do you have any reason to dispute that
20   Mr. Williams wanted to get more secondary business out
21   of the Merrill account as a result of the transfer?
22        A.   No.  We all expect more business.
23                  (Exhibit No. 110 was marked.)
24        Q.   (BY MS. DORWART)  Okay.  I'm going to hand you
25   what I'm marking as Exhibit 110 which is a two-page

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

115

1       A.  Yes.

2       Q.  And does that reflect that as of February 1 of

3   2017 that the percent of books to Rip was 70 percent?

4       A.  Yes.  I can read the document.

5       Q.  Okay.  And Rip is you; right, Mr. Ripley?

6       A.  Yes.

7       Q.  And the percent of books of the payout to Rena

8   was 30 percent, correct?

9       A.  Yes.

10      Q.  Okay.  So is it fair to say that from 2013 when

11  you started splitting commissions with Rena to 2017

12  there had been no changes to the percentage of payouts

13  between you and Rena?

14          MS. LAHR:  Object to the form of the

15  question.  Percentage of the book?  I think there's two

16  different things here, payout and percent of book and

17  that's my objection.

18      A.  No, that's not an accurate statement.

19      Q.  (BY MS. DORWART)  Okay.  Why not?

20      A.  Because it changed from 14 in this proposal

21  here.  Let's see.  January 1st of '18.  That there were

22  numerous changes in the commission payout starting about

23  six to nine months after it was established, maybe at

24  the most a year.

25      Q.  Okay.  And when was the last time you were told

Charles P. Ripley                                    3/31/2021

116

1   what the payout structure would be as far as changes

2   being made prior to Rena Connor leaving?

3        A.  I believe this was the final document.

4        Q.  So it's fair to say that on August 17, 2017 you

5   were provided with the last set of changes to

6   partnership payouts prior to Rena leaving, correct?

7        A.  True.

8        Q.  Okay.  Did you consider this change in payouts

9   that was presented in August 17, 2017 as an adverse

10  action?

11       A.  I did.

12       Q.  And you were aware of the adverse action as of

13  August 17, 2017, correct?

14              MS. LAHR:  Object to the form of the

15  question.

16       A.  This is the final document that I have on the

17  compensation.  And I -- it was -- basically forced to

18  agree.

19       Q.  (BY MS. DORWART)  And you were aware that the

20  changes would be made, not the effective date of them

21  but you were aware the changes would be made as of

22  August 17, 2017 on these last set of changes, correct?

23       A.  Correct.

24              MS. LAHR:  Object to the form of the

25  question.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

117

1      Q.  (BY MS. DORWART)  And the last set of changes
2   are in Exhibit 110, correct?
3            MS. LAHR:  I'm going to object to the form
4   of the question.
5      A.  Yes.
6      Q.  (BY MS. DORWART)  When you received the email
7   on August 17th of 2017 did you contact human resources?
8      A.  No.
9      Q.  After you received the email of August 2017 --
10  I'm sorry.
11           After you received the email dated
12  August 17, 2017 what's the first date that you addressed
13  any kind of changes in payouts with human resources?
14     A.  I never discussed my compensation with HR. I
15  was told by Mr. Polyak that if I discussed any of this
16  with HR that there would be serious consequences to me
17  and the partnership.
18           (Exhibit No. 96 was marked.)
19     Q.  (BY MS. DORWART)  I'm going to hand you what
20  I'm going to mark as Deposition Exhibit 96 and I'll go
21  ahead and hand you 97 at the same time.
22           MS. DORWART:  Sorry videographer for the
23  paper shuffling.  Hope your ears are okay.
24           MS. LAHR:  Thank you.
25           MS. DORWART:  My arms are short.

Charles P. Ripley                                    3/31/2021

118

```
1        Q.  (BY MS. DORWART)  Mr. Ripley, you worked with
2   Ms. Connor under the partnership in 2017, correct?
3        A.  Correct.
4        Q.  And what were your Social Security wages for
5   2017?
6        A.  406.632.05.
7             MS. LAHR:  Object to the form of the
8   question.  I think you might have misunderstood the
9   question.
10       Q.  (BY MS. DORWART)  I'll reask it.  There's a
11  couple.  What was your wages, tips and other
12  compensation for 2017?
13       A.  $406,632.05.
14       Q.  Thank you.  And that was when you were working
15  as a partner with Ms. Connor, correct?
16       A.  Yes.
17       Q.  And you-all were splitting commissions,
18  correct?
19       A.  Yes.
20       Q.  Okay.  And I have also handed you -- that's on
21  Deposition Exhibit 96, correct?
22       A.  Correct.
23       Q.  Which is your 2017 W-2?
24       A.  Uh-huh.
25             (Exhibit No. 97 was marked.)
```

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                3/31/2021

                                                        120

1  to you here does that refresh your recollection as to

2  what your commission split was with Ms. Connor?

3       A.  It was less than mine.  I have never quite

4  figured out this example on this Exhibit 110.  But it

5  was certainly less percentage than mine in 2017.

6       Q.  Now when Ms. Connor left there was a discussion

7  about reviewing accounts and splitting those amongst

8  other brokers, other sales officers, correct?

9       A.  Correct.

10      Q.  Okay.  Was there ever a discussion about

11 inserting a new sales officer to replace Connor?

12      A.  No.

13      Q.  Okay.  And amongst those people to whom the

14 accounts were split when Ms. Connor left, was there

15 anyone who was older in age than you?

16      A.  Who was older than me?

17      Q.  Uh-huh.

18      A.  Not to my knowledge.

19      Q.  Okay.  And who was in the Richardson office at

20 the time Ms. Connor left as far as a sales officer?

21      A.  Myself, Tom Jett, John Monaghan and James

22 Rossi, Jim Rossi, R-o-s-s-i.

23      Q.  Anyone else who was a sales officer?

24      A.  I'm not sure what Josh Wall's status was at

25 that point but he was involved in the discussions.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

121

1      Q.  Okay.  Approximately, how old do you think
2  Mr. Rossi is?
3      A.  In 2018?
4      Q.  Yes, sir.
5      A.  Late 60s.
6      Q.  And approximately how old was Tom Jett?
7      A.  Late 60s.
8      Q.  And approximately how old was Mr. Monaghan?
9      A.  Early-to-mid 50s.
10      Q.  How old were you when you were hired at BOK FS?
11      A.  I was hired in 2010.  68, I presume.  67, 68.
12      Q.  And we are sitting here today in 2021, how old
13  are you now?
14      A.  I am 78.
15      Q.  Would it be fair to say that from the end of
16  March of 2019 -- strike that.
17            The end of March of 2020 to in fact just
18  recently, you have not been in the office at BOK FS due
19  to COVID?
20      A.  Yes.
21      Q.  And so you have been out of the office?
22      A.  Yes.  I work from home.
23      Q.  When is the first time you saw Mr. Polyak in
24  person between the end of March 2020 and today?
25      A.  Well, actually, it was yesterday.  I don't

Charles P. Ripley                                        3/31/2021

123

1        A.  Of a permanent evac.

2        Q.  Was that just a one-off come back to try to get

3   your materials moved to a new floor?

4        A.  That's correct.

5        Q.  Okay.  And after August 15th of 2018 did anyone

6   use the word retire with you?

7        A.  Nick used it in different conversations.

8        Q.  Nick used the word retire with you after August

9   of 2018?

10       A.  Uh-huh.

11       Q.  When was the most recent time you heard Nick

12  use the word retire with respect to you?

13       A.  I presume sometime in '19, I presume.

14       Q.  In what context do you recall, if any?

15       A.  In 2019?

16       Q.  Yes.

17       A.  I don't remember the specific contact or

18  specific date but I do remember him mentioning that.

19       Q.  In what context?

20       A.  He mentioned it, you know, like when do you

21  think you will retire kind of thing as a -- and I would

22  get asked that question.

23       Q.  Where were you?

24       A.  In '18?

25       Q.  Or in --

Charles P. Ripley                                    3/31/2021

                                                                124

1        A.  Excuse me, '19.

2        Q.  Yes sir.

3        A.  I'm sure it was at the office.

4        Q.  Were you in Mr. Polyak's office?

5        A.  I presume.  But I could have been on the desk.

6        Q.  After Rena Connor left did you ever have a

7    conversation with Mr. Polyak about Rena Connor?

8        A.  Yes.

9        Q.  And where did that conversation occur?

10       A.  In the office.

11       Q.  In whose office?

12       A.  In our office in Richardson.

13       Q.  Did it occur in a specific office?

14       A.  I don't know if it occurred on the trading

15   floor or in Nick's personal office.

16       Q.  You don't remember where it occurred?

17       A.  I presume it would have been in his office but

18   I can't make that absolute statement.

19       Q.  Okay.  And what did you say about Rena, if

20   anything?

21       A.  I was very supportive of Rena.  I mean, we -- I

22   can't recall the specific conversation although I was

23   dismayed that she had left.  And he...

24       Q.  Why were you dismayed that Ms. Connor had left?

25       A.  Because I valued her as -- professionally and

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                        3/31/2021

125

1  personally and I felt like that she made a great

2  contribution to the partnership and to the revenue that

3  we put together for the firm.

4       Q.  Did you ever say anything negative about her

5  after she left?

6       A.  No.

7       Q.  And what were you talking about Rena about when

8  you had this meeting with Mr. Polyak that was either on

9  the trading floor or in his office after Rena left?

10      A.  Well, we had one significant conversation in

11  his office about Rena and her departure.  And it was in

12  a conversation that was -- evolved -- revolved around

13  reassignment of accounts.

14      Q.  Did you say anything negative about Rena at the

15  time?

16      A.  No.

17      Q.  How did the conversation end?

18      A.  He threw me out of his office.

19      Q.  Do you know why?

20      A.  Because I confronted him with some statements

21  that he had made to me that theoretically -- or he said

22  had come from Rena.  And I discussed with Rena about it

23  and I confronted him and his statements were not

24  accurate.

25               And he became very agitated and had to

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

126

1  admit that no, they were not accurate but that's what

2  she meant.

3          Q.   What were the statements?

4          A.   About me not being able to cover the accounts

5  after her departure.

6          Q.   Have you prepared any damages in this case?

7          A.   Yes.

8          Q.   Are they in the Redweld folder that got

9  produced today?

10         A.   I don't know if they're in that folder or not.

11              MS. LAHR:   They are not.   He prepared them

12  for counsel.

13              MS. DORWART:   Counsel, we are going to

14  reserve some time on this deposition because Rule 26

15  damages were due in this lawsuit which has been pending

16  since '19 some time ago and have not been produced in

17  this case.   And you cannot hide them behind counsel.

18              And we do also reserve the right to object

19  to the presentation of those damages because it has been

20  so long that they have not been produced.

21              MS. LAHR:   I object to your reservation

22  because we have been seeking documents from you to

23  accurately prepare the damages and you refused to

24  produce them.   But we did get some day before yesterday.

25              MS. DORWART:   Rule 26 damages are due,

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

127

1  okay, as soon as the lawsuit is filed and the term that

2  they are due is long overdue.  I'll save it for later

3  but we will reserve the particular issue with respect to

4  that.  Because we're sitting here today in 2021 without

5  damages in a case that was filed in 2019.

6           MS. LAHR:  We wouldn't be sitting here if

7  you would have produced the documents --

8           MS. DORWART:  How's that?

9           MS. LAHR:  -- that we repeatedly asked for.

10          MS. DORWART:  You know what, damages are

11  your problem and I'm not going to have that argument

12  with you --

13          (Crosstalk.)

14          MS. LAHR:  And discovery is yours.  And we

15  sought the discovery and you have refused to produce it.

16     Q.  (BY MS. DORWART)  How much do you think you're

17  entitled to, Mr. Ripley, as damages in this case?

18     A.  In excess of seven figures.

19     Q.  How much in excess of seven figures?

20     A.  It's impossible for me to be able to give you

21  an exact figure because I don't have the documentation

22  that's needed to compute the damages, so.

23     Q.  Now you had access to all of your's and Rena's

24  commission runs prior to the time Rena left, correct?

25     A.  Correct.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

128

1        Q.   So you had that access.  And have you prepared

2   any damages with respect to the time period that you're

3   alleging prior to January 4th of 2018?

4        A.   I didn't understand the question.

5        Q.   Have you prepared any damages with respect to

6   the time period that you are alleging prior to

7   January 4th of 2018?

8        A.   I have worked up some estimates because I don't

9   have all of the information necessary to make that

10  determination.

11       Q.   And what are your estimates of your damages

12  prior to Rena leaving on January 4th of 2018?

13       A.   I believe they were approximately $750,000 but

14  I don't have all the information necessary to establish

15  an absolute figure at this point.

16       Q.   Okay.  For the time period prior to January

17  4th, 2018 you had access to all of your and Rena's

18  commission runs, correct?

19       A.   I don't -- didn't have access to Rena's

20  commission runs.  I haven't seen them before.

21       Q.   You knew what the splits were, correct?

22       A.   I knew where the splits were, yes.

23       Q.   So you could figure out your damages, correct?

24       A.   Theoretically.

25       Q.   Because you had access to your percentage,

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              129

1  correct?

2       A.  Theoretically.

3       Q.  And you have not done anything to present those

4  to counsel as of today?

5       A.  I presented her an estimate of what I thought

6  they would be.

7       Q.  Okay.  Have you done anything to present

8  damages for the time period prior to January 4th, 2018

9  to BOK FS?

10      A.  I have not presented them to BOK FS.

11      Q.  For the time period after January 24th, 2018

12 would it be fair to say that you are actually asking for

13 the value of what would have been Rena's commissions had

14 she remained on the account?

15            MS. LAHR:  Object to the form of the

16 question.

17      A.  No.

18      Q.  (BY MS. DORWART)  You're asking for a hundred

19 percent of the commission on the accounts you have lost,

20 correct?

21      A.  Yes.

22      Q.  And prior to Rena leaving you were only getting

23 at max 70 percent of the commission, right?

24      A.  I'm not sure how to answer the question.

25      Q.  Okay.  So let's give you an example.

Charles P. Ripley                                    3/31/2021

130

1          A.  Okay.

2          Q.  You had an account that might have moved --

3     let's do First Financial.

4          A.  Uh-huh.

5          Q.  You and Rena were splitting First Financial at

6     least -- well, let's give a hypothetical.  If you hadn't

7     changed your splits you were splitting 70 and she was

8     getting 30, correct?

9          A.  I guess.

10         Q.  And so now you're asking for the other

11    30 percent, correct?

12         A.  I'm asking for a hundred percent, yes.

13         Q.  Even though before you were only getting

14    70 percent?

15              MS. LAHR:  Object to the form of the

16    question.

17         A.  Yes.

18         Q.  (BY MS. DORWART)  So on accounts that were

19    being handled by two sales officers from 2013 to

20    January 4th, 2018 where you were splitting commissions

21    you're now asking for a hundred percent of the

22    commission on those accounts?

23         A.  Yes.  Because -- yes.

24         Q.  So you're actually asking for more than you

25    were making before Rena Connor left, correct?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

131

1            MS. LAHR:  Object to the form of the

2    question.

3        A.  I would not be splitting the commission revenue

4    with anyone else; that is correct.

5        Q.  (BY MS. DORWART)  So you are actually asking

6    BOK FS to pay you more than you were receiving before

7    Rena Connor left on a percentage basis?

8            MS. LAHR:  Object to the form of the

9    question.  You can still answer.

10       A.  Yes.

11       Q.  (BY MS. DORWART)  Did any of your accounts go

12   to any officers outside of the Richardson office?

13       A.  It is my understanding that this is a correct

14   statement.

15       Q.  Okay.  And to what other officers, if you know?

16       A.  I'm not privy to that information.  It's

17   speculation.

18       Q.  Does the name Gary Tillman ring a bell?

19       A.  Oh, I -- yes, I know Mr. Tillman.

20       Q.  Okay.  Did he get any accounts that you used to

21   service with Ms. Connor?

22       A.  I don't know.

23       Q.  Did you ever tell Mr. Polyak that Josh Wall was

24   doing the bulk of the work on the First Financial

25   account?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              132

1        A.  No.

2        Q.  Did you ever draft notes to the affect that

3   Josh Wall was doing the bulk of the work on the First

4   Financial account?

5        A.  No.

6        Q.  Did you ever draft anything that stated my

7   largest contribution has been staying out of the way

8   with respects to the First Financial account?

9        A.  I did make that statement.

10       Q.  Was that before or after the account

11  transferred a hundred percent to Josh?

12       A.  Prior to the assignment.

13       Q.  So it's fair to say that the complete transfer

14  to Josh occurred after you stated that you were staying

15  out of the way with respect to the First Financial

16  account?

17       A.  Yes.

18       Q.  Was there -- strike that.

19            When did Josh Wall become an assistant to

20  you and Rena?

21       A.  Within months after we set up the partnership

22  or before the partnership was effective.

23       Q.  And who's the we that set up the partnership?

24       A.  I'm sorry?

25       Q.  Who's the we when you say we set up the

Charles P. Ripley                                    3/31/2021

133

1  partnership?

2       A.  When I accepted Meredith's request for -- he

3  was basically the one that set it up.

4       Q.  You're one of the we, correct?

5       A.  I guess Rena and Meredith and I.

6       Q.  Okay.  With the addition of Rena did the First

7  Financial relationship grow?

8       A.  Yes.

9       Q.  Did Josh expand his personal relationship with

10  First Financial representatives?

11       A.  He did.

12       Q.  Was there a First Financial representative

13  named Garrett?

14       A.  Yes.

15       Q.  Is that a first name or a last name?

16       A.  That is his first name, the last name is Betts,

17  B-e-t-t-s, Betts.

18       Q.  Did Mr. Wall establish a relationship

19  Mr. Garrett Betts?

20       A.  He already had an established relationship with

21  him.

22       Q.  Okay.  Was Josh Wall indispensable in handling

23  the First Financial account?

24       A.  Nobody is indispensable.

25       Q.  Did you ever write words that Josh was

Charles P. Ripley                                     3/31/2021

                                                              136

1    of this Exhibit 147?

2              MS. LAHR:  Object to the form of the

3    question.

4         A.  Yes.

5         Q.  (BY MS. DORWART)  Did you draft the first page

6    of 147?

7         A.  Yes.

8         Q.  Did you send it from your home email address to

9    your work email address?

10        A.  I did.

11        Q.  Okay.  Does that refresh your recollection that

12   you had stated quite honestly Josh has accomplished this

13   on his own?

14        A.  Yes.  Because of the transactions he was

15   executing.  Yes.

16        Q.  And do you recall whether or not this was

17   created in response to a request from Mr. Polyak to give

18   you a candid assessment of how you were adding value to

19   the sales partnership for First Financial?

20        A.  I believe so.

21        Q.  And your response was, my largest contribution

22   has been staying out of the way, not tripping over each

23   other or duplicating effort?

24        A.  Yes.  That was an accurate statement.

25        Q.  And did Josh carry the bulk of the load with

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              139

1        A.   They were very quiet.

2        Q.   So at the time the bank portion of First

3   Financial was transferred to Josh Wall the bank portion

4   was quote, very quiet?

5        A.   Yes.

6        Q.   Had you been calling on them?

7        A.   Yes.

8        Q.   I thought you said you weren't tripping over or

9   duplicating efforts?

10       A.   Because I was the only one that was really

11  calling the portfolio manager.  And I was assisting Josh

12  when he was not available on the trust side.

13       Q.   How long had the bank side of the First

14  Financial relationship been very quiet by the time it

15  was transferred to Josh?

16       A.   I didn't understand your question.

17       Q.   How long had the bank side of the First

18  Financial relationship been very quiet by the time it

19  had transferred to Josh?

20       A.   I would say a year to 18 months.  The portfolio

21  manager for the bank was executing transactions on

22  behalf of the bank and they did not like the market.

23  And they did not want to make any long-term commitments

24  based upon market conditions.

25       Q.   So by the time that the First Financial account

Charles P. Ripley                                    3/31/2021

140

1   was fully transferred to Josh the bank side of the

2   portfolio had been quiet for a year to 18 months?

3       A.  Had been very quiet for a long period of time.

4   And about the time that the transfer was made I believe

5   the bank activity picked up.

6       Q.  When Josh got the account the bank activity

7   picked up?

8       A.  That was the approximate time frame.

9       Q.  At the time of transfer it had been quiet,

10  correct?

11              MS. LAHR:  Object to the form of the

12  question.

13      A.  Yes.

14      Q.  (BY MS. DORWART)  We discussed earlier you

15  having meetings when some accounts were put into the

16  pot?

17      A.  Correct.

18      Q.  Do you recall that?  I'm going to call out some

19  names, if you can let me know if they were transferred

20  into the pot, as far as your memory of them.  Benergy?

21      A.  Yes.

22      Q.  Definitive?

23      A.  Yes.

24      Q.  Dimensional Funds?

25      A.  Yes.

Charles P. Ripley                                    3/31/2021

142

1      A.  No.

2      Q.  -- from this morning about putting things into

3  the pot?

4      A.  No.  There were two -- I believe two rounds of

5  Nick asking about putting accounts or a certain amount

6  of accounts into the pot.  And whatever went into that

7  pot, well, we distributed to other salespeople.  And

8  everyone was to participate in that, whether they did or

9  not I don't know.

10          But I do know that I received no accounts

11  in return and all of my accounts were reassigned.

12      Q.  And at the time you were the only officer who

13  had been teamed with anyone else in the Richardson

14  office, correct?

15          MS. LAHR:  Object to the form of the

16  question.

17      A.  To the best of my knowledge.

18      Q.  (BY MS. DORWART)  Did your email -- strike

19  that.

20          Did you ever send an email to Polyak

21  listing the accounts to put into the pot?

22      A.  I didn't understand your question.

23      Q.  Did you ever send an email to Polyak listing

24  the accounts to put into the pot?

25      A.  I believe so.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

                                                                  144

1              MS. LAHR:  Object to the form of the

2    question.

3         Q.  (BY MS. DORWART)  Do you want me to reread the

4    question?

5         A.  Oh, yes, please?  I'm sorry.

6         Q.  Do you think Mr. Polyak had a right to rely on

7    your statement I am willing to throw these in the pot?

8         A.  I guess.

9         Q.  Did you keep notes of your conversations with

10   customers in Salesforce?

11        A.  No.

12        Q.  Did you keep notes of your customers'

13   conversations in some kind of a journal?

14        A.  Yes.

15        Q.  Did you produce that journal in your Redweld?

16        A.  No.

17        Q.  Do you still have that journal?

18        A.  They were ongoing journals.  Some of them may

19   be around, some of them may be not.  Usually I either

20   discarded them after the information was no longer

21   pertinent.

22        Q.  Did you discard any journals in 2018?

23        A.  I don't know.

24        Q.  Did you make any efforts to save all existing

25   journals as of 2018?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

145

1          A.   No.

2          Q.   Okay.  By the time you filed your EEOC charge

3   did you take efforts to save all of your journals?

4          A.   No.

5          Q.   Is it possible that you threw away journals

6   with your communications with clients for the year 2017?

7          A.   Quite possibly.

8          Q.   Is it possible that you threw away your

9   journals with conversations with clients for the year

10  2018?

11         A.   Quite possibly.

12         Q.   Is it possible that you threw away journals

13  with your conversations with clients for the year 2019?

14         A.   Quite possibly.

15         Q.   Is it possible that you threw away journals

16  with conversations with clients for the year 2020?

17         A.   Yes.  Quite possibly.

18         Q.   Is it possible that you threw away journals

19  with respect to conversations with clients during the

20  year 2021?

21         A.   Quite possibly, if they no longer were

22  pertinent.

23         Q.   Did you have an understanding that

24  conversations with clients would be pertinent to

25  decisions to transfer accounts?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

146

1          A.   No.

2          Q.   Why not?

3          A.   I was never concerned about the transfer of

4    accounts.

5          Q.   Okay.  With respect to Deutsch which you

6    mentioned earlier this morning, was Deutsch running

7    quiet in January of 2018?

8          A.   To the best of my knowledge, yes.

9          Q.   Did you share that with Nick Polyak?

10         A.   I believe that he asked for some commentary on

11   some accounts at some point and I answered those

12   questions that he gave me.  Which accounts they were and

13   when -- exactly when it was.  And no recollection of the

14   specific accounts, nor the dates.

15         Q.   When you responded to Mr. Polyak, were you

16   being honest?

17         A.   I have always been honest in every statement

18   that I made to him.

19         Q.   Did Mr. Polyak have a right to rely on the

20   statements that you shared with him regarding

21   communications with clients recently in January of 2018?

22              MS. LAHR:  Object to the form of the

23   question.

24         A.   I don't understand the question.

25         Q.   (BY MS. DORWART)  Did Mr. Polyak have a right

Charles P. Ripley                                    3/31/2021

147

1    to rely on the statements that you shared with him

2    regarding your communications with clients in January

3    of 2018?

4         A.  Yes.

5         Q.  Did you tell him that with respect to GSAM that

6    you had limited communication and they were difficult to

7    reach?

8         A.  Yes, I did.  Initially, at that -- at the time

9    that request was made.  I finally established a good

10   relationship with them and they were not difficult to

11   reach anymore.

12        Q.  Did you tell him that you had nothing to do

13   with Deutsch at the time that you spoke to Mr. Polyak in

14   2018?

15        A.  Possibly.

16        Q.  What did you tell Mr. Polyak, if anything,

17   about UBS in January of 2018?

18        A.  I would imagine that I told him about that

19   account and others because at the first part of '18

20   there was a massive activity in '17 because of the

21   change in the tax law.  There were virtually none of

22   these large institutional accounts that were very

23   active.

24               They had spent all their money in '17, they

25   didn't know how the tax law was going to affect their

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

148

1    business and they were very quiet starting the year.

2        Q.  Did you tell Mr. Polyak that Jodi had been your

3    contact for UBS and had revealed very little?

4        A.  Possibly.

5        Q.  And that's one of the accounts that was

6    transferred to John Monaghan, correct?

7        A.  Correct.  To the best of my knowledge Monaghan

8    was assigned the account, yes.  I was never told who the

9    accounts were assigned to.

10       Q.  Did you tell him with respect to Ziegler

11   Capital that you had not spoken to either Paul or Rick

12   since Rena's departure?

13       A.  I don't know.

14       Q.  Did you tell Mr. Polyak that you had no success

15   in helping Northern Trust?

16       A.  Possibly.

17            (Exhibit No. 123 was marked.)

18       Q.  (BY MS. DORWART)  I'm going to hand you what I

19   have marked as Exhibit 123.

20       A.  Thank you.

21       Q.  Okay.

22            MS. DORWART:  Sorry for the shuffle, guys.

23            MS. LAHR:  Thank you.

24            MS. DORWART:  You're welcome.

25       Q.  (BY MS. DORWART)  Does that appear to be an

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

149

1   email from you to Nick Polyak dated as of Tuesday
2   January 30th, 2018?
3        A.   Uh-huh.
4        Q.   Did Mr. Polyak have a right to rely on the
5   information that you provided him with respect to each
6   of the accounts?
7        A.   Yes.
8        Q.   Okay.  And you didn't have any information in
9   any kind of software like Salesforce, so that somebody
10  could check what your communications tracking had been,
11  correct?
12       A.   Correct.
13       Q.   Did some of the ISOs use Salesforce to track
14  their communication?
15       A.   Can you repeat the statement, please?
16       Q.   Did some of the ISOs, the sales officers, use
17  Salesforce to track their communications with clients?
18       A.   I don't know.
19       Q.   Does it appear that the accounts you have
20  listed were not entering into activity with you as of
21  January 30th, 2018 as set forth on Exhibit 123?
22       A.   The statements that I made here are accurate.
23  When you read the statement a minute ago about Northern
24  you took it out of context and only read one part of the
25  statement.

Charles P. Ripley                                          3/31/2021

151

1        Q.   Do you remember sending a statement to

2   Mr. Polyak stating too many surveys, too many meetings

3   and no action equals lost interest?

4        A.   Yes, I do remember making that statement.

5        Q.   In what context did you make that statement?

6        A.   There were too many meetings, as I said,

7   surveys, etcetera, things that took time out of our

8   normal working day that took away from actually making

9   calls to try to produce revenue.

10       Q.   So did you find Gallup surveys to be taking

11  away from your efforts to create revenue?

12       A.   Yes.

13       Q.   So you didn't like the surveys?

14            MS. LAHR:   Object to the form of the

15  question.

16       A.   I thought the surveys were pertinent more to a

17  normal bank, what a quote normal bank would do.  I

18  didn't feel like they were as pertinent to a division

19  like ours in debt capital markets.

20            They were more designed for a -- just a

21  straight financial institution without having a

22  broker/dealer operation like ours.

23       Q.   (BY MS. DORWART)  Did you ever complain to

24  Mr. Polyak about your goal decreasing as Rena's

25  percentage share of commissions increased?

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

152

1      A.  I think you are talking about two different

2  things here.  I didn't understand your statement.

3      Q.  Okay.  Did you ever complain to Mr. Polyak

4  about your annual goal decreasing?

5      A.  He decreased my goals when Rena departed.

6      Q.  Did that make it easier to meet your goals with

7  the accounts that you had remaining?

8      A.  Theoretically, that would be correct.

9      Q.  The lower goal is easier to meet, correct?

10     A.  Yes.

11     Q.  Did you ever consider that Rena left because

12 you were unwilling to change the commission splits with

13 her?

14             MS. LAHR:  Object to the form of the

15 question.

16     A.  No.

17     Q.  (BY MS. DORWART)  When Rena Connor left did you

18 announce to customers that you and Josh Wall would be

19 servicing their accounts?

20     A.  Yes.  I felt like that they should be aware of

21 Rena's departure because of the partnership that they

22 knew we had established.  And that she -- they should be

23 notified that she was no longer an employee of the bank.

24             I think I had also asked Nick to do that

25 and he did not feel like it was his responsibility to do

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

155

1       A.   Could you repeat that, please?

2       Q.   Did you ever tell Nick Polyak to be sure to

3   remove your designation from the AGA Capital account?

4       A.   Yes.

5       Q.   Why?

6       A.   Because -- I don't know the correct terminology

7   exactly but they basically were an advisor to

8   municipalities.  Rena dealt with them primarily and when

9   she left Josh and I basically -- or I inherited the

10  account.

11           And there were regulations that came out of

12  all kinds of disclosure issues with that designation of

13  an advisor calling on municipalities, that we could be

14  held liable in some way.

15           If I sold -- we sold a bond to AGA Capital

16  and they in turn sell that bond to the City of Houston,

17  for example, that we could be held liable in some way.

18           And I did not want to be a part of that in

19  any way and I wanted my name removed.  The bank came out

20  with regulations about it and told us to be cautious and

21  stated the new rules and regulations.

22           And I wanted off the account.  I didn't

23  want any part to do with it.

24       Q.   But you are not claiming any damages with

25  respect to AGA Capital --

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

156

1        A.   No.

2        Q.   -- in this case, are you?

3        A.   No.   I don't even know if they did any business

4    with those whatsoever after Rena's departure.

5        Q.   But she was primarily responsible for AGA

6    Capital?

7        A.   Yes.

8        Q.   Did you get the benefits of Rena's efforts with

9    respect to AGA Capital?

10       A.   Yes.

11       Q.   Okay.  Do you know if Rena ever complained

12   about your activity while she was working with you?

13       A.   It's become -- it's come to my attention now.

14       Q.   How?

15       A.   Through looking at some of the documents that

16   have been furnished.

17       Q.   What do you --

18       A.   And I have seen --

19       Q.   What do you recall seeing in that --

20       A.   I remember seeing something from Nick and also

21   Nick telling me basically that she complained about me.

22   I never knew -- that was all news to me.

23       Q.   Do you think it's concerning if you were

24   sending the clients old data from a deal from a month

25   ago?

Charles P. Ripley                                          3/31/2021

159

1  trying to be mean.  It's just a matter of her trying

2  together to have a clear enough record, right?

3              So do you see where she wrote Rip is

4  getting progressively worse?

5       A.  Yes.  I read this.

6       Q.  Okay.  And that's from Rena Connor, your

7  partner at the time, correct?

8       A.  Correct.

9       Q.  She was your coworker?

10      A.  Correct.

11      Q.  And she sent that to Nick Polyak?

12      A.  Correct.

13      Q.  And he was your manager?

14      A.  Correct.

15      Q.  Okay.  When Rena went out on vacation since you

16  were her partner shouldn't you have been primarily

17  responsible for handling the desk while she was gone?

18      A.  I was.  That's an accurate statement.

19      Q.  And as to -- in comparison to everybody else

20  here it sounds like everybody else is kind of a single

21  sales officer, correct, as far as you are aware?

22      A.  As far as I'm aware, yes.

23      Q.  Okay.

24      A.  But we all had backups.

25      Q.  Okay.  But you would have been Rena's primary

Charles P. Ripley                                    3/31/2021

160

1   backup because you were her partner, correct?

2        A.   Correct.

3        Q.   And that would have made logical sense because

4   you-all were sharing commission on accounts, correct?

5        A.   Correct.

6        Q.   Did Mr. Polyak talk to you about rightsizing

7   the book of business after Rena Connor left?

8        A.   I don't know what that term means.

9        Q.   You don't know what the term rightsize means?

10       A.   No.

11       Q.   You have never heard the term rightsize with

12  respect to the portfolio?

13       A.   No, I don't -- I'm not familiar with that term,

14  especially as it applies to what we're talking about.

15       Q.   Do you think it was wrong for the bank to look

16  at the list of your accounts and make sure that the bank

17  had adequate coverage for those accounts?

18       A.   I think it's the duty and responsibility of the

19  bank to always overview and review people's production

20  and account coverage.

21       Q.   When Kari Goins came down, do you think that

22  happened in the spring of 2018?

23       A.   No.  I think it was in the second or third

24  quarter, maybe even fourth quarter.  Or no, second or

25  third quarter probably.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                      3/31/2021

                                                              164

1        Q.  -- about performance issues?

2        A.  The three different accounts, yes.

3        Q.  Okay.  And with respect to those three

4   different accounts, did they address anything personal

5   or was it really about the account client -- about

6   client coverage?

7             MS. LAHR:  Object to the form of the

8   question.

9        A.  I don't understand the question.

10       Q.  (BY MS. DORWART)  Sure.  With respect to the

11  three different accounts that you were being counseled

12  for was there anything personal in this counseling or

13  was it really about work?

14       A.  It was all -- it was a hundred percent about

15  work.  There wasn't any personal information in there.

16  It was all work-related.

17       Q.  When you answered the Gallup surveys was there

18  a question in there that says, do you have a friend at

19  work?

20       A.  The Gallup survey is totally anonymous.

21       Q.  I understand that.  Is there a question on the

22  surveys that you were answering that says, do you have a

23  friend at work?

24       A.  I don't remember.

25       Q.  Do you remember what the questions were on the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                        3/31/2021

166

1   any conversations.

2        Q.   (BY MS. DORWART)   Okay.   Did you ever talk to

3   Kari Goins about the sales support role?

4        A.   No.

5        Q.   Okay.   Did you have sales support after Rena

6   Connor left?

7        A.   Yes.   We -- not for a couple of months.   But

8   yes, we hired someone to assume Josh's role.

9        Q.   And who was hired to assume Josh's role?

10       A.   Erika Garcia.

11       Q.   Okay.

12       A.   E-r-i-k-a.

13       Q.   Thank you.   And when do you think Erika Garcia

14  was hired?

15       A.   A couple of months after Rena's departure, two

16  or three months.   She was an employee of the bank and

17  was reassigned to our department.

18       Q.   Do you know what department she came from?

19       A.   I think she was -- I don't think she was a

20  branch manager but she was in a position like that in a

21  branch -- not in our branch, I don't know what branch

22  she came from.

23       Q.   Was that a consumer -- consumer branch?

24       A.   Consumer, yes.   Uh-huh.

25       Q.   And does Erika Garcia still work as sales

**STRYKER REPORTING SERVICES**                        **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

167

1    support to this day?

2         A.   Yes.

3              MS. LAHR:  We've been going about an hour

4    and 45 minutes, could we take -- time to take a break?

5              MS. DORWART:  You bet.

6              THE VIDEOGRAPHER:  We are off the record at

7    2:41.

8              (Break taken from 2:43 p.m. to 2:54 p.m.)

9              THE VIDEOGRAPHER:  We are back on the

10   record at 2:52 p.m.

11        Q.   (BY MS. DORWART)  Is it true or a false

12   statement that the bulk of accounts that you and Rena

13   Connor shared were reassigned to a BOK FS employee who

14   was approximately 30 years old?

15        A.   I'm sure I was speaking of Josh Wall.

16        Q.   Is it true or false that the bulk of the

17   accounts that were reassigned were reassigned to Josh

18   Wall?

19        A.   To the best of my knowledge but I had -- nobody

20   ever gave me a list of the accounts.

21        Q.   So as you sit here today, your allegation is

22   still that the bulk of your accounts that you had

23   serviced with Rena Connor were reassigned to Josh Wall?

24        A.   I believe so.

25        Q.   What accounts were reassigned to Josh Wall, as

STRYKER REPORTING SERVICES                    (817) 494-0700

Charles P. Ripley                                    3/31/2021

168

1   far as you know?

2        A.  I don't know that I can specifically tell you.

3   Except, let's see.  Watermill, Belle Haven, First

4   Financial Trust, Scarsdale.  I don't remember others.

5        Q.  Do you know whether or not Mr. Monaghan got

6   more accounts than Mr. Wall?

7        A.  I don't know about the direct number but I

8   would say that Monaghan received the largest accounts

9   and that were capable of generating the most commission

10  revenue.

11       Q.  Would it be fair to say that Josh Wall got

12  accounts that were not known for being as

13  revenue-generating?

14            MS. LAHR:  Object to the form of the

15  question.

16       A.  Possibly.

17       Q.  (BY MS. DORWART)  Out of the accounts that you

18  recall, Josh Wall getting Watermill, Belle Haven, First

19  Financial, Scarsdale, were any of those the ones that

20  you put into the pot of accounts?

21       A.  I think that some of the smaller ones were.

22  Yes.

23       Q.  And which ones were those smaller ones?

24       A.  Scarsdale, Watermill.

25       Q.  Okay.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

                                                              169

1        A.   Those are the only two that I remember offhand.

2        Q.   Belle Haven?

3        A.   Belle Haven, possibly.

4        Q.   And First Financial is the one that you agreed

5   to split with Josh Wall, correct?

6        A.   Under duress, yes.

7        Q.   What duress?

8        A.   I was told that if we didn't agree to split it

9   and I didn't agree to that a hundred percent that the

10   account would be given to Josh Wall which is how it

11   ended up anyway.

12        Q.   How long did it take to get to a hundred

13   percent of First Financial going to Josh Wall?

14        A.   Within a year I believe.

15        Q.   What's the difference -- strike that.

16             What's a -- known in your municipal bond

17   business as a primary deal, if you know?

18        A.   Well, there -- oh, a -- on a -- there's a split

19   between a negotiated transaction and a competitive

20   transaction.  And both of them are basically primary

21   deals.

22        Q.   Is there something known as a secondary

23   activity?

24        A.   There is a secondary market, yes.

25        Q.   Explain the secondary market to me.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

170

1      A.  Secondary market are bonds that come out for
2  sale from accounts, from dealers, from bank portfolios
3  and that we have an opportunity as a broker/dealer to
4  submit a bid for those bonds if we think they are
5  undervalued or meet our clients investment criteria.
6      Q.  Did you work much on the secondary market,
7  Mr. Ripley?
8      A.  As much as possible, yes.
9      Q.  Do you know if the accounts that were
10 transferred from you and Rena to others performed better
11 in the secondary market after the transfer?
12     A.  I don't have any information about that.
13     Q.  Between you and Rena who covered more secondary
14 market activity?
15     A.  I think it was pretty much split depending on
16 what accounts, what the market was doing.  The --
17     Q.  Do you think --
18     A.  -- market conditions.
19     Q.  Do you think there was an equal workload
20 between you and Rena on those secondary markets?
21          MS. LAHR:  Object to the form of the
22 question.
23     A.  It fluctuated, sometimes it was and sometimes
24 it wasn't.  It depended on a number of different
25 factors, economic factors, what we had in inventory,

Charles P. Ripley                                    3/31/2021

171

1  what kind of deal flow we had.

2        Q.  (BY MS. DORWART)  You have to hustle more to

3  get a secondary market deal done, don't you?

4        A.  I don't think so.

5               MS. LAHR:  Object to the form of the

6  question.

7        Q.  (BY MS. DORWART)  No?

8        A.  No, I don't think so.

9        Q.  It doesn't take more effort to get secondary

10 sales done?

11       A.  It depends on the transaction.  Each

12 transaction is unique.

13       Q.  Are you aware of anyone who reports to Nick

14 Polyak who receives overrides on an account after an

15 account transfer?

16       A.  I have no knowledge of that.

17       Q.  Did you ever nod off while sitting at the

18 trading -- while at your desk?

19       A.  I became aware of that, yes.

20       Q.  When did that occur?

21       A.  I can't give you an exact date but Rena and I

22 discussed it.  And then Nick and I had a conversation

23 about it.

24       Q.  Did Rena tell you that you had nodded off?

25       A.  I believe she did, yes.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

172

1      Q.  Do you know what time period it was that you
2   were nodding off?
3      A.  No.
4      Q.  It was before Rena left, though, right?
5      A.  Obviously, yes.
6      Q.  Rena was your coworker at the time, correct?
7      A.  She was a partner.
8      Q.  She was also a coworker, correct?
9              MS. LAHR:  Object to the form of the
10   question.
11      A.  She was a partner/coworker, yes.
12      Q.  (BY MS. DORWART)  Did you ever have any trouble
13   utilizing software while you were working at BOK FS?
14      A.  Bloomberg frequently changed their programming
15   without telling their users what they were doing.  So
16   when they would make some changes, yes, I would
17   occasionally have problems adapting to a new format.
18      Q.  And that was through no fault of BOK FS,
19   correct?
20      A.  That's correct.
21      Q.  I'll hand you what I'm going to mark as --
22              MS. DORWART:  Let me find my stickers, 42.
23              (Exhibit No. 42 was marked.)
24      Q.  (BY MS. DORWART)  Can you identify that for the
25   record?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

173

1      A.   Yes.   This is a counseling report that I had

2  spoke of earlier but couldn't remember the exact

3  description.

4      Q.   And what's the date on that counseling report?

5      A.   It is 4/3/2018.

6      Q.   And is that the counseling report that

7  referenced the three customer issues that we discussed

8  earlier today?

9      A.   That's correct.

10     Q.   Okay.   Is there anything in that counseling

11 report that appears to be personal?

12     A.   It is all work-related.

13     Q.   Okay.   And with respect to that counseling

14 report, I note that when we got it from the copy shop

15 because we just received it today but it has a bunch of

16 materials stapled to the back of it.

17              So I want to kind of focus on that if you

18 can.  The front page is just the counseling form from

19 BOK FS, correct?

20     A.   Correct.

21     Q.   Does your rebuttal appear in this package of

22 documents that's stapled in Exhibit 42?

23     A.   Yes.   The rebuttal appears on the page -- well,

24 page three was page one at the bottom left-hand corner.

25     Q.   Thank you.   I appreciate that.   Now the

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

174

1   materials that are following, that's a typewritten

2   rebuttal, correct?

3        A.   That's correct.

4        Q.   Are the materials that are set out behind that

5   typewritten rebuttal, are those materials that you

6   attached to your rebuttal?

7        A.   No.  All those attachments were made by Nick.

8   I presume Nick, some -- it wasn't me.

9        Q.   Okay.  Were those part of the original

10  counseling?

11       A.   Yes.

12       Q.   Okay.  So the counseling portion of this

13  document is the front page --

14       A.   Accusations.

15       Q.   Okay.  Under those.  If you could, what I'm

16  going to ask you to do, I'm going to hand you a pen.

17  And if you will just mark what pages are your rebuttal,

18  just put an R at the bottom of the rebuttal so that I

19  know what the difference is between what part was yours

20  and what part was added.

21            If you will put an R on there for your part

22  at the bottom of each of those pages that will be

23  helpful for our record later.

24       A.   (Witness complies.)

25       Q.   Is it fair to say that you just marked R on

Charles P. Ripley                                          3/31/2021

179

1   which you used the word age discrimination in writing

2   with Nick Polyak?

3        A.  I don't know that.  I can't answer that.

4        Q.  Okay.  How many years have you been employed

5   since this rebuttal was provided to BOK FS?

6        A.  Well, since -- well, the date of the report is

7   4/3/18.  I was an employee then and I'm still an

8   employee.

9             MS. LAHR:  Do you want to put that back in

10  here or do you want to hold on to it?

11            MS. DORWART:  I'll hold on to it for now.

12  I'm not sure where that's going to go.

13       Q.  (BY MS. DORWART)  Is it fair to say that you

14  did not agree with any coaching that Mr. Polyak was

15  providing with respect to the three accounts listed on

16  Exhibit 42?

17       A.  I think all of his accusations were inaccurate.

18       Q.  So you refused to accept coaching regarding the

19  matters set forth in the counseling report on 4/3/2018,

20  correct?

21            MS. LAHR:  Object to the form of the

22  question.

23       A.  Can you repeat the question, please?

24       Q.  (BY MS. DORWART)  Did you refuse to accept the

25  coaching regarding the matters set forth in the

STRYKER REPORTING SERVICES                    (817) 494-0700

Charles P. Ripley                                    3/31/2021

181

1   here?  And if you need it again, I'll grab it.

2            MS. DORWART:  Right.  I think we are going

3   to end up having to make that whole thing -- I don't

4   know -- an exhibit since we just got it today though.

5       Q.  (BY MS. DORWART)  What type of revenue do you

6   believe was transferred to Josh Wall as a result of

7   accounts being reassigned after Rena Connor left the

8   bank?

9       A.  I have no idea.

10      Q.  So you have no idea if the bulk of revenue that

11  was transferred to Josh Wall after Rena Connor left the

12  bank, correct?

13      A.  I have no -- I have not seen any documentation

14  of -- evidencing any of Joshua Wall's production.

15      Q.  So prior to him making this complaint you had

16  no idea what Josh Wall received as a result of his

17  efforts on accounts that were reassigned following the

18  departure of Rena Connor, correct?

19      A.  I don't know what accounts he was assigned and

20  I don't know the amount of revenue that's been generated

21  on those accounts.

22      Q.  Then how did you know that the bulk of the

23  accounts were reassigned to an employee who was

24  approximately 30 years old when you filed your complaint

25  in this manner?

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

184

1      A.   Every salesman.

2      Q.   Name them.

3      A.   Every person that I know of that was in that

4   room with us conducts some personal --

5               MS. LAHR:  Object to the form of the

6   question.

7      Q.   (BY MS. DORWART)   Okay.  Who are the people

8   that are in that room with you that you allege are your

9   comparators?

10      A.   The people in the room are Kent Payne, Nick

11   Polyak from time to time, Patrick Short, Will Harper,

12   John Monaghan, Erika Garcia, Josh Wall.  I feel

13   like there are -- and Jim Rossi.  I believe those are

14   everybody that basically operates out of our room.

15      Q.   Who is your peer in that room?

16      A.   My peer?

17      Q.   Uh-huh.

18      A.   Other salesmen would be my peer group.

19      Q.   And who are those?

20      A.   Jim Rossi, John Monaghan, Josh Wall and Tom

21   Jett when he was there before he resigned.

22      Q.   Did Monaghan, Rossi and Tom Jett come to the

23   meeting where you just talked about putting accounts

24   into the pot?

25      A.   Yes.  And I think you left off some people

Charles P. Ripley                                      3/31/2021

185

1    and...

2        Q.   Josh Wall at the time did not have any accounts

3    to put into the pot, correct?

4        A.   But he was in the room, though.

5        Q.   He was in the room but he didn't have any

6    accounts to put in the pot, correct?

7        A.   Ha had not -- no.  He had no specific account

8    assignments at that point.  Monaghan did, Jett did,

9    Rossi did and I did.

10       Q.   Was there anyone else who came into that room

11   to discuss putting accounts into the pot?

12       A.   Polyak.

13       Q.   He is the manager, correct?

14       A.   Correct.

15       Q.   Did you have any other peers besides Monaghan,

16   Rossi and Tom Jett in the room when you were discussing

17   putting accounts into the pot?

18       A.   I don't think so.

19       Q.   Have you talked to Rena Connor since she left?

20       A.   Yes.

21       Q.   When?

22       A.   I can't give you specific dates.

23       Q.   What year?

24       A.   Since her departure which was 2018 so I talked

25   to her in '18, '19, '20 and 21.

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                          3/31/2021

189

1  informed her about the litigation?

2        A.   I think it was briefly discussed in other

3  conversations.

4        Q.   How many times did you briefly discuss the

5  litigation with Rena in addition to this conversation in

6  which you said, yes, it's true?

7        A.   I don't remember.

8        Q.   What do you recall speaking about with Rena in

9  these other conversations about the litigation?

10       A.   I don't remember.

11       Q.   Is there anything that should be affecting your

12 memory after lunch today?

13       A.   No.

14       Q.   What -- strike that.

15            Do you believe that Mr. Polyak has

16 overlooked performance deficiencies from younger peers

17 of yours?

18       A.   I don't know.

19       Q.   What was the standard BOK FS commission rate?

20       A.   I don't know.

21       Q.   Have you ever been told what the standard BOK

22 FS commission rate was?

23       A.   Nick implied that it was 40 percent.  Whether

24 that was an accurate statement or not I don't know

25 because I have been told by Nick that everybody has

Charles P. Ripley                                    3/31/2021

190

1   different deals at the bank.

2       Q.   Did anyone other than Nick explain the standard

3   commission rate was 40 percent at BOK FS?

4       A.   No.

5       Q.   Are you aware of anyone that had as high a

6   commission rate as you that reports to Mr. Polyak?

7       A.   I have no idea what anybody's compensation rate

8   was, on any employee that is a commissioned salesperson.

9       Q.   So it's fair to say you have no reason to

10  dispute that 40 percent is the standard commission rate,

11  correct?

12      A.   I can't speak to the accuracy of that

13  statement.

14      Q.   Because you have no information, correct?

15      A.   No.  Because I have no information.  That

16  information is not shared amongst salespeople by their

17  managers.

18      Q.   When do you believe -- strike that.

19           When, if ever, you believe you engaged in

20  protective activity in this case?

21           MS. LAHR:  Object to the form of the

22  question.

23      A.   I don't understand the question.  Can you

24  repeat it, please?

25      Q.   (BY MS. DORWART)  Yes.  When, if ever, do you

Charles P. Ripley                                    3/31/2021

191

1  believe you engaged in protective activity in this case?

2          MS. LAHR:  Object to the form of the

3  question.

4      A.  I don't understand the term protective

5  activity.

6      Q.  (BY MS. DORWART)  When did you first raise any

7  claim with age discrimination to either a manager or HR

8  at BOK FS?

9      A.  I think I brought it up to Nick on several

10 occasions when we were in discussions about how the

11 commission revenue was to be split between myself and

12 Rena in the partnership.

13     Q.  Was there anyone who witnessed you raising age

14 discrimination to a manager or HR?

15     A.  Not to my knowledge.

16     Q.  And none of your emails regarding splits on

17 commission address age, correct?

18          MS. LAHR:  Object to the form of the

19 question.

20     A.  That's correct.

21     Q.  (BY MS. DORWART)  Have you engaged an expert in

22 this case?

23     A.  No.

24          MS. DORWART:  It's 3:32.  I'm going to take

25 a break to determine how much time we have to save since

Charles P. Ripley                                    3/31/2021

                                                          196

1   about.  I don't know.

2       Q.  Do you think it's fair to only produce things

3   to BOK FS today in deposition?

4               MS. LAHR:  Object to the form of the

5   question.  I am going to instruct you not to answer

6   that.

7       Q.  (BY MS. DORWART)  Are you accepting your

8   counsel's instruction not to answer?

9       A.  Correct.

10              MS. DORWART:  Will you mark that for the

11  record as an instruction not to answer?

12              THE REPORTER:  Yes.

13      Q.  (BY MS. DORWART)  I am going to hand you what

14  I'm going to mark partly as Deposition Exhibit 43.

15              (Exhibit No. 43 was marked.)

16      A.  Thank you.

17              MS. DORWART:  Counsel, you will have to

18  look at the original.  It's the hostile work environment

19  folder and I only have two copies made.

20              MS. LAHR:  That's fine.

21      Q.  (BY MS. DORWART)  Did you start making notes

22  while you sat at the desk?

23      A.  Occasionally.

24      Q.  Occasionally.  Do you think that made people

25  feel comfortable?

Charles P. Ripley                                    3/31/2021

197

1              MS. LAHR:  Object to the form of the

2  question.

3       Q.  (BY MS. DORWART)  You can answer,

4              MS. LAHR:  If you know.

5       A.  I don't know.

6       Q.  (BY MS. DORWART)  There's a folder in here, a

7  Manila folder labeled hostile work environment, right?

8       A.  Uh-huh.

9       Q.  Are these all the documents that you have that

10  support your claim for a hostile work environment?

11       A.  I'm not sure.

12       Q.  Inside the folder labeled hostile work

13  environment?

14       A.  I think I probably have others but I'm not

15  sure.

16       Q.  Where do you think the others are located?

17       A.  If I have any they would be at my house.

18       Q.  You have other documents that you have not

19  produced in this case, that you think support your

20  hostile work environment claim?

21       A.  Possibly.  I don't know.  I don't know.  I

22  can't answer that question accurately.

23       Q.  If you could look at page two of the -- and

24  these aren't Bates-stamped because we just simply didn't

25  have time.  But if you could look at the second page of

**STRYKER REPORTING SERVICES**                    **(817) 494-0700**

Charles P. Ripley                                        3/31/2021

                                                                210
1   office?

2        A.  I did for awhile.

3        Q.  And is that what the final page that's single

4   and unstapled as well, 7:50 a.m. where --

5        A.  Uh-huh.

6        Q.  Do you think that made people feel comfortable

7   knowing you were tracking them?

8             MS. LAHR:  Object to the form of the

9   question.

10       A.  And what was your statement?

11       Q.  (BY MS. DORWART)  Do you think that made people

12   feel comfortable?

13            MS. LAHR:  Object to the form of the

14   question.

15       A.  I don't have any idea that they knew I was

16   doing that.

17       Q.  (BY MS. DORWART)  Is it fair to say that you

18   gathered your evidence of hostile work environment and

19   put them in a hostile work environment folder in this

20   package?

21       A.  Yes.

22       Q.  And you did your best to gather all those up

23   and put those in there, that one particular folder,

24   correct?

25            MS. LAHR:  Object to the form of the

Charles P. Ripley                                           3/31/2021

211

1   question.

2          A.   Yes.

3              MS. DORWART:   Okay.   With that, Counsel,

4   there is no way I can go through this stack of all these

5   documents and we also have no damages.   I'm going to

6   hold the rest of my time.

7              And I'm obviously going to have to address

8   this because receiving the volume of documents and I'm

9   just going to hold them up for the video.

10             MS. LAHR:   You already did.

11             MS. DORWART:   I just want to make sure that

12  we have a good picture.   And I'm going to ask the court

13  reporter if there's a way to take a photograph of what

14  we received today.   Which we have never received before

15  in this case.

16             So can you see the Redweld.   And this is a

17  document that counsel is refusing to allow making

18  virtual and so that we can determine where those page

19  breaks are.   I don't know, since we were running through

20  here.

21             I'm going to have to reserve questions

22  regarding that and regarding any damages because we have

23  none in this case to date.   And with respect to those

24  issues we're going to have to reserve the remainder of

25  our time.

**STRYKER REPORTING SERVICES**                      **(817) 494-0700**

Charles P. Ripley                                    3/31/2021

213

1  used?

2              THE REPORTER:  Five hours and seven

3  minutes.

4              MS. DORWART:  So we have approximately

5  something a little bit shy -- seven minutes shy of two

6  hours left with respect to deposition time.  And that we

7  will save and renotice counsel.

8              I'll ask you to get me a date when that is

9  convenient so that I can get back to --

10             MS. LAHR:  Yes.  I would like a date to

11 finish Mr. Polyak as well, so.

12             THE REPORTER:  Can we go off the record?

13             MS. DORWART:  Yes.

14             MS. LAHR:  Yes.

15             THE VIDEOGRAPHER:  We are off the record at

16 4:18 p.m.

17             (Proceedings concluded at 4:18 p.m.)

18             (Exhibit No. 44 was marked.)

19

20

21

22

23

24

25

EXHIBIT 2

**EEOC CHARGE OF DISCRIMINATION BASED UPON AGE**

**COMPLAINANT INFORMATION:**

Complainant full name:  Charles Peyton Ripley

Address:  6507 Patrick Drive

Dallas, Texas  75214-2528

Cell phone:  214-766-4653

Email:  charles.ripley2010@gmail.com


**COMPLAINANT REPRESENTATIVE:**

Marilyn K. Lahr

3131 McKinney Ave., Suite 600

Dallas, Texas  75204

Telephone:  214.335.6464

Fax:  888.828.2856

Email:  mimilahr@yahoo.com

Preferred form of communication:  email


**EMPLOYER INFORMATION:**

BOK Financial Securities, Inc.

333 West Campbell Road, Suite 300

Richardson, TX  75080

Date hired:  June 30, 2010

Current Position:  Senior Vice President

Number of employees:  in excess of 20 employees

Company Officer Address:

Jerry Williams

Senior Vice President – Director of Institutional Sales and Trading

BOK Financial Securities, Inc.

1001 Technology Drive, Suite 102

Little Rock, AR 72223

Phone:  501.482.3229

Fax:  501.482.3202

Email:  jwilliams@bokf.com

HR Representative

Kari Goins

kgoins@bokf.com


**BASIS OF CLAIM:**

I am asserting a claim of age discrimination.

I am 75 years old.

My birth date is 12/07/1942

I am white.

I believe I am being discriminated against based upon age, and retaliated against for asserting an age discrimination claim.

The age discrimination is a continuing violation, with the negative employment action taken against me approximately the latter part of January, 2018, and in or around April, 2018.

I was informed the latter part of January, 2018, by my manager, Nick Polyak (approximate age 55) that he would be taking a number of accounts assigned to me away from me.  I learned he was reassigning them to other individuals in the office who are younger than I (by 20 years or more).  Prior to these discussions, Mr. Polyak had asked me several times when I planned to retire.  I did not respond.  When I asked why the accounts were being taken from me and reassigned to others in the offices, Mr. Polyak stated that I "had too many accounts," and he did not think I would be able to perform up to his standards.

I believe this statement was a pretext, and that Mr. Polyak was really removing the accounts from me because of my age, and possibly in retaliation for my not retiring when Mr. Polyak (or others at BOKFS) thought I should.  My belief is based upon several facts:  (1) in inducing me to enter into a partnership with Ms. Rena Connor in 2014, I was told it was to allow for a "smooth transition of the accounts to Ms. Connor" upon my retirement.  I had no plans to retire at that time, and had not been discussing my retirement with anyone at BOKFS.  (2) If the plan was to allow for a "smooth transition" of all of my accounts to Ms. Connor upon my retirement, it did

not make sense to remove those very same accounts from me, upon Ms. Connor's departure from the company, especially since I had nearly all of the same accounts prior to taking Ms. Connor on as a partner. I had no performance issues handling that number of accounts prior to my partnership with Ms. Connor, and indeed, had performed quite successfully. I was not given the opportunity to demonstrate I could continue to handle the accounts upon her departure, even though I requested the opportunity. It is certainly supportive of my age discrimination claim that Mr. Polyak and others at BOKFS believed Ms. Connor could continue to handle the accounts upon MY departure, but not the other way around. (3) The accounts taken from me were primarily reassigned to two men in the office who are substantially younger than I, including John Moynihan (I believe he received the bulk of my Tier I accounts, and is approximate age: 55) and Josh Wall (approximate age: 32). At the time my accounts were being reassigned, Mr. Moynihan had approximately fifteen more accounts than I. So the explanation that some of my accounts needed to be reassigned to others because I had "too many accounts" was clearly pretextual.

When I pointed the above facts out to Mr. Polyak, Mr. Polyak ultimately retaliated against me and took further adverse action against me, writing up a "Counseling Report" in an effort to justify his actions against me. His contentions in the counseling report were pretextual, as well, and I rebutted each of the four points he raised in the "Counseling Report," showing they were not based in fact. I specifically requested an opportunity to meet and rebut the counseling report. Ms. Goins declined my request, stating "that is behind us." I responded if I was not going to have an opportunity to properly respond, I wanted it removed from my personnel file. Ms. Goins refused.

Mr. Polyak's removal of accounts from me is an adverse action, as it substantially alters (decreases) my ability to earn income.

By way of further background:

I had been handling the referenced accounts for a number of years on my own, with good success. Nearly monthly I received congratulatory emails from Nick Polyak and his supervisor and a promotion to Senior Vice President. In or around 2014, I was asked to take on a young administrative assistant, Rena Connor, approximate age at that time, 28, now 32, and train her in Institutional Fixed Income Sales. I was asked to take Ms. Connor on as a partner primarily "so there would be a seamless transition with our accounts when you choose to retire." I had not discussed or mentioned retirement.

I agreed to the request only on the condition that taking Ms. Connor on as a partner so long as my commission structure and formula were not altered. I was receiving a 55% commission at that time. I was promised I would continue to receive the same commission as before. For the next year, BOKFS honored its commitment to me, and I mentored Ms. Connor, to great success.

In January, 2016, my manager, Nick Polyak demanded that I give up a portion of my commission (10%) to Ms. Connor. I objected to this demand. I ultimately relented, as I felt I had no choice.

Ms. Connor and I continued to experience great success. In or around early 2017, Nick Polyak began assigning a portion of the gross revenues from the Ripley/Connor partnership to a separate registered representative number assigned to Ms. Connor, instead of our partnership account. The result of this was to reduce my commissions even further – I was no longer receiving commissions on some of the revenue generated as a result of our partnership, only Ms. Connor was.

In or around the first week of January, 2018, Ms. Conner resigned from BOKFS and took a position elsewhere.   Shortly after that, Nick Polyak informed me that he was planning to remove a number of productive Tier I accounts from me and reassign them to other individuals at the firm who are younger than I, including John Moynihan (approximate age:  55) and Josh Walls (approximate age:  32).  This type of reassignment of accounts is not customary in the industry.  I was not offered an override on the accounts that were to be reassigned, although an override is customary in the industry if a productive account is reassigned.

I asked why my accounts were being reassigned.  I was told I had "too many" accounts.  I would note I had approximately 60 accounts assigned to me before the reassignment and Mr. Moynihan had approximately 75 accounts.  I pointed this fact out to Mr. Polyak, as well as the fact I had nearly all of the accounts prior to taking on Ms. Connor as a partner, and further, that the company had represented to me that they intended to transferal of the accounts to Ms. Connor upon my "retirement."  If that was the case, there was no reason I should not being permitted to retain the accounts myself.   Three months later, in April, 2018, Mr. Polyak created a "counseling report" identifying four times he alleges I did not perform up to his standards.  The four incidents Mr. Polyak identified were not factually accurate, and were a mere pretext.  I responded with correct facts.

I also complained to Kari Goins asserting I believed I was being discriminated against based upon age, and retaliated against.  My complaints to Ms. Goins were made on or around April 2, 2018.


**REQUESTED RESOLUTION:**

I want the accounts which were reassigned to me transferred back to me.  I want back compensation for the lost revenue resulting from the Conner/Ripley parternship.  I want back compensation for commissions lost as a result of those accounts being reassigned.


DATE: _August 13 2018_    SIGNATURE: _Charles P. Ripley_

EXHIBIT 3

Rena Connor

1417 Toucan Dr.
Little Elm, TX 75068
(817) 501-9908
connor.rena@gmail.com

January 4th, 2018

BOK Financial Securities, Inc.
Vice President – Institutional Fixed Income Sales

Nick,

I would like to inform you and Brett that I am formally giving my 30 day notice, in accordance with the
BOK rep agreement, to resign from my position with the firm.

This decision was extremely difficult; my gratitude for the professional growth and opportunities that
BOK has given me over the last 7 years is immense. However, I have accepted a new role with a firm in
New Jersey as an Executive Director and will be starting after fulfilling my obligation to BOK on February
5th, 2018.

Thank you so much for everything you have done for me as an employee over the last several years and
I wish the firm continued success.

- Rena Connor

**BOKFS-001799**

**CONFIDENTIAL**

EXHIBIT 4

# COUNSELING REPORT

**● BOK FINANCIAL CORPORATION**

| NAME OF EMPLOYEE COUNSELED | SUPERVISOR | POSITION | DEPARTMENT | LOCATION | DATE |
|---|---|---|---|---|---|
| Charles Ripley | Nick Polyak | Investment Sales | BOKFS | Richardson | 4/3/2018 |

| PURPOSE OF COUNSELING (place an X next to applicable selection) | AREA OF CONCERN (place an X next to applicable selection) |
|---|---|
| _X_ To call area of concern to employee's attention  (Verbal Notice)<br>___ To indicate seriousness of a problem    (Written Notice)<br>___ To place on formal probation from: _____ to: _____ (not to exceed 90 days)<br>___ Remove from probation<br>___ Recommend Termination<br><br>Although these procedures involve multiple steps, these steps may be combined, shortened, or eliminated, if circumstances are warranted and with the approval of the Human Resources Department. | _X_ Quality of work<br>___ Quantity of work<br>___ Attendance / Tardiness<br>___ Failure to report / call in<br>___ Personal conduct<br>___ Policy Violation<br>___ Fraud/Financial<br>___ Other |

**DOCUMENT DATES, DESCRIPTION, AND CONSEQUENCES OF PERFORMANCE/BEHAVIORAL ISSUES**

On January 29th, Charles and his manager, Nick Polyak met to discuss concerns of quality of work. Not previously discussed was Charles' customer offering of $5MM Conroe ISD 5% +50 spread (when +50 was 4% coupon context) on 1/10/2018.

Since our discussion on January 29th the following incidents have occurred:

1.  3/21/2018 - OU Med Bid/Counter w/ customer; Charles was slow and cumbersome to locate the customer bid/CUSIP in question.
2.  3/27/2018 - Richardson balances in '19 & '20; keeping pace w/ levels and when bonds traded; asking trader if bonds had traded and levels after Bloomberg post was made to the system.
3.  3/28/2018 - Offering Oklahoma Water Resources bonds to customers as OK Dev Fin Authority; wrong bonds/wrong header

As an Investment Sales Officer III, Charles is responsible for delivering the best client experience possible and to ensure his quality of work meets minimum expectations.  Failure to complete the action steps below or failure to demonstrate immediate, sustained and significant improvement could result in further disciplinary action, up to and including termination.

**DOCUMENT THE PERFORMANCE CRITERIA NEEDED FOR WORK IMPROVEMENT (Be specific and measurable)**

| ACTION STEPS<br><br>(If applicable, discuss EAP benefit) | PERSON(S) RESPONSIBLE | PROGRESS DATE(S) | | FOLLOW-UP |
|---|---|---|---|---|
| Ensure daily activities with customers, traders and fellow salespeople are accurate, efficient (time sensitive), and complete so as to reflect professionally on the firm, and conduct within the firm is efficient w/ existing resources. | Charles Ripley | PLANNED<br>5/1/2018 | ACTUAL | DATE and DISCUSSION: |
| | | PLANNED | ACTUAL | DATE and DISCUSSION: |
| | | PLANNED | ACTUAL | DATE and DISCUSSION: |

| HAS EMPLOYEE PREVIOUSLY BEEN COUNSELED ABOUT THIS ISSUE:  YES  NO | IF YES:   VERBAL    WRITTEN | BY WHOM:<br>Nick Polyak | WHEN:<br>1/29/2018 3PM CST |
|---|---|---|---|

**SUMMARIZE RESULTS OF INTERVIEW AND ATTITUDE OF EMPLOYEE**

Charles was accepting of the feedback and expectations of the role and committed to favor accuracy foremost over speed.

**EXHIBIT**

42

PENGAD 800-631-6989

| SUPERVISOR'S/MANAGER'S SIGNATURE | DATE | HUMAN RESOURCE'S SIGNATURE | DATE |
|---|---|---|---|
| | 4/6/18 | | |

**\*\*ADDITIONAL INCIDENTS COULD RESULT IN FURTHER DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION\*\***

| NOTE: | The purpose of your signature is to acknowledge receipt of this document; however, failure to acknowledge receipt will be considered insubordination. | EMPLOYEE'S SIGNATURE | DATE |
|---|---|---|---|
| | | | 4/20/2018 |

To Whom It May Concern:

Please accept this Addendum as my response to the allegations made by my Supervisor, Nick Polyak, in the "DOCUMENTS DATES, DESCRIPTION, AND CONSEQUENCES OF PERFORMANCE/BEHAVORIAL ISSUES" of the aforementioned Counseling Report.  My signature on Page 2 of the Report is an acknowledgment of receipt of the Report only.  It is not an admission on my part that I am in agreement with the allegations; nor do I agree that the quality of my work on behalf of BOKFS was compromised.

I would like to explain the circumstances that led to a teleconference attended by Jerry Williams, Nick Polyak, Kari Goins and myself at 3:00 PM on March 27, 2018.

Nick and I had several conversations and email exchanges reference the subject allegations, especially the #1 allegation, "OU MED CTR BID/COUNTER with my account, Hopwood.  On Wednesday, March 21, Nick called me into his office to once again discuss the allegations.  Nick's behavior towards me was animated and aggressive.  I felt he was using his position as my supervisor to intimidate me to the point of making a false admission.  I expressed to Nick that I felt he was targeting me, and that his comments constituted age discrimination.  Nick stated I was "no longer able to keep pace," to which I replied that his statement was not accurate, and that it appeared he was attempting to build a case to terminate me.  Nick's response was to become more verbally aggressive, and confrontational.

I also took the opportunity to express to Nick my concern over other instances where he attempted to intimidate me; where his behavior towards me had been aggressive and bullying in nature.

One example I presented was when Nick was threatening to take away accounts from me after Rena's resignation.  He directly stated to me:  "Would it surprise you if I told you Rena told me you were not capable of handling these accounts?"  Based on my multi-year professional and personal relationship with Rena, which involved me being her direct mentor within in the organization, I knew this statement to be unequivocally false.  The statement by Nick gave the appearance he was applying this as his reasoning to validate account reassignments.  I directly challenged his statement by asking:  "Would it surprise you to know that Rena denied making that statement?"  Nick proceeded to admit Rena did not say that, "but that's what she meant."

A second example of Nick's aggressive and bullying approach involved an incident whereby Josh Wall had made an extremely derogatory remark to him at our holiday function.  When I questioned how this type of behavior could be acceptable in our workplace – and why such

1



egregious behavior was leading to Josh being rewarded with new accounts and responsibilities – Nick's temper escalated to the point he began screaming, ordering me to "get the hell out of his office." I walked out with Nick following, and he proceed to violently slam the door shut. I was obviously very concerned with what had happened. I didn't know whether or not to report the incident to HR as I felt intimidated. However, I did make the decision that I never wanted to have another conversation with Nick without someone else present.

On Friday I received an email from Nick to confirm a meeting with him on Wednesday. I was rattled by the sequence of events, Nick's inability to be truthful with me, his volatile temper, and my concern of being alone with him in a meeting. I made the decision to call Jerry and explain the situation and tell him my concerns about meeting privately with Nick. I did not trust Nick; I had no idea where his irrational temper would lead; and I did not think it was prudent to put myself in in such a vulnerable position.

Reference the "not previously discussed," the Conroe ISD offering by my customer RBC ARB: yes, I did send the off-the-market-offering to the BOKFMUNI distribution list that was established by Nick. The list consists of names of BOKFS institutional bond salespersons only. All of the salespersons that have offerings from their accounts are asked to distribute them using BOSCMUNI, and many are distributed each day. It is not industry practice to verify each offering to insure it is on-the-market. We use the offerings as another source of inventory to sell bonds to accounts. Accepted practice is for each salesperson who has an interest in an offering to determine on his own or with a trader if the offering is on-market and move forward. The distribution is only made to salespersons within the firm for internal use only - it is not made as an offering from BOKFS to an account. For example, I have included Exhibit A, which is an account offering sent to John Moynihan on April 18, 2018, which John sent to the BOSCMUNI distribution list. The bonds, designated by an asterisk, Arlington, are offered at 3.05%. Pat Short immediately questioned John as "where do they get off making that offering - they are way too high - worth something behind a 3.40." John's response was absolutely correct when he stated that "the account could put any offering on his bonds that he wanted, they were his bonds." Consequently, everyone was on the same page. The established procedure worked.

Reference Incident #1: I was at a doctor's appointment, and when I returned, Josh informed me that we were in a market with Hopwood on some OU MEDS. So, I consequently become involved in the transaction after the fact. Am I penalized by being at a doctor's office for an hour and not up to speed immediately upon my return? We had positions in three CUSIPS of the OU MEDS. I called Brandy Strader to obtain all the facts on the situation with Hopwood. Actually, the position belonged to Dan Phelps, but he was out of the office, and

2



Brandy was covering for him. Usually there only three persons involved in a position of this nature, but in this case the number almost doubled. I have discussed the situation with Brandy, and we agree that the situation was handled professionally. Clearly, the account remains comfortable conducting transactions with me and BOKFS, as I have executed transactions with them since the referenced allegation, resulting in approximately $20,000 in gross revenue for BOKFS.

Reference Incident #2: There were two competitive transactions for the City of Richardson on the same day. I had presale orders for four maturities on both transactions from Goldman Sachs Asset Management, at the same levels, using a 5.00% coupon. RBC bought the first transaction and used the same order I had from GSAM. BOKFS bought the second transaction, but our underwriter, Allen Mattson, chose to not use GSAM's order and bid with a 4.00% coupon at less yield. The next day we still had balances in 2019 and 2020. Allen called me and said he had an order at an adjusted level for 2019 (implying the buyer was going to take the entire balance), and the account would probably also take the 2020 maturity. Allen was very with fair with me and asked if I wanted to see if GSAM would have an interest, thus acknowledging my work the previous day with them. GSAM said they would take the 4.00% coupon but wanted their original level. Consequently, Allen sold the bonds away at the higher level. I saw the print for only 1500 in each maturity and called Allen to confirm the amount. I needed that explicit, correct information, and to convey to GSAM if necessary. I did keep pace, and executed in an efficient, professional manner.

Reference Incident #3: Yes, when sending out the long position on Oklahoma Water Resources, I did incorrectly identify them in the Header as ODFA. However, the description in each line offering on RUNZ was correct. If an account was interested in making a purchase, when they pulled the CUSIP, they would have the correct security description and offering.

I am confident the allegations Nick has made are trivial, explicit examples of harassment and targeting, and support my allegation of creating a hostile work environment, making it very difficult for me to reach my goals and objectives and those of BOKFS. I am being held to a different standard than other salespersons. I am unclear as to the shift in Nick's behavior towards me, and his recent decision to review my Bloomberg messages, emails and phone calls. To date, Nick's communications with me as my Supervisor, almost monthly and most recently dated January, 2018, praise my contributions to BOKFS, my work ethic and professionalism. Since I have been with BOKFS my production has been either at the top, or near the top, of my peer group annually.

3



I am open to learning opportunities at BOKFS suggestion. This includes training opportunities related to more effective communication, and additional classes directly related to my industry and type of sales activities. I do actively participate in on-going education yearly as a function of my role and have at all times maintained all required licenses and certifications. I am committed to being a steward of BOKFS values and our brand, not only to our team members within the organization, but at all times our clients as well. I am proud to work for BOKFS and am committed to helping our organization be as successful as possible. My goals have always included having relationships with my peers, managers and clients which are grounded in mutual respect for one another, and which lead to us all working together as a unit. I look forward to working with all of you to resolve this situation and appreciate your assistance in formulating a plan for us to all be successful together.

Respectively,

Charles P. Ripley

April 20, 2018

4



From: CHRIS OMARA (HOPWOOD LANE TRADING)
Bcc: CHARLES RIPLEY (BOK FINANCIAL SECURI)
Date: 03/21/18 11:05:17

OK *OKLAHOMA ST DEV FIN 4.125 08/15/57 67884XCM7

    4.19 bid  1mm

CHARLES RIPLEY

11:26:49 Hi, Chris - I've returned, and Josh gave me the details of our market.  Can you please give me a call?  Thanks!    Rip

11:49:

CHARLES RIPLEY

12:26:24 Our OK trader is Spring Breakin', so another trader is handlin' the position.  I believe that the very best she is willing to do, without trying to track down the OK trader, is 4.15.  I don't know if this meets your DP bogey, but we can fill you @ 4.15 on 1000.  Thanks!  Rip

CHRIS OMARA

12:27:58 ok...ill prob hold off but will try to come back maybe after the fed

CHARLES RIPLEY

12:31:40 Understood - thanks for the post!

13:55:26 Tried to call you - after a few rings, get a disconnect.  I can offer 1000 '57 @ 4.16.  Only have 120M due '57, so believe he wants to hold 'em.  Have 1480 due '48, and would offer @ 4.01.

CHRIS OMARA

13:56:01 ok, if i can get there ill be back

CHARLES RIPLEY

13:57:15 Got it - thank you!

CHARLES RIPLEY

11:26:49 Hi, Chris - I've returned, and Josh gave me the details of our market. Can you please give me a call? Thanks!    Rip

CHARLES RIPLEY

12:26:24 Our OK trader is Spring Breakin', so another trader is handlin' the position. I believe that the very best she is willing to do, without trying to track down the OK trader, is 4.15. I don't know if this meets your DP bogey, but we can fill you @ 4.15 on 1000. Thanks!  Rip

CHRIS OMARA

12:27:18 ok...ill prob hold off but will try to come back maybe after the fed

CHARLES RIPLEY

12:31:30 Understood - thanks for the post!

13:32   Still not there yet. Will reflect DP that will work.

212-284-9362

13:43   Message

13:45   Brandy

13:47   JB

13:51   BB reply - " If I can get there, etc

14:05   Brandy - Dan not answering

&lt;Menu&gt; to Return, Reply Sent

| 1) Delete | 2) Reply | 22) Reply All | 3) Forward | 12) Prev | 11) Next | 99) Options | Message: View |

↩
        03/21/18 13:43:53
   From ⁊ CHRIS OMARA (HOPWOOD LANE TRADING)                    📞 +1-212-284-9362
Attached  97) Bloomberg Function (MKCU)           91) ☆   92) Move        94) Tags



OK *OKLAHOMA ST DEV FIN 4.125 08/15/57 67884XCM7

    rip 4.20 bid  currently   1mm

        also do you offer  /48 or /52's ?

In providing this information to a municipal entity or obligated person, Piper Jaffray is not recommending an
action, acting as an advisor, and does not owe a fiduciary duty under Section 15B of the Exchange Act with res
pect to this information. Piper Jaffray is acting for its own interests, and any recipient should discuss this
information with their advisors before acting on this information. Securities offered through Piper Jaffray &
Co., member SIPC and NYSE. Piper Jaffray may own, buy, or sell these securities. Additional information at p
iperjaffray.com/disclosures. This e-mail may be considered a solicitation. To be added to our Do Not E-mail Re
gistry, go to piperjaffray.com/do_not_email.
               SN 339045 CDT  GMT-5:00 H367-5426-1 21-Mar-2018 13:49:17

## Ripley, Charles

| | |
|---|---|
| **From:** | Polyak, Nick |
| **Sent:** | Wednesday, March 21, 2018 2:00 PM |
| **To:** | Ripley, Charles |
| **Subject:** | OU Med - Bid/Counter w/ Hopwood |
| **Attachments:** | March 21_2018_Hopwood Bid OU Med.WAV |

**Importance:**    High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached
Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 | Phone
(972) 365-8806 | Mobile
npolyak@bokf.com | Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

713-289-5847 Brandy

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 97) Settings | | 98) Output | 100) Feedback | | | Page 8/13 DPPN | |

US Munis-By Issuer · 66) MSG Contributor · 13:45:22
Bank of Oklahoma · Zoom · 100%

Bank of Oklahoma -> Muni Offerings -> BOK Financial Securities -> By Issuer

| | Size | | Municipal Offering | ST | Cpn | Maturity | Yield | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | S&P | Mdys | Credit | Call Type | | CUSIP | SK | TRDR | Price | |
| 71) | | 1480 | OKLAHOMA ST DEV FIN AUTH HLTHS | OK | 4 | 08/15/2048 | 4.000 | | | |
| | A2 | AA | AGM 4.01 | CA:28@100.000 | | 67884XCJ4 | .5 | | 100.000 | |
| 72) | | 120 | OKLAHOMA ST DEV FIN AUTH HLTHS | OK | 4 | 08/15/2052 | 3.940 | | | |
| | A2 | AA | AGM NRG | CA:28@100.000 | | 67884XCL9 | 1.75 | | 100.502 | |
| 73) | | 2660 | OKLAHOMA ST DEV FIN AUTH HLTHS | OK | 4.125 | 08/15/2057 | 4.029 | | | |
| | A2 | AA | AGM 4.16 | CA:28@100.000 | | 67884XCM7 | 1.75 | | 100.800 | |
| 74) | | 30 | OKLAHOMA ST MUNI PWR AUTH | OK | 4 | 01/01/2047 | 3.500 | | | |
| | N.A. | A | | CA:23@100.000 | | 67910HNE6 | 1.75 | | 102.175 | |
| 75) | | 250 | OKLAHOMA ST WTR RESOURCE BRD R | OK | 5 | 04/01/2020 | 1.550 | | | |
| | Aaa | AAA | | NON-CALLABLE | | 67919PNT6 | .25 | | 106.841 | |
| 76) | | 170 | ONALASKA WI | WI | 4 | 10/01/2024 | 2.250 | | | |
| | Aa2 | N.A. | | NON-CALLABLE | | 682217EP5 | .75 | | 110.518 | |
| 77) | | 175 | ONALASKA WI | WI | 4 | 10/01/2025 | 2.350 | | | |
| | Aa2 | N.A. | | NON-CALLABLE | | 682217EQ3 | .75 | | 111.277 | |
| 78) | | 190 | ONALASKA WI | WI | 3 | 10/01/2027 | 2.600 | | | |
| | Aa2 | N.A. | | CA:26@100.000 | | 682217ES9 | .75 | | 103.031 | |
| 79) | | 195 | ONALASKA WI | WI | 3 | 10/01/2028 | 2.700 | | | |
| | Aa2 | N.A. | | CA:26@100.000 | | 682217ET7 | .75 | | 102.263 | |
| 80) | | 200 | ONALASKA WI | WI | 3 | 10/01/2029 | 2.800 | | | |
| | Aa2 | N.A. | | CA:26@100.000 | | 682217EU4 | 1 | | 101.502 | |

SN 339045 CDT GMT-5:00 H367-5426-0 21-Mar-2018 13:45:22

**Ripley, Charles**

| | |
|---|---|
| **From:** | Ripley, Charles |
| **Sent:** | Wednesday, March 21, 2018 3:38 PM |
| **To:** | Polyak, Nick |
| **Subject:** | RE: OU Med - Bid/Counter w/ Hopwood |

The conversation reflects my attempt to get the very best possible price for the bonds, in order to maximize BOKF's return on Dan's position.  Brandy and I discussed bid vs ask; the flexibility Dan had in his offering; what she wanted to accomplish; how to handle the situation in Dan's absence, etc. The client did not respond to Josh's 4.12 bid. Therefore, I did not want to play my entire hand and tell the account that our best was 4.15.  I was trying to push the account to give me something, hopefully inside of a 4.15.  I know how the account enjoys the game.  The counter was reflected when I told the account that I could "probably" get "1 or 2 basis points better," but not without an order.  At that point, if I had offering the bonds at 4.15, that would have just shown weakness, and a cheaper bid, if any, from the account.  Believe Chis said he would see if that would work, and get back to me.  That's probably not verbatim; however, the essence is that the account would not make a commitment.  I do understand your concern is "our sharpness, speed and efficiency in a market," which should be of primary concern to all of us.  A negative in this situation was/is Dan's absence, which was always a concern of mine and Brandy's.

I am confident that the conversation/transaction does not meet your complete objectives; however, is any transaction 100% textbook? Brandy and protected the firm's position, and the account was aware of where we stood. There were no misunderstandings, and I believe that Dan would agree with my analysis.

Thank you.

**Charles P. Ripley**
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 | Office
(214) 766-4653 | Cell
(214) 776-0890 | Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 2:00 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** OU Med - Bid/Counter w/ Hopwood
**Importance:** High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached

1

Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 I Phone
(972) 365-8806 I Mobile
npolyak@bokf.com I Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**



From: Ripley, Charles
Sent: Wednesday, March 21, 2018 3:38 PM
To: Polyak, Nick <NPolyak@bokf.com>
Subject: RE: OU Med - Bid/Counter w/ Hopwood

The conversation reflects my attempt to get the very best possible price for the bonds, in order to maximize BOKF's return on Dan's position. Brandy and I discussed bid vs ask; the flexibility Dan had in his offering; what she wanted to accomplish; how to handle the situation in Dan's absence, etc. The client did not respond to Josh's 4.12 bid. Therefore, I did not want to play my entire hand and tell the account that our best was 4.15. I was trying to push the account to give me something, hopefully inside of a 4.15. I know how the account enjoys the game. The counter was reflected when I told the account that I could "probably" get "1 or 2 basis points better," but not without an order. At that point, if I had offering the bonds at 4.15, that would have just shown weakness, and a cheaper bid, if any, from the account. Believe Chis said he would see if that would work, and get back to me. That's probably not verbatim; however, the essence is that the account would not make a commitment. I do understand your concern is "our sharpness, speed

and efficiency in a market," which should be of primary concern to all of us. A negative in this situation was/is Dan's absence, which was always a concern of mine and Brandy's.

I am confident that the conversation/transaction does not meet your complete objectives; however, is any transaction 100% textbook? Brandy and protected the firm's position, and the account was aware of where we stood. There were no misunderstandings, and I believe that Dan would agree with my analysis.

Thank you.

## **Charles P. Ripley**
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 2:00 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** OU Med - Bid/Counter w/ Hopwood
**Importance:** High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached
Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 I Phone
(972) 365-8806 I Mobile
npolyak@bokf.com I Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**Ripley, Charles**

| | |
|---|---|
| **From:** | Polyak, Nick |
| **Sent:** | Wednesday, March 21, 2018 4:21 PM |
| **To:** | Ripley, Charles |
| **Subject:** | RE: OU Med - Bid/Counter w/ Hopwood |

As clearly evidenced in the IB you provided me, you did in fact reflect 4.15 best. The 4.14 was never reflected. The customer didn't respond to the 4.12 counter and the revised counter improved to 4.15 best. If I were the customer why not wait, they may hit my 4.19 bid at this rate?

You took 5+ minutes w/ Brandy figuring out which CUSIP/bonds were involved.

This was a routine bid/counter situation that was made cumbersome and reflects poorly to the customer. Brandy handling Dan's position made the situation less efficient but I'm particularly critical of your handling the market and what we o/o.

I'm only asking you to control what you can which is 4.19 bid for $4MM ..CM7. The following from the customer is plain as day.

Wed    3/21/2018    Ref Hopwood

This was all caused by Josh who is plotting with Nick to basically get me fired. Nick calls me into his office and starts reading me out for the timing of the Hopwood transaction. He was very volatile to the point of almost screaming, kept questioning me, not listening to my explanation of why he was incorrect. I kept my cool and we got into it, especially about targeting me to try and find a reason to fire me, and wouldn't accept the fact that he was wrong. "I want you here as long as you want, et." I told him that I didn't believe him. Got into statements that he had told me previously trying to intimidate me. "Would you be surprised if Rena told me several times that you were not capable, etc?" Using that statement to jerk accounts away. Well, I threw the BS flag and turned the tables and told him Rena denied the statements. Then he goes nuts and backs off almost screaming at that point. Then he tries to say that maybe Rena did not

Thursday, Nacasa Labat

CHRIS OMARA
09:51:40 4.17 bid  OK  4.125 /57
CHARLES RIPLEY
09:53:42 Thanks for the bid, but best I can do is repeat our 4.16 offer.
CHRIS OMARA
09:54:06 ok, if i can get there ill be back
CHARLES RIPLEY
09:55:00 Thank you.  Presume we are clear, or do I try and protect you for a few minutes?
CHRIS OMARA
09:56:26 we are clear , thanks for asking

From: CHARLES RIPLEY, BOK FINANCIAL SECURI
To: NICK POLYAK, BOK FINANCIAL SECURI
Subject: HOPWOOD
Date: 03/22, 2018 10:05:30

Hopwood finally came back with a 4.17 bid.  Reflected to Brandy.  She still has
not heard from Dan, and wanted me to just repeat her earlier offering @ 4.16,
which I did.  Reply was "if I can get there I'll be back."  So, we have a 4.17/
4.16 mkt, and we are clear.

-----------------------------------------------------------
Charles Ripley
214-576-0873

From: CHARLES RIPLEY (BOK FINANCIAL SECURI)
Bcc: NICK POLYAK (BOK FINANCIAL SECURI)
Subject: Re:HOPWOOD
Date: 03/22/18 10:12:20

Brandy's hands are tied without speaking to Dan, and it sounds like he is ignoring her.

From: NICK POLYAK (BOK FINANCIAL SECURI) At: 03/22/18 10:08:25

To: CHARLES RIPLEY (BOK FINANCIAL SECURI )
Subject: Re:HOPWOOD

They should hit it and run.

From: CHARLES RIPLEY (BOK FINANCIAL SECURI) At: 03/22/18 10:05:30

To: NICK POLYAK (BOK FINANCIAL SECURI )
Subject: HOPWOOD

Hopwood finally came back with a 4.17 bid. Reflected to Brandy. She still has not heard from
Dan, and wanted me to just repeat her earlier offering @ 4.16, which I did. Reply was "if I can
get there I'll be back." So, we have a 4.17/4.16 mkt, and we are clear.

------------------------------------------------------------
Charles Ripley
214-576-0873

From: CHARLES RIPLEY (BOK FINANCIAL SECURI)
Bcc: NICK POLYAK (BOK FINANCIAL SECURI)
Subject: Re:HOPWOOD
Date: 03/22/18 10:30:13

++I was talking to Brandy, and Dan called her. "With the market up, my best now is 4.14. They should have hit our 4.16 offering." I have IB'd to account, and have no response. ++

Brandy's hands are tied without speaking to Dan, and it sounds like he is ignoring her.

----------

From: NICK POLYAK (BOK FINANCIAL SECURI) At: 03/22/18 10:08:25

To: CHARLES RIPLEY (BOK FINANCIAL SECURI)
Subject: Re:HOPWOOD

They should hit it and run.

From: CHARLES RIPLEY (BOK FINANCIAL SECURI) At: 03/22/18 10:05:30

To: NICK POLYAK (BOK FINANCIAL SECURI)
Subject: HOPWOOD

Hopwood finally came back with a 4.17 bid. Reflected to Brandy. She still has not heard from Dan, and wanted me to just repeat her earlier offering @ 4.16, which I did. Reply was "if I can get there I'll be back." So, we have a 4.17/4.16 mkt, and we are clear.

--------------------------------------------------------------
Charles Ripley
214-576-0873

10:32 Called Hop since he had not picked up IB. "Yes, saw it, if I can etc, etc, etc.

## Ripley, Charles

| | |
|---|---|
| **From:** | Ripley, Charles |
| **Sent:** | Tuesday, March 27, 2018 8:42 AM |
| **To:** | Polyak, Nick |
| **Subject:** | RE: OU Med - Bid/Counter w/ Hopwood |

I acknowledge that I did receive your "response." I didn't realize you were requesting a reply . In reference to your "corrective action plan," I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so. Thank you.

### Charles P. Ripley
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Monday, March 26, 2018 3:52 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood
**Importance:** High

You never acknowledged my response on this. I appreciate you posting me on the situation last Thursday even though we didn't get a trade done. Getting the actual trade done was never my criticism. We all know all bid/counter situations cannot be quantified by a trade itself.

This serves as a written warning/evidence of my concern of your ability to be quick, accurate and efficient with markets with our customers.

Please respond to me with your corrective action plan to remedy this concern going forward.

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 4:21 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

As clearly evidenced in the IB you provided me, you did in fact reflect 4.15 best. The 4.14 was never reflected. The customer didn't respond to the 4.12 counter and the revised counter improved to 4.15 best. If I were the customer why not wait, they may hit my 4.19 bid at this rate?

You took 5+ minutes w/ Brandy figuring out which CUSIP/bonds were involved.

This was a routine bid/counter situation that was made cumbersome and reflects poorly to the customer. Brandy handling Dan's position made the situation less efficient but I'm particularly critical of your handling the market and what we o/o.

I'm only asking you to control what you can which is 4.19 bid for $4MM ..CM7. The following from the customer is plain as day



From: Ripley, Charles
Sent: Wednesday, March 21, 2018 3:38 PM
To: Polyak, Nick <NPolyak@hokt.com>
Subject: RE: OU Med - Bid/Counter w/ Hopwood

2

The conversation reflects my attempt to get the very best possible price for the bonds, in order to maximize BOKF's return on Dan's position. Brandy and I discussed bid vs ask; the flexibility Dan had in his offering; what she wanted to accomplish; how to handle the situation in Dan's absence, etc. The client did not respond to Josh's 4.12 bid. Therefore, I did not want to play my entire hand and tell the account that our best was 4.15. I was trying to push the account to give me something, hopefully inside of a 4.15. I know how the account enjoys the game. The counter was reflected when I told the account that I could "probably" get "1 or 2 basis points better," but not without an order. At that point, if I had offering the bonds at 4.15, that would have just shown weakness, and a cheaper bid, if any, from the account. Believe Chis said he would see if that would work, and get back to me. That's probably not verbatim; however, the essence is that the account would not make a commitment. I do understand your concern is "our sharpness, speed and efficiency in a market," which should be of primary concern to all of us. A negative in this situation was/is Dan's absence, which was always a concern of mine and Brandy's.

I am confident that the conversation/transaction does not meet your complete objectives; however, is any transaction 100% textbook? Brandy and protected the firm's position, and the account was aware of where we stood. There were no misunderstandings, and I believe that Dan would agree with my analysis.

Thank you.

## Charles P. Ripley

Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 2:00 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** OU Med - Bid/Counter w/ Hopwood
**Importance:** High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached
Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com

3

333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 I Phone
(972) 365-8806 I Mobile
npolyak@bokf.com I Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**Ripley, Charles**

| | |
|---|---|
| **From:** | Polyak, Nick |
| **Sent:** | Wednesday, March 28, 2018 9:14 AM |
| **To:** | Ripley, Charles |
| **Subject:** | RE: OU Med - Bid/Counter w/ Hopwood |

Rip,

Your response was:

*I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so*

What's wrong with this offer this morning?

| ⊟ ⊟ **Audit Trail [CDT]** | | **Username** | | | | | | **Event** | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar 28 2018 07:48:01AM | | Global Relay Archive | | | | | | 📧 Imported | | |

| + | Subject 🖋: | ✉ **BOKF OK DEV FIN AUTH BALANCES//RIP//214-576-0873** |
|---|---|---|
| | From 👤: | "Charles Ripley (BOK FINANCIAL SECURI)" <c.ripley@bloomberg.net> |
| | Date 🕐: | **1 hour ago** Wed, 28 Mar 2018 07:47:13 -0500 |
| | To 👤: | undisclosed-recipients:; |
| | Bcc/DL 👤: | cripley@bokf.com |

| Security | St | Issuer | | Moody | S&P | ASz (M) | Cpn | Mty | A Px | A YTC |
|---|---|---|---|---|---|---|---|---|---|---|
| 67920QNU8 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | | AAA | 495 | 2.500 | 10/01/27 | 99.496 | 2.560 |
| 67920QNV6 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | | AAA | 510 | 2.625 | 10/01/28 | 98.957 | 2.740 |
| 67920QNW4 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | | AAA | 520 | 2.750 | 10/01/29 | 98.349 | 2.920 |
| 67920QNX2 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | | AAA | 440 | 3.000 | 10/01/30 | 99.380 | 3.060 |

-------------------------------------------------------------------- Charles Ripley 214-576-0873

Load: 0.3 seconds | Size: 19KB | Serial #: 41684630 | **After Review ✔ go to ❯ : Next Message ▾**

Yesterday... Reference GSAM's down 6 bid yesterday morning, how long did it take you to figure out that Richardson partials in 19 & 20 traded down 3? I know it to be ~30 minutes.

I want more specifics on your corrective action. I continue to be concerned of your handling of the basics.

**From:** Ripley, Charles
**Sent:** Tuesday, March 27, 2018 8:42 AM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

I acknowledge that I did receive your "response." I didn't realize you were requesting a reply . In reference to your "corrective action plan," I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so. Thank you.

## Charles P. Ripley

1

Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Monday, March 26, 2018 3:52 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood
**Importance:** High

You never acknowledged my response on this. I appreciate you posting me on the situation last Thursday even though we didn't get a trade done. Getting the actual trade done was never my criticism. We all know all bid/counter situations cannot be quantified by a trade itself.

This serves as a written warning/evidence of my concern of your ability to be quick, accurate and efficient with markets with our customers.

Please respond to me with your corrective action plan to remedy this concern going forward.

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 4:21 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

As clearly evidenced in the IB you provided me, you did in fact reflect 4.15 best. The 4.14 was never reflected. The customer didn't respond to the 4.12 counter and the revised counter improved to 4.15 best. If I were the customer why not wait, they may hit my 4.19 bid at this rate?

You took 5+ minutes w/ Brandy figuring out which CUSIP/bonds were involved.

This was a routine bid/counter situation that was made cumbersome and reflects poorly to the customer. Brandy handling Dan's position made the situation less efficient but I'm particularly critical of your handling the market and what we o/o.

I'm only asking you to control what you can which is 4.19 bid for $4MM ..CM7. The following from the customer is plain as day.



From: Ripley, Charles
Sent: Wednesday, March 21, 2018 3:38 PM
To: Polyak, Nick <NPolyak@bokf.com>
Subject: RE: OU Med - Bid/Counter w/ Hopwood

The conversation reflects my attempt to get the very best possible price for the bonds, in order to maximize BOKF's return on Dan's position. Brandy and I discussed bid vs ask; the flexibility Dan had in his offering; what she wanted to accomplish; how to handle the situation in Dan's absence, etc. The client did not respond to Josh's 4.12 bid. Therefore, I did not want to play my entire hand and tell the account that our best was 4.15. I was trying to push the account to give me something, hopefully inside of a 4.15. I know how the account enjoys the game. The counter was reflected when I told the account that I could "probably" get "1 or 2 basis points better," but not without an order. At that point, if I had offering the bonds at 4.15, that would have just shown weakness, and a cheaper bid, if any, from the account. Believe Chis said he would see if that would work, and get back to me. That's probably not verbatim; however, the essence is that the account would not make a commitment. I do understand your concern is "our sharpness, speed

and efficiency in a market," which should be of primary concern to all of us. A negative in this situation was/is Dan's absence, which was always a concern of mine and Brandy's.

I am confident that the conversation/transaction does not meet your complete objectives; however, is any transaction 100% textbook? Brandy and protected the firm's position, and the account was aware of where we stood. There were no misunderstandings, and I believe that Dan would agree with my analysis.

Thank you.

## Charles P. Ripley
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 | Office
(214) 766-4653 | Cell
(214) 776-0890 | Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 2:00 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** OU Med - Bid/Counter w/ Hopwood
**Importance:** High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached
Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 | Phone
(972) 365-8806 | Mobile
npolyak@bokf.com | Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

4

## Ripley, Charles

| | |
|---|---|
| **From:** | Ripley, Charles |
| **Sent:** | Wednesday, March 28, 2018 10:26 AM |
| **To:** | Polyak, Nick |
| **Subject:** | RE: OU Med - Bid/Counter w/ Hopwood |

The OK WATERS are a retail structure and price. I had no luck with them when we priced the issue, and the accounts that could purchase the credit want premium bonds. However, I did send them to my accounts at 07:45:31 Central this morning.

Reference Richardson, Allen and I were in communication with each other when he called me and said that he was tied up on the '19 maturity down 3 BPS; they were probably going to trade. He also told me that I was the best indication in '20, and he felt that it was only fair to give me a shot with GSAM at down 3. I spoke to GSAM. (I presume you saw that RBC used their order on the larger deal.) After a back-and-forth with GSAM reference CUSIP (we used 4's, and RBC used 5s, which was their presale), they did not care about Allen's offering @ down 3, but did gave me an order down 6 from the original. Allen did not care there, and told me he was pretty sure that the account that was buying '19 would take the '20 maturity also. I reflected to GSAM that Allen was just repeating his offering, and GSAM once again did not care and we were clear at that point. My IB conversation with Ben Kim began @ 7:49:01 and ended @ 7:59:47. It was not +/- 30 minutes as you have suggested.

The above is not "corrective action," it's "handling the basics," a practice that I have followed for damn near 50 years. If I had not, I would not have been successful, and I believe that my success at BOKF is indicative of the quality of my work ethic. I don't believe" that you should be concerned of my handling of the basics." Thank you.

### Charles P. Ripley
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 28, 2018 9:14 AM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

Rip,

Your response was:

*I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so*

1

What's wrong with this offer this morning?

| Audit Trail [CDT] | | Username | | | | | | | Event | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar 28 2018 07:48:01AM | | Global Relay Archive | | | | | | | Imported | |

**Subject ✐:** 📨 BOKF OK DEV FIN AUTH BALANCES//RIP//214-576-0873

**From ▲:** "Charles Ripley (BOK FINANCIAL SECURI)" <c.ripley@bloomberg.net>

**Date 🕙:** 1 hour ago Wed, 28 Mar 2018 07:47:13 -0500

**To ▲:** undisclosed-recipients:;

**Bcc/DL ▲:** cripley@bokf.com

| Security | St | Issuer | | Moody | S&P | ASz (M) | Cpn | Mty | A Px | A YTC |
|---|---|---|---|---|---|---|---|---|---|---|
| 67920QNU8 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 495 | 2.500 | 10/01/27 | 99.496 | 2.560 | |
| 67920QNV6 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 510 | 2.625 | 10/01/28 | 98.957 | 2.740 | |
| 67920QNW4 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 520 | 2.750 | 10/01/29 | 98.349 | 2.920 | |
| 67920QNX2 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 440 | 3.000 | 10/01/30 | 99.380 | 3.060 | |

------------------------------------------------------------------------------ Charles Ripley 214-576-0873

Load: 0.3 seconds | Size: 19KB | Serial #: 41684630 | After Review ✓ go to ▶ : Next Message ▾

Yesterday... Reference GSAM's down 6 bid yesterday morning, how long did it take you to figure out that Richardson partials in 19 & 20 traded down 3? I know it to be ~30 minutes.

I want more specifics on your corrective action. I continue to be concerned of your handling of the basics.

**From:** Ripley, Charles
**Sent:** Tuesday, March 27, 2018 8:42 AM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

I acknowledge that I did receive your "response." I didn't realize you were requesting a reply . In reference to your "corrective action plan," I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so. Thank you.

**Charles P. Ripley**
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 | Office
(214) 766-4653 | Cell
(214) 776-0890 | Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name. BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Monday, March 26, 2018 3:52 PM

2

**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood
**Importance:** High

You never acknowledged my response on this. I appreciate you posting me on the situation last Thursday even though we didn't get a trade done. Getting the actual trade done was never my criticism. We all know all bid/counter situations cannot be quantified by a trade itself.

This serves as a written warning/evidence of my concern of your ability to be quick, accurate and efficient with markets with our customers.

Please respond to me with your corrective action plan to remedy this concern going forward.

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 4:21 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

As clearly evidenced in the IB you provided me, you did in fact reflect 4.15 best. The 4.14 was never reflected. The customer didn't respond to the 4.12 counter and the revised counter improved to 4.15 best. If I were the customer why not wait, they may hit my 4.19 bid at this rate?

You took 5+ minutes w/ Brandy figuring out which CUSIP/bonds were involved.

This was a routine bid/counter situation that was made cumbersome and reflects poorly to the customer. Brandy handling Dan's position made the situation less efficient but I'm particularly critical of your handling the market and what we o/o.

I'm only asking you to control what you can which is 4.19 bid for $4MM ..CM7. The following from the customer is plain as day.

3



**From:** Ripley, Charles
**Sent:** Wednesday, March 21, 2018 3:38 PM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

The conversation reflects my attempt to get the very best possible price for the bonds, in order to maximize BOKF's return on Dan's position. Brandy and I discussed bid vs ask; the flexibility Dan had in his offering; what she wanted to accomplish; how to handle the situation in Dan's absence, etc. The client did not respond to Josh's 4.12 bid. Therefore, I did not want to play my entire hand and tell the account that our best was 4.15. I was trying to push the account to give me something, hopefully inside of a 4.15. I know how the account enjoys the game. The counter was reflected when I told the account that I could "probably" get "1 or 2 basis points better," but not without an order. At that point, if I had offering the bonds at 4.15, that would have just shown weakness, and a cheaper bid, if any, from the account. Believe Chis said he would see if that would work, and get back to me. That's probably not verbatim; however, the essence is that the account would not make a commitment. I do understand your concern is "our sharpness, speed

and efficiency in a market," which should be of primary concern to all of us. A negative in this situation was/is Dan's absence, which was always a concern of mine and Brandy's.

I am confident that the conversation/transaction does not meet your complete objectives; however, is any transaction 100% textbook? Brandy and protected the firm's position, and the account was aware of where we stood. There were no misunderstandings, and I believe that Dan would agree with my analysis.

Thank you.

## Charles P. Ripley
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 | Office
(214) 766-4653 | Cell
(214) 776-0890 | Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 2:00 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** OU Med - Bid/Counter w/ Hopwood
**Importance:** High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached
Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 | Phone
(972) 365-8806 | Mobile
npolyak@bokf.com | Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

## Ripley, Charles

| | |
|---|---|
| **From:** | Polyak, Nick |
| **Sent:** | Wednesday, March 28, 2018 11:15 AM |
| **To:** | Ripley, Charles |
| **Subject:** | RE: OU Med - Bid/Counter w/ Hopwood |

You are missing my points.

1. You offered OWRB's as ODFA's - today
2. You asked the desk if Richardson's traded 30 minutes after trade was posted - yesterday
3. You couldn't find the OU Med bonds that were subject of the customer's 4.19 bid – on 3/21, Wednesday last week

I'll schedule some time for us to discuss in person when I get back.

I'm not debating your success over 50 years, however I do make the distinction of primary and secondary. The above basic issues are secondary in nature.

**From:** Ripley, Charles
**Sent:** Wednesday, March 28, 2018 10:26 AM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

The OK WATERS are a retail structure and price. I had no luck with them when we priced the issue, and the accounts that could purchase the credit want premium bonds. However, I did send them to my accounts at 07:45:31 Central this morning.

Reference Richardson, Allen and I were in communication with each other when he called me and said that he was tied up on the '19 maturity down 3 BPS; they were probably going to trade. He also told me that I was the best indication in '20, and he felt that it was only fair to give me a shot with GSAM at down 3. I spoke to GSAM. (I presume you saw that RBC used their order on the larger deal.) After a back-and-forth with GSAM reference CUSIP (we used 4's, and RBC used 5s, which was their presale), they did not care about Allen's offering @ down 3, but did gave me an order down 6 from the original. Allen did not care there, and told me he was pretty sure that the account that was buying '19 would take the '20 maturity also. I reflected to GSAM that Allen was just repeating his offering, and GSAM once again did not care and we were clear at that point. My IB conversation with Ben Kim began @ 7:49:01 and ended @ 7:59:47. It was not +/- 30 minutes as you have suggested.

The above is not "corrective action," it's "handling the basics," a practice that I have followed for damn near 50 years. If I had not, I would not have been successful, and I believe that my success at BOKF is indicative of the quality of my work ethic. I don't believe" that you should be concerned of my handling of the basics." Thank you.

## Charles P. Ripley
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080

(214) 576-0873 | Office
(214) 766-4653 | Cell

1

(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 28, 2018 9:14 AM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

Rip,

Your response was:

*I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so*

What's wrong with this offer this morning?

| ⊟ ⊟ Audit Trail [CDT] | | | Username | | | | | Event | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar 28 2018 07:48:01AM | | | Global Relay Archive | | | | | 📧 Imported | | |

+    Subject ✒ :    📧 **BOKF OK DEV FIN AUTH BALANCES//RIP//214-576-0873**
       From ⬇ :    "Charles Ripley (BOK FINANCIAL SECURI)" <c.ripley@bloomberg.net>
       Date 🔟 :    1 hour ago Wed, 28 Mar 2018 07:47:13 -0500
       To ⬇ :    undisclosed-recipients:;
       Bcc/DL ⬇ :    cripley@bokf.com

| Security | St | Issuer | Moody | S&P | ASz (M) | Cpn | Mty | A Px | A YTC |
|---|---|---|---|---|---|---|---|---|---|
| 67920QNU8 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 495 | 2.500 | 10/01/27 | 99.496 | 2.560 |
| 67920QNV6 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 510 | 2.625 | 10/01/28 | 98.957 | 2.740 |
| 67920QNW4 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 520 | 2.750 | 10/01/29 | 98.349 | 2.920 |
| 67920QNX2 | OK | OKLAHOMA ST WTR RES BRD LOAN P | N.A. | AAA | 440 | 3.000 | 10/01/30 | 99.380 | 3.060 |

-------------------------------------------------------------------------------- Charles Ripley 214-576-0873

Load: 0.3 seconds | Size: 19KB | Serial #: 41684630 | After Review ✔ go to ❯ : Next Message ▾

Yesterday... Reference GSAM's down 6 bid yesterday morning, how long did it take you to figure out that Richardson partials in 19 & 20 traded down 3? I know it to be ~30 minutes.

I want more specifics on your corrective action. I continue to be concerned of your handling of the basics.

**From:** Ripley, Charles
**Sent:** Tuesday, March 27, 2018 8:42 AM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

I acknowledge that I did receive your "response." I didn't realize you were requesting a reply . In reference to your "corrective action plan," I always do my very best to be quick, accurate and efficient with markets with our customers, and I will continue to do so. Thank you.

2

**Charles P. Ripley**
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Monday, March 26, 2018 3:52 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood
**Importance:** High

You never acknowledged my response on this. I appreciate you posting me on the situation last Thursday even though we didn't get a trade done. Getting the actual trade done was never my criticism. We all know all bid/counter situations cannot be quantified by a trade itself.

This serves as a written warning/evidence of my concern of your ability to be quick, accurate and efficient with markets with our customers.

Please respond to me with your corrective action plan to remedy this concern going forward.

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 4:21 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

As clearly evidenced in the IB you provided me, you did in fact reflect 4.15 best. The 4.14 was never reflected. The customer didn't respond to the 4.12 counter and the revised counter improved to 4.15 best. If I were the customer why not wait, they may hit my 4.19 bid at this rate?

You took 5+ minutes w/ Brandy figuring out which CUSIP/bonds were involved.

This was a routine bid/counter situation that was made cumbersome and reflects poorly to the customer. Brandy handling Dan's position made the situation less efficient but I'm particularly critical of your handling the market and what we o/o.

I'm only asking you to control what you can which is 4.19 bid for $4MM ..CM7. The following from the customer is plain as day.



OKSMED 4.125 08/15/57   **100.8**        --        100.8 / 100.8        4.03 /
67884XCM7 Muni        1) Actions ▾   2) Settings ▾   Inventory & Pricing: Detaile

Message Results
From CHRIS OMARA
To CHARLES RIPLEY
Subject OK ●OKLAHOMA ST DEV FIN 4.125 08/15/57 67884XCM7

OK ●OKLAHOMA ST DEV FIN 4.125 08/15/57 67884XCM7

4.19 bid  1mm

**From:** Ripley, Charles
**Sent:** Wednesday, March 21, 2018 3:38 PM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** RE: OU Med - Bid/Counter w/ Hopwood

The conversation reflects my attempt to get the very best possible price for the bonds, in order to maximize BOKF's
return on Dan's position.  Brandy and I discussed bid vs ask; the flexibility Dan had in his offering; what she wanted to
accomplish; how to handle the situation in Dan's absence, etc. The client did not respond to Josh's 4.12 bid  Therefore,
I did not want to play my entire hand and tell the account that our best was 4.15.  I was trying to push the account to
give me something, hopefully inside of a 4.15. I know how the account enjoys the game. The counter was reflected
when I told the account that I could "probably" get "1 or 2 basis points better," but not without an order.  At that point,
if I had offering the bonds at 4.15, that would have just shown weakness, and a cheaper bid, if any, from the
account.  Believe Chis said he would see if that would work, and get back to me. That's probably not verbatim; however,
the essence is that the account would not make a commitment. I do understand your concern is "our sharpness, speed

4

and efficiency in a market," which should be of primary concern to all of us. A negative in this situation was/is Dan's absence, which was always a concern of mine and Brandy's.

I am confident that the conversation/transaction does not meet your complete objectives; however, is any transaction 100% textbook? Brandy and protected the firm's position, and the account was aware of where we stood. There were no misunderstandings, and I believe that Dan would agree with my analysis.

Thank you.

**Charles P. Ripley**
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 | Office
(214) 766-4653 | Cell
(214) 776-0890 | Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Wednesday, March 21, 2018 2:00 PM
**To:** Ripley, Charles <CRipley@bokf.com>
**Subject:** OU Med - Bid/Counter w/ Hopwood
**Importance:** High

Listen to this and tell me if this is representative of an efficient bid/counter situation.

Bid from acct 4.19 $1MM 67884XCM7
Counter 4.12 Josh Wall in your absence
You reached Brandy – dialog attached
Best 4.15 reflected to acct

4.14 counter never reflected

My concern is our sharpness, speed and efficiency in a market.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 | Phone
(972) 365-8806 | Mobile
npolyak@bokf.com | Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

EXHIBIT 5

**Charles P Ripley - 000007179 - BOK Financial Securities, Inc.**

# Job History

**History type**
All

| Effective | Job | Alternate Title | Status | Reason | Pay Frequency | Hourly/Salaried | Scheduled Hours | Type | Notes |
|---|---|---|---|---|---|---|---|---|---|
| 03/01/2017 | 40064 - Investment Sales Off III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 03/01/2016 | 40064 - Investment Sales Off III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 09/30/2015 | 40064 - Investment Sales Off III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 03/01/2015 | 40064 - Investment Sales Off III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 03/01/2014 | 40064 - Investment Sales Off III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 09/20/2013 | 40064 - Investment Sales Off III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 03/01/2013 | 40064 - INVESTMENT SALES OFF III | | Active | Perf Review | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 08/16/2012 | 40064 - INVESTMENT/SALES OFF III | | Active | Supervisor Change | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 07/01/2012 | 40064 - INVESTMENT/SALES OFF III | | Active | Mass update | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 07/05/2011 | 40064 - INVESTMENT/SALES OFF III | | Active | None | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 09/02/2010 | 40064 - INVESTMENT/SALES OFF III | | Active | None | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |
| 06/30/2010 | 40064 - INVESTMENT/SALES OFF III | | Active | New hire | Semi-Monthly | Salaried | 86.7000 | Full Time Employees | |

1 / 1

EXHIBIT 6



**BOSC, Inc.**
A subsidiary of BOK Financial Corp.

June 30, 2010

Charles P. Ripley
3525 Rock Creek Drive
Dallas, Texas 75204

Dear Charles:

This letter is a formal offer for the position of Investment Sales Officer with BOSC. You will be an employee at will and the foregoing is not intended to create an employment contract or an expectation of employment for any fixed period of time, but is intended to confirm our understanding regarding compensation and other terms of the offer.

The terms of the offer are as follows:

- Your monthly draw against commissions will be $1500.00 as long as you continue employment with BOSC and meet the standards of performance in accordance with BOSC Policies. Your commissions will be paid on the 15th of the month and any negative amount will be carried forward for the next month's calculation.

- You will receive an up-front signing bonus of One Hundred Thousand Dollars ($100,000), payable within 30 days of the Effective Date of your employment with BOSC. The $100,000 Signing Bonus will be paid in the form of a forgivable loan, forgiven in four installments starting November 1, 2010, subject to the conditions and provisions contained in the Promissory Note evidencing such loan. If accepted, these terms, will be incorporated into a Sales Representative Agreement and Promissory Note.
  - Each month, 50% of your commissions will be held back and will be paid at the end of each forgiveness period as long as you meet your performance target. If you do not meet your performance target then any commissions that have been held back will go toward your forgivable loan.

**CONFIDENTIAL**                                                                                          **BOKFS-000022**

- Production payout information:
  - You will earn the standard payout (40%) on your personal production for non-futures transactions according to the BOSC Sales Incentive Plan. Payout on Oppenheim products will be 30%. Your commissions will be paid on the 15th of the month.
  - If you generate at least $1 million in production during your first 13 months of employment, you will earn an additional 5% commission on your total production.

All offers of employment are contingent on a negative drug screen, positive professional references, an FBI fingerprint investigation and a standard credit check. These will be arranged and provided to you following your acceptance of this offer. To indicate your acceptance of this offer, please sign below and return to me within the next week. My fax number is 866-304-6775.

This letter also confirms that (i) until your employment with your existing employer is terminated you will fulfill your duty of loyalty to your current employer and (ii) you will comply with all obligations respecting confidential information of your current employer, including any such obligations respecting customer lists and customer information and the like. This letter also confirms your prior advice to us that you are not a party to any non-competition or non-solicitation agreement with your existing employer.

Please contact me at 918-272-9155 to discuss any questions or concerns you might have.

Sincerely,

*Tiffany Wilson*

Tiffany Wilson
VP, Corporate Recruiter
BOK Financial

Accepted: _____     Date: _____
Charles P. Ripley

EXHIBIT 7

## BOSC, INC.
## REPRESENTATIVE AGREEMENT

This Agreement is made and entered into this *30* day of *JUNE*, *2010* by and between BOSC, Inc., an Oklahoma Corporation ("BOSC") and *CHARLES RIPLEY* ("Representative").

In consideration of the mutual promises hereinafter made and other good and valuable consideration (the receipt and adequacy of which BOSC and Representative hereby acknowledge), BOSC and Representative agree as follows:

1. **BOSC'S OBLIGATIONS**. BOSC:

   A. Hereby appoints Representative as its agent to be located in a branch office of *BANK OF TEXAS* (hereinafter "FI") located at *7600 NORTHWEST HWY, DALLAS, X* ("Branch Office") to solicit purchases of securities and investments offered through BOSC to depositors and customers of FI and to the general public.

   B. Shall exercise exclusive control over the Representative with respect to all aspects of securities transactions and related securities business through a Series 24 licensed principal of BOSC who shall serve as the Branch Manager ("Branch Manager") of the Office of Supervisory Jurisdiction through which all securities activities shall take place.

   C. BOSC shall employ Representative as a professional with compensation to be paid to Representative pursuant to separate agreement between BOSC and Representative and in accordance with the policies and procedures then in effect at BOSC.

2. **THE REPRESENTATIVE'S OBLIGATIONS**. The Representative:

   A. Shall provide to prospective purchasers a current prospectus or other offering materials when required by the federal and/or state securities laws, shall explain fully the terms of any security or investment offering for sale to a customer, shall make no untrue or misleading statements or representations, shall not omit any material information or facts pertaining to any aspect of the transaction or sale, and shall comply with all laws respecting offers and sales of securities and advising persons on such matters.

   B. Shall (i) conduct business in accordance with the rules and regulations of the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any state agencies regulating Representative's activities, (ii) conduct business in accordance with the policies and procedures of BOSC and the best customs and procedures of the securities industry, (iii) shall not conduct business or receive funds until fully licensed as required by all such laws, rules and regulations, and (iv) shall accept such supervision and control by his/her Branch Manager and officers of BOSC as BOSC determines is necessary or appropriate to fully

and timely comply with all such laws, regulations, rules, customs and procedures. Without limiting the generality of the foregoing, shall not, directly or indirectly, (i) engage in municipal securities business with an issuer to whom the Representative has made a political contribution within the previous two years (other than a contribution in an amount less than $250 to an official of such issuer for whom the Representative is entitled to vote) or (ii) make a political contribution to any issuer to whom the Representative is engaging or seeking to engage in the municipal securities business.

C.    Shall (i) mail any correspondence, make any communication or cause any advertising to be made respecting investments or the investment business only after said correspondence, communication or advertising is approved in advance by BOSC and (ii) provide copies of all such correspondence, communication and advertising to BOSC in accordance with all applicable SEC, FINRA and state agencies rules and regulations.

D.    Shall accept payments from customers by check or money order only payable to the underwriter, investment company or insurance company designated by BOSC.

E.    Shall indemnify BOSC and hold BOSC harmless from any and all loss, cost or liability (including legal, accounting and expert fees and expenses) which result from the Representative's negligence, violation, or other misconduct.

F.    Shall not act in any manner whatsoever as an agent for any individual or entity competitive in any respect with BOSC.

G.    Shall (i) represent to all customers and prospective customers, whenever he/she is soliciting purchases or interviewing customers or otherwise, that (a) he/she is acting as a Representative of BOSC and (b) all orders for securities will be placed through BOSC and (ii) conduct all business totally separate and distinct from all other business conducted at the FI.

H.    Shall conduct himself/herself and his/her affairs in a professional manner consistent with the building of a quality reputation for himself/herself and BOSC and in accordance with the best standards of the industry.

I.    Recognizes that (i) he/she shall accept direction for BOSC securities activities solely from BOSC in accordance with BOSC's policies and procedures and, (ii) will neither seek nor accept direction regarding the conduct of securities business from any individual or group who is not a duly authorized BOSC Branch Manager or BOSC officer.

J.    Shall not (i) directly solicit any established customer of BOSC for a period of one (1) year after the termination of this Agreement (for whatever reason, whether with or without cause) or (ii) solicit any employee of BOSC to accept employment with any entity for a period of one (1) year after termination of this Agreement (for whatever reason, whether with or without cause). This promise by Representative may be enforced by temporary, preliminary and

- 2 -

permanent injunctive relief without the necessity of establishing irreparable injury and without the posting of any bond, in addition to any other remedies the law may provide. Without limiting the generality of the provisions of this paragraph, the phrase "directly solicit any established customer of BOSC" includes (i) making or participating in any mail or e-mail communication to such customer which is not part of a mass mailing to a public of which established customers of BOSC are an insignificant part the purpose of which was not to communicate with established customers of BOSC and (ii) having or participating in any meeting with or making or participating in telephone call to such customer unless such customer was an established social friend of the Representative and the purpose of the telephone call was strictly social.

K.   Shall, immediately upon termination of this Agreement, deliver to BOSC all copies of all documents and electronic files concerning the business (including training, licensure, commission, and production information) of BOSC and/or FI and/or customers of BOSC and/or FI including all electronic files and documents (whether prepared by BOSC and/or FI or the Representative and whether prepared before or after the start of this Agreement) containing any information respecting the identities of the customers of BOSC and/or FI or their addresses or telephone numbers, or the nature or amounts of their investments, assets or liabilities, or their investment needs or strategies. Without limiting the generality of the provisions of this Paragraph, as used in this Paragraph the words "documents and electronic files concerning the business of BOSC" includes all documents identified in the BOSC Quarterly Certification, diaries, handwritten notes, address books, calendars, and other documents (written or electronic and whether or not Representative regards such documents as his/her personal documents) which contain any of the information described in the Paragraph whether prepared by Representative or BOSC.

L.   Shall completely perform all duties (including the duty of loyalty) owed by Representative to his prior employer until such time as such duties shall have terminated, return to his employer all copies and electronic files of his prior employer (of the kind described in the preceding paragraph relating to the business of his prior employer, and comply with all lawful agreements limiting the Representative's right to engage in the securities business.

M.   During Representative's employment under this Agreement, BOSC shall make available to Representative and Representative will become acquainted with various information relating to the BOSC's business operations, customers, products, marketing data, business plans, strategies, employees, contracts, financial records and accounts, projections and budgets, and similar information which are crucial to BOSC. Representative agrees that to the extent such information is not generally available to the public and gives BOSC an advantage over competitors who do not know of or use such information, such information and documents shall be deemed trade secrets of the BOSC. Representative further agrees that all such information and documents relating to the business of the BOSC, whether

- 3 -

CONFIDENTIAL
BOKFS-000026

they are prepared by Representative or coming into Representative's possession in any other way, are owned by the BOSC and shall remain the exclusive property of the BOSC.   Representative shall not misuse, misappropriate or disclose such trade secrets of BOSC, directly or indirectly, or use them for Representative's own benefit, either during the term of this Agreement or at any time thereafter, except as may be necessary or appropriate in the course of Representative's employment with the BOSC, unless such action is either previously agreed to in writing by the BOSC or required by law.

3.    **LIMITED OF AUTHORITY AND REPRESENTATIVE'S REPRESENTATION.**

A.    The Representative is a limited agent of BOSC only and has no authority to bind BOSC in any way except to communicate to customers materials supplied by BOSC and to accept transactions in securities offered through BOSC.

B.    The Representative hereby represents that he/she has delivered to BOSC true copies of all agreements by which Representative may be bound which purport to limit the ability of Representative to engage in the securities business.

4.    **TERMINATION OF AGREEMENT**.

A.    The    effective    date    of    this    Agreement    shall    be
6/30/2016 _____.  This Agreement shall automatically renew on the April 15 next following and on each April 15 thereafter for one year periods unless this Agreement is terminated as hereafter provided.

B.    This Agreement may be terminated by either party at any time, without cause, by but only by, giving thirty (30) days written notice to the other party.

C.    This Agreement shall automatically terminate (i) upon cancellation of Representative's coverage by his/her surety company or (ii) upon cancellation or non-renewal of any required license.

D.    This Agreement may be terminated by BOSC at any time without notice for a breach of this Agreement by the Representative.

E.    The death of the Representative shall automatically terminate this Agreement on the date of death.

F.    Upon termination, the Representative shall cease using the name BOSC, shall no longer hold himself/herself out as a Representative and shall return all materials bearing the BOSC name to BOSC and as otherwise provided herein

- 4 -

5.    **MISCELLANEOUS PROVISIONS**.  The following miscellaneous provisions shall apply to this Agreement:

A.    All notices or advices required or permitted to be given by or pursuant to this Agreement, shall be given in writing.  All such notices and advices shall be (i) delivered personally, (ii) delivered by facsimile or delivered by U.S. Registered or Certified Mail, Return Receipt Requested mail, or (iii) delivered for overnight delivery by a nationally recognized overnight courier service. Such notices and advices shall be deemed to have been given (i) the first business day following the date of delivery if delivered personally or by facsimile, (ii) on the third business day following the date of mailing if mailed by U.S. Registered or Certified Mail, Return Receipt Requested, or (iii) on the date of receipt if delivered for overnight delivery by a nationally recognized overnight courier service.  All such notices and advices and all other communications related to this Agreement shall be given as follows:

If to BOSC:

Scott Grauer
BOSC, Inc.
Williams Tower, Plaza Southeast
Tulsa, Oklahoma 74172
918-595-3165 - Tel
918-588-6510 - Fax

If to Representative: CHARLES P RIPLEY
3525 ROCK CREEK DRIVE
DALLAS TX 75204-6K
214-508-3977 - Telephone
214-521-6550 - Fax

or to such other address as the party may have furnished to the other parties in accordance herewith, except that notice of change of addresses shall be effective only upon receipt.

B.    This Agreement shall be deemed made and executed in Tulsa County, Oklahoma.

C.    This Agreement shall be subject to, and interpreted by and in accordance with, the laws (excluding conflict of law provisions) of the State of Oklahoma.

D.    This Agreement is the entire Agreement of the parties respecting the subject matter hereof.  There are no other agreements, representations or warranties, whether oral or written, respecting the subject matter hereof.

E.    No course of prior dealings involving any of the parties hereto and no usage of trade shall be relevant or advisable to interpret, supplement, explain or vary any of the terms of this Agreement, as expressly provided herein.

- 5 -

CONFIDENTIAL                                     BOKFS-000028

F.   This Agreement, and all the provisions of this Agreement, shall be deemed drafted by all of the parties hereto. This Agreement shall not be interpreted strictly for or against any party, but solely in accordance with the fair meaning of the provisions hereof to effectuate the purposes and interest of this Agreement.

G.   Each party hereto has entered into this Agreement based solely upon the agreements, representations and warranties expressly set forth herein and upon his own knowledge and investigation.

H.   Each of the persons signing below on behalf of a party hereto represents and warrants that he or she has full requisite power and authority to execute and deliver this Agreement on behalf of the party for whom he or she is signing and to bind such party to the terms and conditions of this Agreement.

I.   This Agreement may be executed in counterparts, each of which shall be deemed an original. This Agreement shall become effective only when all of the parties hereto shall have executed the original or counterpart hereof. This agreement may be executed and delivered by a facsimile transmission of a counterpart hereof.

J.   In any action brought by a party hereto to enforce the obligations of any other party hereto, the prevailing party shall be entitled to collect from the opposing parties to such action such party's reasonable attorneys fees and costs (including court costs, reasonable fees of accountants and experts, and other expenses incidental to the action).

K.   This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This is not a third party beneficiary contract. No person or entity other than a party hereto shall have any rights under this Agreement. This Agreement may be amended or modified only in a writing which specifically references this Agreement.

BOSC, INC.

By _____
Scott B. Grauer, President & CEO

_____
"Representative"
CHARLES R. RIPLEY

- 6 -

BOKFS-000029

EXHIBIT 8

## BOSC, INC.
## REPRESENTATIVE AGREEMENT

This Agreement is made and entered into this 31 st day of March , 2011 by and between BOSC, Inc., an Oklahoma Corporation ("BOSC") and Rena Connor ("Representative").

In consideration of the mutual promises hereinafter made and other good and valuable consideration (the receipt and adequacy of which BOSC and Representative hereby acknowledge), BOSC and Representative agree as follows:

1. **BOSC'S OBLIGATIONS**. BOSC:

   A. Hereby appoints Representative as its agent to be located in a branch office of BANK OF TEXAS (hereinafter "FI") located at 333 W. CAMPBELL RD, RICHARDSON, TX ("Branch Office") to solicit purchases of securities and investments offered through BOSC to depositors and customers of FI and to the general public.

   B. Shall exercise exclusive control over the Representative with respect to all aspects of securities transactions and related securities business through a Series 24 licensed principal of BOSC who shall serve as the Branch Manager ("Branch Manager") of the Office of Supervisory Jurisdiction through which all securities activities shall take place.

   C. BOSC shall employ Representative as a professional with compensation to be paid to Representative pursuant to separate agreement between BOSC and Representative and in accordance with the policies and procedures then in effect at BOSC.

2. **THE REPRESENTATIVE'S OBLIGATIONS**. The Representative:

   A. Shall provide to prospective purchasers a current prospectus or other offering materials when required by the federal and/or state securities laws, shall explain fully the terms of any security or investment offering for sale to a customer, shall make no untrue or misleading statements or representations, shall not omit any material information or facts pertaining to any aspect of the transaction or sale, and shall comply with all laws respecting offers and sales of securities and advising persons on such matters.

   B. Shall (i) conduct business in accordance with the rules and regulations of the Securities and Exchange Commission (SEC), the National Association of Securities Dealers (NASD), any state agencies regulating Representative's activities, (ii) conduct business in accordance with the policies and procedures of BOSC and the best customs and procedures of the securities industry, (iii) shall not conduct business or receive funds until fully licensed as required by all such laws, rules and regulations, and (iv) shall accept such supervision and

**BOKFS-001792**

CONFIDENTIAL

control by his/her Branch Manager and officers of BOSC as BOSC determines is necessary or appropriate to fully and timely comply with all such laws, regulations, rules, customs and procedures. Without limiting the generality of the foregoing, shall not, directly or indirectly, (i) engage in municipal securities business with an issuer to whom the Representative has made a political contribution within the previous two years (other than a contribution in an amount less than $250 to an official of such issuer for whom the Representative is entitled to vote) or (ii) make a political contribution to any issuer to whom the Representative is engaging or seeking to engage in the municipal securities business.

C.    Shall (i) mail any correspondence, make any communication or cause any advertising to be made respecting investments or the investment business only after said correspondence, communication or advertising is approved in advance by BOSC and (ii) provide copies of all such correspondence, communication and advertising to BOSC in accordance with all applicable SEC, NASD and state agencies rules and regulations.

D.    Shall accept payments from customers by check or money order only payable to the underwriter, investment company or insurance company designated by BOSC.

E.    Shall indemnify BOSC and hold BOSC harmless from any and all loss, cost or liability (including legal, accounting and expert fees and expenses) which result from the Representative's negligence, violation, or other misconduct.

F.    Shall not act in any manner whatsoever as an agent for any individual or entity competitive in any respect with BOSC.

G.    Shall (i) represent to all customers and prospective customers, whenever he/she is soliciting purchases or interviewing customers or otherwise, that (a) he/she is acting as a Representative of BOSC and (b) all orders for securities will be placed through BOSC and (ii) conduct all business totally separate and distinct from all other business conducted at the FI.

H.    Shall conduct himself/herself and his/her affairs in a professional manner consistent with the building of a quality reputation for himself/herself and BOSC and in accordance with the best standards of the industry.

I.    Recognizes that (i) he/she shall accept direction for BOSC securities activities solely from BOSC in accordance with BOSC's policies and procedures, and (ii) will neither seek nor accept direction regarding the conduct of securities business from any individual or group who is not a duly authorized BOSC Branch Manager or BOSC officer.

J.    Shall not (i) directly solicit any established customer of BOSC for a period of one (1) year after the termination of this Agreement (for whatever reason,

- 2 -

**BOKFS-001793**

CONFIDENTIAL

whether with or without cause) or (ii) solicit any employee of BOSC to accept employment with any entity for a period of one (1) year after termination of this Agreement (for whatever reason, whether with or without cause). This promise by Representative may be enforced by temporary, preliminary and permanent injunctive relief without the necessity of establishing irreparable injury and without the posting of any bond, in addition to any other remedies the law may provide. Without limiting the generality of the provisions of this paragraph, the phrase "directly solicit any established customer of BOSC" includes (i) making or participating in any mail or e-mail communication to such customer which is not part of a mass mailing to a public of which established customers of BOSC are an insignificant part the purpose of which was not to communicate with established customers of BOSC and (ii) having or participating in any meeting with or making or participating in telephone call to such customer unless such customer was an established social friend of the Representative and the purpose of the telephone call was strictly social.

K.    Shall, immediately upon termination of this Agreement, deliver to BOSC all copies of all documents and electronic files concerning the business (including training, licensure, commission, and production information) of BOSC and/or FI and/or customers of BOSC and/or FI including all electronic files and documents (whether prepared by BOSC and/or FI or the Representative and whether prepared before or after the start of this Agreement) containing any information respecting the identities of the customers of BOSC and/or FI or their addresses or telephone numbers, or the nature or amounts of their investments, assets or liabilities, or their investment needs or strategies. Without limiting the generality of the provisions of this Paragraph, as used in this Paragraph the words "documents and electronic files concerning the business of BOSC" includes all documents identified in the BOSC Quarterly Certification, diaries, handwritten notes, address books, calendars, and other documents (written or electronic and whether or not Representative regards such documents as his/her personal documents) which contain any of the information described in the Paragraph whether prepared by Representative or BOSC.

L.    Shall completely perform all duties (including the duty of loyalty) owed by Representative to his prior employer until such time as such duties shall have terminated, return to his employer all copies and electronic files of his prior employer (of the kind described in the preceding paragraph relating to the business of his prior employer, and comply with all lawful agreements limiting the Representative's right to engage in the securities business.

M.    During Representative's employment under this Agreement, BOSC shall make available to Representative and Representative will become acquainted with various information relating to the BOSC's business operations, customers, products, marketing data, business plans, strategies, employees, contracts, financial records and accounts, projections and budgets, and similar information which are crucial to BOSC. Representative agrees that to the extent such information is not generally available to the public and gives BOSC an

- 3 -

**BOKFS-001794**

CONFIDENTIAL

advantage over competitors who do not know of or use such information, such information and documents shall be deemed trade secrets of the BOSC. Representative further agrees that all such information and documents relating to the business of the BOSC, whether they are prepared by Representative or coming into Representative's possession in any other way, are owned by the BOSC and shall remain the exclusive property of the BOSC. Representative shall not misuse, misappropriate or disclose such trade secrets of BOSC, directly or indirectly, or use them for Representative's own benefit, either during the term of this Agreement or at any time thereafter, except as may be necessary or appropriate in the course of Representative's employment with the BOSC, unless such action is either previously agreed to in writing by the BOSC or required by law.

3.   **LIMITED OF AUTHORITY AND REPRESENTATIVE'S REPRESENTATION.**

A.   The Representative is a limited agent of BOSC only and has no authority to bind BOSC in any way except to communicate to customers materials supplied by BOSC and to accept transactions in securities offered through BOSC.

B.   The Representative hereby represents that he/she has delivered to BOSC true copies of all agreements by which Representative may be bound which purport to limit the ability of Representative to engage in the securities business.

4.   **TERMINATION OF AGREEMENT.**

A.   The effective date of this Agreement shall be _____. This Agreement shall automatically renew on the April 15 next following and on each April 15 thereafter for one year periods unless this Agreement is terminated as hereafter provided.

B.   This Agreement may be terminated by either party at any time, without cause, by but only by, giving thirty (30) days written notice to the other party.

C.   This Agreement shall automatically terminate (i) upon cancellation of Representative's coverage by his/her surety company or (ii) upon cancellation or non-renewal of any required license.

D.   This Agreement may be terminated by BOSC at any time without notice for a breach of this Agreement by the Representative.

E.   The death of the Representative shall automatically terminate this Agreement on the date of death.

F.   Upon termination, the Representative shall cease using the name BOSC, shall no longer hold himself/herself out as a Representative and shall return all materials bearing the BOSC name to BOSC and as otherwise provided herein

- 4 -

**BOKFS-001795**

CONFIDENTIAL

5.  **MISCELLANEOUS PROVISIONS**.  The following miscellaneous provisions shall apply to this Agreement:

A.  All notices or advices required or permitted to be given by or pursuant to this Agreement, shall be given in writing.  All such notices and advices shall be (i) delivered personally, (ii) delivered by facsimile or delivered by U.S. Registered or Certified Mail, Return Receipt Requested mail, or (iii) delivered for overnight delivery by a nationally recognized overnight courier service.  Such notices and advices shall be deemed to have been given (i) the first business day following the date of delivery if delivered personally or by facsimile, (ii) on the third business day following the date of mailing if mailed by U.S. Registered or Certified Mail, Return Receipt Requested, or (iii) on the date of receipt if delivered for overnight delivery by a nationally recognized overnight courier service.  All such notices and advices and all other communications related to this Agreement shall be given as follows:

        If to BOSC:

                Scott Grauer
                BOSC, Inc.
                Williams Tower, Ninth Floor
                Tulsa, Oklahoma 74103
                918-595-3165 - Tel
                918-588-6510 - Fax

        If to Representative:  *Rena Connor*
                *BOSC Inc.*
                *333 W. Campbell Rd., 3rd Floor, Richardson, TX 75080*
                *(214) 576-0889* Telephone
                *(214) 576-0870* - Fax

or to such other address as the party may have furnished to the other parties in accordance herewith, except that notice of change of addresses shall be effective only upon receipt.

B.  This Agreement shall be deemed made and executed in Tulsa County, Oklahoma.

C.  This Agreement shall be subject to, and interpreted by and in accordance with, the laws (excluding conflict of law provisions) of the State of Oklahoma.

D.  This Agreement is the entire Agreement of the parties respecting the subject matter hereof.  There are no other agreements, representations or warranties, whether oral or written, respecting the subject matter hereof.

**BOKFS-001796**

CONFIDENTIAL

E.    No course of prior dealings involving any of the parties hereto and no usage of trade shall be relevant or advisable to interpret, supplement, explain or vary any of the terms of this Agreement, as expressly provided herein.

F.    This Agreement, and all the provisions of this Agreement, shall be deemed drafted by all of the parties hereto. This Agreement shall not be interpreted strictly for or against any party, but solely in accordance with the fair meaning of the provisions hereof to effectuate the purposes and interest of this Agreement.

G.    Each party hereto has entered into this Agreement based solely upon the agreements, representations and warranties expressly set forth herein and upon his own knowledge and investigation.

H.    Each of the persons signing below on behalf of a party hereto represents and warrants that he or she has full requisite power and authority to execute and deliver this Agreement on behalf of the party for whom he or she is signing and to bind such party to the terms and conditions of this Agreement.

I.    This Agreement may be executed in counterparts, each of which shall be deemed an original. This Agreement shall become effective only when all of the parties hereto shall have executed the original or counterpart hereof. This agreement may be executed and delivered by a facsimile transmission of a counterpart hereof.

J.    In any action brought by a party hereto to enforce the obligations of any other party hereto, the prevailing party shall be entitled to collect from the opposing parties to such action such party's reasonable attorneys fees and costs (including court costs, reasonable fees of accountants and experts, and other expenses incidental to the action).

K.    This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This is not a third party beneficiary contract. No person or entity other than a party hereto shall have any rights under this Agreement. This Agreement may be amended or modified only in a writing which specifically references this Agreement.

BOSC, INC.

By _____
                                  SCOTT B. GRAMER
                                  PRES. & CEO

"Representative" _RENA CONNOR_

- 6 -

**BOKFS-001797**

CONFIDENTIAL

EXHIBIT 9

[INTENTIONALLY WITHHELD]

EXHIBIT 10

| From: | Polyak, Nick </O=BOKFCORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NPOLYAK> |
|---|---|
| Sent: | Thursday, August 31, 2017 9:18 AM |
| To: | Greer, Donna <DRGreer@bokf.com> |
| Subject: | FW: Update - Partnership % Split/Payout |

Donna,

See below for the profile update to Rip/Rena's partnership effective 9/1, then 11/1 and 1/1/2018.

Let me know if you have any questions.  Thanks!

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080
(214) 346-3921 I Phone
(972) 365-8806 I Mobile
npolyak@bokf.com I Email
Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**From:** Polyak, Nick
**Sent:** Thursday, August 17, 2017 4:10 PM
**To:** Connor, Rena <RConnor@bokf.com>; Ripley, Charles <CRipley@bokf.com>
**Subject:** Update - Partnership % Split/Payout

Rip/Rena,

We've had numerous conversations about this over the past year or more without a firm conclusion.

Here's the plan for the remainder of the year with the terminal point of the changes to the partnership being 1/1/2018.

|  | | Rip | | Rena |
|---|---|---|---|---|
| Month | Payout | % of Book | Payout | % of Book |
| 2/1/2017 | 50% | 70% | 50% | 30% |
| 3/1/2017 | 50% | 65% | 50% | 35% |
| 4/1/2017 | 50% | 65% | 50% | 35% |
| 5/1/2017 | 50% | 65% | 50% | 35% |
| 6/1/2017 | 50% | 65% | 50% | 35% |
| 7/1/2017 | 50% | 65% | 50% | 35% |
| 8/1/2017 | 50% | 65% | 50% | 35% |
| 9/1/2017 | 50% | 60% | 50% | 40% |
| 10/1/2017 | 50% | 60% | 50% | 40% |
| 11/1/2017 | 50% | 55% | 50% | 45% |
| 12/1/2017 | 50% | 55% | 50% | 45% |
| 1/1/2018 | 40% | 50% | 40% | 50% |



**EXHIBIT**

**110**

**BOKFS-001721**

**CONFIDENTIAL**

I will communicate the changes to the profile before month-end.

Nick Polyak
Senior Vice President | Institutional Sales

BOK Financial Securities, Inc. | securities.bokfinancial.com
333 West Campbell Road, Richardson, TX 75080

(214) 346-3921 I Phone
(972) 365-8806 I Mobile
npolyak@bokf.com I Email

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**

**BOKFS-001722**

**CONFIDENTIAL**

EXHIBIT 11

**From:**       Polyak, Nick </O=BOKFCORP/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NPOLYAK>
**Sent:**       Tuesday, January 30, 2018 4:39 PM
**To:**         Ripley, Charles <CRipley@bokf.com>
**Cc:**         Polyak, Nick <NPolyak@bokf.com>
**Subject:**    RE: LIMITED JANUARY ACCOUNT REVIEW

Rip,

Thanks for putting the time into this. I'm sure we discuss further.

From the beginning (post Rena's departure) I have asked you for an honest assessment of your ability to handle the book that you and both handled together – all facets – munis and other fixed income products fit for the account and our ability to service. You reference production multiple times as a basis for keeping coverage largely the way it stands today. The environment has changed with a lack of primary business – negotiated (senior & co-mgd) and competitive opportunities, thus the ability to get secondary business done with the platform as it exists today. As I've stated multiple times my expectation is different for different customer types with what we have to offer. I have singled out those relationships (trust & sma types) that we should be doing regular business with – even as things are today. My expectation is understandably different for large bank portfolios, large insurance companies and arbs.

Below is a snapshot of where your muni production is today (through 1/29) and it's clear that without new issues, production will be a struggle.

Below is not all inclusive however provided for context.

| | January, 2018 | | | 2017 | | |
|---|---|---|---|---|---|---|
| | Sales Credit | Volume | Trans | Sales Credit | Volume | Trans |
| All Sales Rep (177) | 636,469.65 | 254,736,871.98 | 4,225.00 | 15,967,197.57 | 5,912,052,325.53 | 56,271.20 |
| | 28,683.00 | 2,733,917.50 | 7.5 | 217,080.42 | 31,271,425.21 | 152.3 |
| | 27,742.00 | 3,845,490.33 | 6 | 199,889.75 | 52,381,749.43 | 187.5 |
| | 26,969.00 | 26,298,506.10 | 706 | 385,377.36 | 267,211,420.48 | 3,939.00 |
| | 25,496.33 | 13,773,973.88 | 130.3 | 520,679.27 | 238,439,609.53 | 1,700.70 |
| | 25,496.25 | 13,773,932.51 | 130.3 | 520,677.71 | 238,438,894.21 | 1,700.70 |
| | 25,496.25 | 13,773,932.51 | 130.3 | 520,677.71 | 238,438,894.21 | 1,700.70 |
| | 25,092.01 | 9,826,831.75 | 81 | 307,080.50 | 93,498,581.14 | 812.3 |
| | 24,180.09 | 4,426,535.78 | 22.6 | 237,938.03 | 70,316,055.94 | 250.4 |
| | 24,180.09 | 4,426,535.78 | 22.6 | 237,659.41 | 70,273,045.07 | 250.2 |
| | 21,005.00 | 18,537,271.90 | 84 | 629,366.15 | 513,474,182.95 | 1,720.50 |
| | 20,418.00 | 8,830,168.95 | 318.3 | 376,138.50 | 180,972,310.94 | 3,931.80 |
| | 19,470.06 | 12,180,447.60 | 77.7 | 716,339.57 | 409,933,029.28 | 1,386.70 |
| Ripley, Charles | 18,968.00 | 12,162,267.38 | 99 | 802,444.95 | 453,518,509.55 | 1,676.50 |
| | 18,304.80 | 4,252,837.10 | 22 | 94,881.91 | 36,681,376.85 | 241.1 |
| | 18,304.80 | 4,252,837.10 | 22 | 94,881.91 | 36,681,376.85 | 241.1 |
| | 16,120.06 | 2,951,023.86 | 15.1 | 137,995.79 | 40,803,703.59 | 145.3 |
| | 14,509.00 | 14,633,857.73 | 74 | 320,393.09 | 222,177,154.56 | 1,257.50 |
| | 13,641.00 | 15,042,404.55 | 59 | 544,115.52 | 285,995,847.05 | 1,241.00 |
| | 12,124.00 | 4,646,916.25 | 62 | 333,589.16 | 156,570,768.75 | 1,307.00 |
| | 12,003.02 | 2,991,261.40 | 117 | 250,420.42 | 45,506,908.54 | 1,142.00 |
| | 10,158.00 | 3,520,124.55 | 17 | 174,090.00 | 45,137,131.30 | 303 |
| | 10,002.69 | 1,286,339.18 | 4.3 | 166,334.53 | 32,307,151.77 | 107.6 |

A concern… One of the statements you made yesterday when I asked about "Do you know all o**BOKFS-001823** you replied "I do, but don't have them written down, I have them in my head", yet you state below that you cannot tell

CONFIDENTIAL

you exactly what discussions I've had with accounts. In passing today I asked Pat if he knew what your inquires were and he did not. I have not asked other traders the same, but I suspect I would get a similar response.

I have long operated on the basis of "trust but verify." My expectations of you on the basis of the relationships (size, dimensions, prominence, numbers, etc.) you cover are undeniably higher. I was not singling you out for review of messages, yet wanted to make sure that I was not missing something. I feel that is fair and objective – go to the body of evidence so to speak. I have indeed observed daily activity, reviewed the blotter activity, outgoing messages and have reviewed phone call activity since Rena's departure the first week of January. I have not singled out one dimension in particular – as you say one sales style doesn't fit for all. I'm happy to review with you specifically what I've reviewed to come to the conclusion that it's not feasible for you to cover all the accounts listed well in the environment we are dealing with.

These relationships are large and multi-dimensional with potentially many contacts and I'm confident there's more business to be done on the secondary side.

**From:** Ripley, Charles
**Sent:** Tuesday, January 30, 2018 1:31 PM
**To:** Polyak, Nick <NPolyak@bokf.com>
**Subject:** LIMITED JANUARY ACCOUNT REVIEW

Nick  -  I worked on this project last night, and basically came to the same conclusion that I attempted to give you yesterday, which was obviously not acceptable to you.  I cannot reach back four weeks and tell you exactly what discussions I have had with accounts.   However, I am very cautious with all accounts when making a call when I do not have a purpose, and I have had very few ways to add value in January.   If I cannot add any value when making calls, I have found that the call can be detrimental to the relationship.  I need to get a plus on the board with an account, not a minus.  Plus, market conditions and our platform have not been favorable since Rena's departure.  I try and pick my spots, but you disagree.  Everybody works differently, and everybody that is successful has developed a process that works for them.  My methodology may not work for you, but evidently it does for me as evidenced by my production. Just because I am not on the phone does not mean that I am not working.  You can poke a hole in everyone's sale methodology.  However, I seem to be the only person in this room that is under your intense supervision, but I am the individual with the highest production; consequently, I must be doing something right?   I am the only person that is required to have a weekly review of my business activity with you.  Have you ever reviewed anyone else's Bloomberg messages and email like you reviewed mine yesterday?  Why am I being targeted?  I truly do not understand this very personal interrogation?   If everyone is held to the same standard it would be one thing, but that is not the case.

Up until very recently I have not kept a journal that you can review.  The below review is sketchy at best, as I probably do not have the information you want.  The list is in the order you gave to me yesterday:

ZIEGLER CAPITAL MANAGEMENT:  I have not spoken to either Paul or Rick since Rena's departure.  They have looked for short, cheap Cal paper

BELLEHAVEN:  buy bonds that are cheap, put 'em in total return portfolios, mark 'em up and put 'em on pick.  New issues or distressed situations, i.e. MUDS, W TRAVIS, taxable, etc.  I have spoken to D.J. a couple of times, but we have nothing to do.

SCHWAB:  I have spoken to John – Ken has been on vacation – and they are pretty much trading water.  They have had a few offerings, but we have not performed.

DEUSTCHE:  have had frequent MBWDs, but we've had nothing to do.  I have the feeling, that without saying it, Deutsche, like a lot of others, way overbought in December, are having trouble digesting their purchases, and the market has not performed as expected.

FRANKLIN:  I have spoken to Paco.  Portfolio is quiet.

**BOKFS-001824**

CONFIDENTIAL

FIDUCIARY:  Matt has been quiet.  No real direction.  Nothing for sale.

GSAM:  Have primarily spoken to Ben and Ty.  Limited communication, and difficult to reach.

NORTHERN:  See their offerings every day, and we have had no success in helping them.  I believe their situation is much like Deutshe's.

UBS:  Jodi has been my contact and has revealed very little.

US BANK:  Welle tells me that he bought aggressively in December and has very little to do.  Short and size, and will not pay market.

You may not agree, but I am diligently working to create revenue – it just may not be in the same manner you want or expect.  Why would I do anything to sabotage my account relationships or my production?   And I certainly have no desire to have an adversarial relationship with you.  Thank you.

Rip


**Charles P. Ripley**
Senior Vice President
BOK Financial Securities, Inc.
333 West Campbell Road
Suite 300
Richardson, TX 75080
cripley@bokf.com
(214) 576-0873 I Office
(214) 766-4653 I Cell
(214) 776-0890 I Fax

Securities, insurance and advisory services offered through BOK Financial Securities, Inc., member FINRA/SIPC and a subsidiary of BOK Financial Corporation. Services may be offered under our trade name, BOK Financial Advisors. **NOT FDIC INSURED | NO BANK GUARANTEE | MAY LOSE VALUE**


**BOKFS-001825**

CONFIDENTIAL

EXHIBIT 12

NICHOLAS E. POLYAK - March 29, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHARLES P. RIPLEY,              *
        Plaintiff,              *
                                *
                                *
VS.                             * Case No. 3:19-cv-00577-S
                                *
                                *
BOK FINANCIAL CORPORATION       *
AND                             *
BOK FINANCIAL SECURITIES,       *
INC.,                           *
        Defendants.             *


*****************************************

ORAL DEPOSITION OF
NICHOLAS E. POLYAK
March 29, 2021


*****************************************



    ORAL DEPOSITION OF NICHOLAS E. POLYAK, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on March 29, 2021, from 2:20 p.m. to 7:35 p.m., before
Kimberly A. Sullivan, CSR No. 3746 in and for the State
of Texas, reported by machine shorthand, at the offices
of BOKFS, 333 West Campbell Road, 4th Floor, Richardson,
Texas, pursuant to the Federal Rules of Civil Procedure.

CRC for SULLIVAN COURT REPORTING
(214) 954-0352

NICHOLAS E. POLYAK - March 29, 2021

```
 1                A P P E A R A N C E S

 2    COUNSEL FOR THE PLAINTIFF

 3        MS. MARILYN K. LAHR
          LAW OFFICES OF MARILYN K. LAHR
 4        2626 COLE AVENUE
          SUITE 300
 5        DALLAS, TEXAS  75204

 6            TELEPHONE:  214.528.4545
              FACSIMILE:  888.828.2856
 7            E-MAIL:  MLAHR@LAHRLAWFIRM.COM

 8
      COUNSEL FOR THE DEFENDANTS
 9
          MS. ERICA ANNE DORWART
10        FREDERIC DORWART, LAWYERS
          124 EAST FOURTH STREET
11        TULSA, OKLAHOMA  74103

12            TELEPHONE:  918.583.9922
              FACSIMILE:  918.584.2729
13            E-MAIL:  EDORWART@FDLAW.COM

14

15

16

17

18

19

20

21

22

23

24

25
```

NICHOLAS E. POLYAK - March 29, 2021

```
 1          W I T N E S S    I N D E X

 2   NICHOLAS E. POLYAK:                           PAGE

 3   EXAMINATION
     BY MS. LAHR                                      5
 4
     Changes and Signature:                         221
 5
     Reporter's Certification:                      223
 6

 7

 8          E X H I B I T    I N D E X

 9   PLAINTIFF:                                     PAGE

10   No. 6 -- E-mail regarding Richardson office meeting
             (7-9-18)                               107
11   No. 7 -- E-mail regarding Thank you, Congratulations
             (1-3-18)                               153
12   No. 8 -- E-mail regarding October, Well done
             (11-4-14)                              158
13   No. 9 -- E-mail regarding October, Well done
             (11-4-14)                              163
14   No. 10 -- E-mail regarding Super April (5-1-15)  163
     No. 11 -- E-mail regarding Nice June (7-6-15)    164
15   No. 12 -- E-mail regarding Great July (8-3-15)   166
     No. 13 -- E-mail regarding Great results in August
16             (9-1-15)                             168
     No. 14 -- E-mail regarding Fantastic September
17             (10-1-15)                            170
     No. 15 -- E-mail regarding Fantastic September
18             (10-1-15)                            171
     No. 16 -- E-mail regarding 2015 CXR team goal,
19             Rena/Rip (1-5-16)                    172
     No. 17 -- E-mail regarding Well done in February
20             (3-2-16)                             173
     No. 18 -- E-mail regarding Well done in February
21             (3-2-16)                             174
     No. 19 -- E-mail regarding Great March, Great 1st
22             Quarter (4-4-16)                     175
     No. 20 -- E-mail regarding Well done in February
23             (3-2-16)                             176
     No. 21 -- E-mail regarding Great March, Great 1st
24             Quarter (4-4-16)                     177
     No. 22 -- E-mail regarding Another great month
25             (5-2-16)                             178
```

CRC for SULLIVAN COURT REPORTING
(214) 954-0352

5b83b83d-c596-462f-8b10-b75d2708a7f0

NICHOLAS E. POLYAK - March 29, 2021

```
1              E X H I B I T   I N D E X

2   PLAINTIFF:                                    PAGE

3   No. 23 -- E-mail regarding Super June (7-1-16)    179
    No. 24 -- E-mail regarding Super June
4             (Second page to Exhibit 23)             179
    No. 25 -- E-mail regarding Solid August and YTD
5             (9-1-16)                                180
    No. 26 -- E-mail regarding Solid August and YTD
6             (9-1-16)                                182
    No. 27 -- E-mail regarding Solid August and YTD
7             (9-1-16)                                183
    No. 28 -- E-mail regarding Luther King (11-1-16)  183
8   No. 29 -- E-mail regarding Fantastic October
              (11-1-16)                               187
9   No. 30 -- E-mail regarding Solid February and
              Partnership Update (3-1-17)             188
10  No. 31 -- E-mail regarding Thank you (5-25-17)    192
    No. 32 -- E-mail regarding Well done in May (6-2-17) 196
11  No. 33 -- E-mail regarding Well done in May (6-2-17) 205
    No. 34 -- E-mail regarding Compliments (8-2-17)   206
12  No. 35 -- E-mail regarding Great Month - Best of
              the Year (9-5-17)                       209
13  No. 36 -- E-mail regarding Great Month - Best of
              the Year (9-5-17)                       211
14  No. 37 -- E-mail regarding Gallup survey scores
              (Nick Polyak - May 2017)                212
15  No. 38 -- E-mail regarding Gallup survey scores
              (Nick Polyak - May 2017)                213
16

17

18

19

20

21

22

23

24

25
```

CRC for SULLIVAN COURT REPORTING
(214) 954-0352

5b83b83d-c596-462f-8b10-b75d2708a7f0

NICHOLAS E. POLYAK - March 29, 2021

```
 1                    NICHOLAS E. POLYAK,
 2  having been first duly sworn, testified as follows:
 3                       EXAMINATION
 4  BY MS. LAHR:
 5     Q.  Hi, good morning, Mr. Williams.  My name is
 6  Marilyn Lahr and other than --
 7     A.  I'm Mr. Polyak.
 8     Q.  I'm sorry.  And tell me again how you say your
 9  name.
10     A.  Polyak.
11     Q.  Polyak.
12         Please bear with me, because I have been
13  pronouncing it a different way, and I will try and get
14  that right.  So my apologies if I don't.  Feel free to
15  raise your hand so I can get that right, because that is
16  important to me.
17         Mr. Polyak, other than when you let me in this
18  morning to the building, we haven't met before, have we?
19     A.  No, ma'am.
20     Q.  Have you ever had your deposition taken before?
21     A.  Yes.
22     Q.  On how many occasions?
23     A.  One.
24     Q.  And when was that?
25     A.  It would have been -- let's see.  1998.  Probably
```

NICHOLAS E. POLYAK - March 29, 2021

1    A.  I think that is a true statement, yes.

2  BY MS. LAHR:

3    Q.  And it was not your understanding from this

4  letter from Mr. Moynihan to Mr. Dean that Mr. Moynihan

5  was seeking any additional accounts to be assigned to

6  him in order to be able to survive financially?

7    A.  No.

8    Q.  Okay.

9    A.  No, this was not a request for accounts.

10    Q.  Okay.  In January of 2018, isn't it true that you

11  actually reassigned some accounts from Mr. Ripley to Mr.

12  Moynihan?

13        MS. DORWART:  I object to the form.

14    A.  Yes.  That would have been part of a material

15  change in staff.  Rena Connor's departure.  So, yes.

16  BY MS. LAHR:

17    Q.  Okay.  So material change in staff.  Now, Ms.

18  Connor was riding under this CXR account, correct?

19    A.  Correct.  Rep ID.

20    Q.  Okay.  And when she departed, it is your position

21  that you made a reassignment of accounts because of her

22  departure?

23    A.  Yes.

24    Q.  Okay.  And you did that in January of 2018,

25  correct?

NICHOLAS E. POLYAK - March 29, 2021

1    A.  Correct.

2    Q.  Does that give you any idea of the date in

3  January that you made those reassignments?

4    A.  I'm sorry.  Which document am I looking at?

5         MS. DORWART:  I object to the form.

6  BY MS. LAHR:

7    Q.  I think we had one -- it might be in here.

8         Let me ask you this.  Do you remember making the

9  reassignments somewhere around the 10th of January of

10  2018?  Does that sound about right?

11         MS. DORWART:  I object to the form.

12    A.  No.  That date sounds too soon.

13  BY MS. LAHR:

14    Q.  Okay.  What is your recollection of when you

15  began reassigning Ms. Connor's accounts?

16    A.  Let's see.  Rena Connor, if she departed January

17  4th of 2018, the work that was done with the team

18  probably took at least 30 days.  So I'm going to say it

19  was probably sometime later in the first quarter before

20  accounts were reassigned.

21    Q.  Did you reassign any accounts to your

22  recollection almost immediately after her departure?

23         MS. DORWART:  I object to the form.

24    A.  Not that I specifically recall.

25  BY MS. LAHR:

NICHOLAS E. POLYAK - March 29, 2021

1    Q.  Okay.  And you indicated it was after meeting

2    with the team.  Is it your representation here that you

3    met with the team prior to making any reassignment of

4    the accounts from Ms. Connor's departure?

5                MS. DORWART:  I object to the form.

6    A.  Yes.  I met with the team to solicit their input

7    to challenge.  We had an upcoming salesperson in Josh

8    Wall that I wanted to make sure that he had a seat at

9    the table for -- as we go forward.  I mean, there's a

10   lot of -- there are a lot of accounts that can be

11   complex from time to time.  I felt that Josh's working

12   knowledge -- even from a support role at that moment in

13   time I felt was valuable to the collaborative effort as

14   to how we're handling these accounts out of this office.

15   BY MS. LAHR:

16   Q.  How did you decide which accounts were Ms.

17   Connor's that needed to be reassigned versus those that

18   were Mr. Ripley's?

19                MS. DORWART:  I object to the form.

20   A.  I made no distinction between what belonged to

21   Rena and what belonged to Ripley.

22   BY MS. LAHR:

23   Q.  Okay.  So how did you decide what accounts were

24   going to be up for reassignment when Ms. Connor

25   departed?

5b83b83d-c596-462f-8b10-b75d2708a7f0

NICHOLAS E. POLYAK - March 29, 2021

1        MS. DORWART:  I object to the form.
2      A.  It would have been a number of factors.  I asked
3  for an honest assessment from Ripley about what he felt
4  like he could really do well and grow and, you know, not
5  only maintain but grow as well.  I knew some of these
6  accounts had -- for example, GSAM had recently been
7  reassigned from the California office back to Ripley and
8  Connor.
9  BY MS. LAHR:
10     Q.  Which one was that?  I'm sorry?
11     A.  That was Goldman Sachs Asset Management.
12     Q.  And your recollection is that had recently been
13 reassigned to them?
14     A.  When we closed California down, we moved a number
15 of accounts around the firm as a function of the
16 California office closing, John Moynihan relocating to
17 Texas.  So there were a number of accounts that were
18 reassigned throughout the firm, and, again, specifically
19 including Goldman Sachs Asset Management going back to
20 Ripley and Connor.
21     Q.  Had they had Goldman Sachs Asset Management
22 before the California office was opened?  Was that taken
23 from them to give to the California office?
24     A.  No.  Goldman Sachs Asset Management was
25 reassigned when we opened up California from Dwight

5b83b83d-c596-462f-8b10-b75d2708a7f0

EXHIBIT 13

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

W-2

**Form W-2 Wage & Tax Statement 2010**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                          OMB No. 1545-0008

| **a** Employee's social security number | | |
|---|---|---|

| **1** Wages, tips, other compensation 147996.78 | **2** Federal income tax withheld 37853.86 |
|---|---|

| **c** Employer's name, address, and ZIP code | **3** Social security wages 106800.00 | **4** Social security tax withheld 6621.60 |
|---|---|---|
| BOSC, Inc. P.O. Box 2300 Tulsa, OK 74102-2300 USA | **5** Medicare wages and tips 155036.54 | **6** Medicare tax withheld 2248.03 |
| | **7** Social security tips 0.00 | **8** Allocated tips 0.00 |

| **b** Employer identification number (EIN) 73-1275307 | **9** Advance EIC payment | **10** Dependent care benefits 0.00 |
|---|---|---|

| **e** Employee's name, address, and ZIP code | **11** Nonqualified plans 0.00 | **13** Statutory employee ☐    Retirement plan ☑    Third-party sick pay ☐ |
|---|---|---|
| y Dr Dallas, TX 75204-1615 | **12** See instructions for box 12 CC       106800.00 D        7039.76 | **14** Other |

| 15 State TX | Employer's state ID No. | 16 State wages, tips, etc. 147996.78 | 17 State income tax 0.00 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

**Form W-2 Wage & Tax Statement 2010**
**Copy 2 - To Be Filed With Employee's State, City, or Local Income Tax Return.**

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation<br>147996.78 | 2 Federal income tax withheld<br>37853.86 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages<br>106800.00 | 4 Social security tax withheld<br>6621.60 |
| | 5 Medicare wages and tips<br>155036.54 | 6 Medicare tax withheld<br>2248.03 |
| | 7 Social security tips<br>0.00 | 8 Allocated tips<br>0.00 |
| b Employer identification number (EIN)<br>73-1275307 | 9 Advance EIC payment | 10 Dependent care benefits<br>0.00 |
| e Employee's name, address, and ZIP code<br><br>                    y<br>                    Dr<br>Dallas, TX 75204-1615 | 11 Nonqualified plans<br>0.00 | 13 Statutory employee ☐    Retirement plan ☒    Third-party sick pay ☐ |
| | 12 See instructions for box 12<br>CC        106800.00<br>D          7039.76 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 147996.78 | 0.00 | | | |

**Form W-2 Wage & Tax Statement 2010**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| | | |
|---|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation<br>147996.78 | **2** Federal income tax withheld<br>37853.86 |
| **c** Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>106800.00 | **4** Social security tax withheld<br>6621.60 |
| | **5** Medicare wages and tips<br>155036.54 | **6** Medicare tax withheld<br>2248.03 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>73-1275307 | **9** Advance EIC payment | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>y<br>Dr<br>Dallas, TX 75204-1615 | **11** Nonqualified plans<br><br>0.00 | **13** Statutory employee ☐   Retirement plan ☒   Third-party sick pay ☐ |
| | **12** See instructions for box 12<br>CC          106800.00<br>D              7039.76 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 147996.78 | 0.00 | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 157275.04 | 157275.04 | 157275.04 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 7039.76 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 2238.50 | - 2238.50 | - 2238.50 |
| Less Excess Wages | | - 48236.54 | |
| Taxable Wages | 147996.78 | 106800.00 | 155036.54 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **M**  0           SIT Res: **TXSIT  M**  0           SIT Work: **TXSIT  M**  0

## Notice to Employee

**Refund.** Even if you do not have to file a tax return, you should file to get a refund if box 2 shows federal income tax withheld or if you can take the earned income credit.

**Earned income credit (EIC).** You must file a tax return if any amount is shown in box 9. You may be able to take the EIC for 2010 if (a) you do not have a qualifying child and you earned less than $13,460 ($18,470 if married filing jointly), (b) you have one qualifying child and you earned less than $35,535 ($40,545 if married filing jointly), (c) you have two qualifying children and you earned less than $40,363 ($45,373 if married filing jointly), or (d) you have three or more qualifying children and you earned less than $43,352 ($48,362 if married filing jointly). You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than $3,100. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.** If you have at least one qualifying child, you may get as much as $1,830 of the EIC in advance by completing Form W-5, Earned Income Credit Advance Payment Certificate, and giving it to your employer.

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

### Instructions for Employee
(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 8.** This amount is not included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

**Box 9.** Enter this amount on the advance earned income credit payments line of your Form 1040 or Form 1040A.

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA and BB) under all plans are generally limited to a total of $16,500 ($11,500 if you only have SIMPLE plans; $19,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $16,500. Deferrals under code H are limited to $7,000. However, if you were at least age 50 in 2010, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, or BB, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You may also visit the SSA at www.socialsecurity.gov.

**Credit for excess taxes.** If you had more than one employer in 2010 and more than $6,621.60 in social security and/or Tier I railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,088.80 in Tier II RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax. (Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee
(continued from back of Copy C)

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Total Tax" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Total Tax" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**CC**—(For employer use only) – HIRE exempt wages and tips

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions that you may deduct.

**Note.** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **your social security benefits**, keep

CONFIDENTIAL                                                                 BOKFS-000281

"Total Tax" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement (continued on back of Copy 2)

Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year. Compare the Social Security wages and the Medicare wages to the information shown on your annual (for workers over 25) Social Security Statement.

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

## W-2

**Form W-2 Wage & Tax Statement 2011**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**

This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                                OMB No. 1545-0008

| **a** Employee's social security number | | **1** Wages, tips, other compensation<br>277490.10 | **2** Federal income tax withheld<br>66307.24 |
|---|---|---|---|
| **c** Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | | **3** Social security wages<br>106800.00 | **4** Social security tax withheld<br>4485.60 |
| | | **5** Medicare wages and tips<br>279009.11 | **6** Medicare tax withheld<br>4045.63 |
| | | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>73-1275307 | | **9** | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>y Dr<br>Dallas, TX 75204-1615 | | **11** Nonqualified plans<br><br>0.00 | **13** Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | | **12** See instructions for box 12<br>AA          13596.80<br>D           1519.01 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 277490.10 | 0.00 | | | |

**CONFIDENTIAL**                                                                    **BOKFS-000839**

**Form W-2 Wage & Tax Statement 2011**
**Copy 2 - To Be Filed With Employee's State, City, or Local Income Tax Return.**

Department of the Treasury – Internal Revenue Service                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation<br>277490.10 | 2 Federal income tax withheld<br>66307.24 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages<br>106800.00 | 4 Social security tax withheld<br>4485.60 |
| | 5 Medicare wages and tips<br>279009.11 | 6 Medicare tax withheld<br>4045.63 |
| | 7 Social security tips<br>0.00 | 8 Allocated tips<br>0.00 |
| b Employer identification number (EIN)<br>73-1275307 | 9 | 10 Dependent care benefits<br>0.00 |
| e Employee's name, address, and ZIP code<br><br>y Dr<br><br>Dallas, TX 75204-1615 | 11 Nonqualified plans<br>0.00 | 13 Statutory employee ☐    Retirement plan ☑    Third-party sick pay ☐ |
| | 12 See instructions for box 12<br>AA          13596.80<br>D            1519.01 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 277490.10 | 0.00 | | | |

**Form W-2 Wage & Tax Statement 2011**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| | |
|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation  277490.10 / **2** Federal income tax withheld  66307.24 |

**c** Employer's name, address, and ZIP code

BOSC, Inc.
P.O. Box 2300
Tulsa, OK 74102-2300
USA

| | |
|---|---|
| **3** Social security wages  106800.00 | **4** Social security tax withheld  4485.60 |
| **5** Medicare wages and tips  279009.11 | **6** Medicare tax withheld  4045.63 |
| **7** Social security tips  0.00 | **8** Allocated tips  0.00 |

**b** Employer identification number (EIN)
73-1275307

**9**

**10** Dependent care benefits
0.00

**e** Employee's name, address, and ZIP code

y Dr

Dallas, TX 75204-1615

**11** Nonqualified plans
0.00

**12** See instructions for box 12
AA          13596.80
D           1519.01

**13** Statutory employee ☐    Retirement plan ☑    Third-party sick pay ☐

**14** Other

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 277490.10 | 0.00 | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 287274.71 | 287274.71 | 287274.71 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 1519.01 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 8265.60 | - 8265.60 | - 8265.60 |
| Less Excess Wages | | - 172209.11 | |
| Taxable Wages | 277490.10 | 106800.00 | 279009.11 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **M   0**                SIT Res: **TXSIT   M   0**                SIT Work: **TXSIT   M   0**

### Notice to Employee

**Refund.** Even if you do not have to file a tax return, you should file to get a refund if box 2 shows federal income tax withheld or if you can take the earned income credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2011 if (a) you do not have a qualifying child and you earned less than $13,660 ($18,740 if married filing jointly), (b) you have one qualifying child and you earned less than $36,052 ($41,132 if married filing jointly), (c) you have two qualifying children and you earned less than $40,964 ($46,044 if married filing jointly), or (d) you have three or more qualifying children and you earned less than $43,998 ($49,078 if married filing jointly). You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than $3,150. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2011 and more than $4,485.60 in social security and/or Tier I railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,088.80 in Tier II RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee
(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions. Unless you have records that show you did not receive the amount reported in box 8 as allocated tips, you must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report the allocated tip amount. On Form 4137 you will figure the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount.

### Instructions for Employee
(continued from back of Copy C)

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Total Tax" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Total Tax" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB and EE) under all plans are generally limited to a total of $16,500 ($11,500 if you only have SIMPLE plans; $19,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $16,500. Deferrals under code H are limited to $7,000. However, if you were at least age 50 in 2011, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, or BB, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Total Tax" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement (continued on back of Copy 2)

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Total Tax" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a taxexempt organization section 457(b) plan. Box 13. If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions that you may deduct.

**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year. Compare the Social Security wages and the Medicare wages to the information shown on your annual (for workers over 25) Social Security Statement.

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

## W-2

**Form W-2 Wage & Tax Statement 2012**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**

This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation 546837.84 | 2 Federal income tax withheld 133858.60 |
|---|---|---|
| c Employer's name, address, and ZIP code | 3 Social security wages 110100.00 | 4 Social security tax withheld 4624.20 |
| BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 5 Medicare wages and tips 546837.84 | 6 Medicare tax withheld 7929.15 |
| | 7 Social security tips 0.00 | 8 Allocated tips 0.00 |
| b Employer identification number (EIN) 73-1275307 | 9 | 10 Dependent care benefits 0.00 |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans 0.00 | 13 Statutory employee ☐  Retirement plan ☑  Third-party sick pay ☐ |
|---|---|---|
| Dr<br>Dallas, TX 75204-1615 | 12 See instructions for box 12<br>AA        22500.00<br>DD        8604.00 | 14 Other |

| 15 State TX | Employer's state ID No. | 16 State wages, tips, etc. 546837.84 | 17 State income tax 0.00 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

**Form W-2 Wage & Tax Statement 2012**
**Copy 2 - To Be Filed With Employee's State, City, or Local Income Tax Return.**

Department of the Treasury – Internal Revenue Service                                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation 546837.84 | 2 Federal income tax withheld 133858.60 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages 110100.00 | 4 Social security tax withheld 4624.20 |
| | 5 Medicare wages and tips 546837.84 | 6 Medicare tax withheld 7929.15 |
| | 7 Social security tips 0.00 | 8 Allocated tips 0.00 |
| b Employer identification number (EIN) 73-1275307 | 9 | 10 Dependent care benefits 0.00 |
| e Employee's name, address, and ZIP code<br><br>y Dr<br>Dallas, TX 75204-1615 | 11 Nonqualified plans 0.00 | 13 Statutory employee ☐    Retirement plan ☑    Third-party sick pay ☐ |
| | 12 See instructions for box 12<br>AA     22500.00<br>DD     8604.00 | 14 Other |

| 15  State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 546837.84 | 0.00 | | | |

**Form W-2 Wage & Tax Statement 2012**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| | 546837.84 | 133858.60 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 110100.00<br><br>**5** Medicare wages and tips<br>546837.84<br><br>**7** Social security tips<br>0.00 | 4624.20<br><br>**6** Medicare tax withheld<br>7929.15<br><br>**8** Allocated tips<br>0.00 |

| b Employer identification number (EIN) | 9 | 10 Dependent care benefits |
|---|---|---|
| 73-1275307 | | 0.00 |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 13 Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
|---|---|---|
| y<br> Dr<br>Dallas, TX 75204-1615 | 0.00 | |
| | **12** See instructions for box 12<br>AA        22500.00<br>DD        8604.00 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| TX | | 546837.84 | 0.00 | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 556099.20 | 556099.20 | 556099.20 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 9261.36 | - 9261.36 | - 9261.36 |
| Less Excess Wages | | - 436737.84 | |
| Taxable Wages | 546837.84 | 110100.00 | 546837.84 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **M  0**    SIT Res: **TXSIT  M  0**    SIT Work: **TXSIT  M  0**

### Notice to Employee

**Refund.** Even if you do not have to file a tax return, you should file to get a refund if box 2 shows federal income tax withheld or if you can take the earned income credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2012 if (a) you do not have a qualifying child and you earned less than $13,980 ($19,190 if married filing jointly), (b) you have one qualifying child and you earned less than $36,920 ($42,130 if married filing jointly), (c) you have two qualifying children and you earned less than $41,952 ($47,162 if married filing jointly), or (d) you have three or more qualifying children and you earned less than $45,060 ($50,270 if married filing jointly). You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than $3,200, or if income is earned for services provided while you were an inmate at a penal institution. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in Box 12, using Code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with Code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2012 and more than $4,624.20 in social security and/or Tier I railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,192.90 in Tier II RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee
(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions. Unless you have records that show you did not receive the amount reported in box 8 as allocated tips, you must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount.

### Instructions for Employee
(continued from back of Copy C)

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

CONFIDENTIAL    BOKFS-000849

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,000 ($11,500 if you only have SIMPLE plans; $20,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $17,000. Deferrals under code H are limited to $7,000. However, if you were at least age 50 in 2012, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct.

**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

**CONFIDENTIAL**

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

## W-2

**Form W-2 Wage & Tax Statement 2013**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                          OMB No. 1545-0008

| | | |
|---|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation <br> 811839.02 | **2** Federal income tax withheld <br> 199923.91 |
| **c** Employer's name, address, and ZIP code <br><br> BOSC, Inc. <br> P.O. Box 2300 <br> Tulsa, OK 74102-2300 <br> USA | **3** Social security wages <br> 113700.00 | **4** Social security tax withheld <br> 7049.40 |
| | **5** Medicare wages and tips <br> 811839.02 | **6** Medicare tax withheld <br> 17278.22 |
| | **7** Social security tips <br> 0.00 | **8** Allocated tips <br> 0.00 |
| **b** Employer identification number (EIN) <br> 73-1275307 | **9** | **10** Dependent care benefits <br> 0.00 |
| **e** Employee's name, address, and ZIP code <br><br><br> Terrell, TX 75160- | **11** Nonqualified plans | **13** Statutory employee ☐   Retirement plan ☒   Third-party sick pay ☐ |
| | AA             23000.00 <br> DD             8916.00 | **14** Other |

| 15  State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

CONFIDENTIAL                                                                 BOKFS-000853

**Form W-2 Wage & Tax Statement 2013**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                                OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation 811839.02 | 2 Federal income tax withheld 199923.91 |
|---|---|---|
| c Employer's name, address, and ZIP code | 3 Social security wages 113700.00 | 4 Social security tax withheld 7049.40 |
| BOSC, Inc. P.O. Box 2300 Tulsa, OK 74102-2300 USA | 5 Medicare wages and tips 811839.02 | 6 Medicare tax withheld 17278.22 |
| | 7 Social security tips 0.00 | 8 Allocated tips 0.00 |
| b Employer identification number (EIN) 73-1275307 | 9 | 10 Dependent care benefits 0.00 |
| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ |
| Terrell, TX 75160- | AA       23000.00 DD       8916.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 818876.78 | 818876.78 | 818876.78 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 7037.76 | - 7037.76 | - 7037.76 |
| Less Excess Wages | | - 698139.02 | |
| Taxable Wages | 811839.02 | 113700.00 | 811839.02 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **M  0**            SIT Res: **TXSIT  M  0**                    SIT Work: **TXSIT  M  0**

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2013 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2013 or if income is earned for services provided while you were an inmate at a penal institution. For 2013 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2013 and more than $7,049.40 in social security and/or Tier I railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,709.20 in Tier II RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee

(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** This amount may be required to be entered on Form 8959. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove a smaller amount with adequate records. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will figure the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount is the total dependent care benefits that your employer paid to you or incurred on your behalf (including

### Instructions for Employee

(continued from back of Copy C)

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If this happens and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131 with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,500 ($12,000 if you only have SIMPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $17,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2013, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under section 409A on a nonqualified deferred compensation plan. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct.

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report RRTA compensation, Tier I tax, Tier II tax, Medicare tax and Additional Medicare Tax.

**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

W-2

**Form W-2 Wage & Tax Statement 2014**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                              OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation<br>685980.23 | 2 Federal income tax withheld<br>167932.53 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages<br>117000.00 | 4 Social security tax withheld<br>7254.00 |
| | 5 Medicare wages and tips<br>685980.23 | 6 Medicare tax withheld<br>14320.54 |
| | 7 Social security tips<br>0.00 | 8 Allocated tips<br>0.00 |
| b Employer identification number (EIN)<br>73-1275307 | 9 | 10 Dependent care benefits<br>0.00 |
| e Employee's name, address, and ZIP code<br><br><br>Terrell, TX 75160-1010 | 11 Nonqualified plans<br><br>0.00 | 13 Statutory employee ☐  Retirement plan ☑  Third-party sick pay ☐ |
| | 12 See instructions for box 12<br>AA          23000.00<br>DD          5112.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

**Form W-2 Wage & Tax Statement 2014**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| | |
|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation<br>685980.23 |
| | **2** Federal income tax withheld<br>167932.53 |
| **c** Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>117000.00 |
| | **4** Social security tax withheld<br>7254.00 |
| | **5** Medicare wages and tips<br>685980.23 |
| | **6** Medicare tax withheld<br>14320.54 |
| | **7** Social security tips<br>0.00 |
| | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>73-1275307 | **9** |
| | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>Terrell, TX 75160-1010 | **11** Nonqualified plans<br><br>0.00 |
| | **13** Statutory employee ☐  Retirement plan ☑  Third-party sick pay ☐ |
| | **12** See instructions for box 12<br>AA      23000.00<br>DD      5112.00 |
| | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

          BOKFS-000860

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 691085.03 | 691085.03 | 691085.03 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 5104.80 | - 5104.80 | - 5104.80 |
| Less Excess Wages | | - 568980.23 | |
| Taxable Wages | 685980.23 | 117000.00 | 685980.23 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **M   0**          SIT Res: **TXSIT   M   0**          SIT Work: **TXSIT   M   0**

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2014 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2014 or if income is earned for services provided while you were an inmate at a penal institution. For 2014 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2014 and more than $7,254 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $3,828 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee

(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf

### Instructions for Employee

(continued from back of Copy C)

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

(including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $17,500 ($12,000 if you have SIMPLE plans; $20,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $17,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2014, your employer may have allowed an additional deferral of up to $5,500 ($2,500 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590, Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

W-2

**Form W-2 Wage & Tax Statement 2015**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| | |
|---|---|
| **a** Employee's social security number ▓▓▓▓ | **1** Wages, tips, other compensation 656876.65 / **2** Federal income tax withheld 184910.52 |

| | | |
|---|---|---|
| **c** Employer's name, address, and ZIP code<br><br>BOSC, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>118500.00 | **4** Social security tax withheld<br>7347.00 |
| | **5** Medicare wages and tips<br>656876.65 | **6** Medicare tax withheld<br>13636.60 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>73-1275307 | **9** | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>▓▓▓▓<br><br>Terrell, TX 75160-1010 | **11** Nonqualified plans<br><br>0.00 | **13** Statutory employee ☐  Retirement plan ☑  Third-party sick pay ☐ |
| | **12** See instructions for box 12<br>AA      24000.00<br>DD      5328.00 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

**Form W-2 Wage & Tax Statement 2015**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                    OMB No. 1545-0008

| | |
|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation  656876.65    **2** Federal income tax withheld  184910.52 |

| | |
|---|---|
| **c** Employer's name, address, and ZIP code  BOSC, Inc.  P.O. Box 2300  Tulsa, OK 74102-2300  USA | **3** Social security wages  118500.00    **4** Social security tax withheld  7347.00 |
| | **5** Medicare wages and tips  656876.65    **6** Medicare tax withheld  13636.60 |
| | **7** Social security tips  0.00    **8** Allocated tips  0.00 |

| | |
|---|---|
| **b** Employer identification number (EIN)  73-1275307 | **9**    **10** Dependent care benefits  0.00 |

**e** Employee's name, address, and ZIP code

Terrell, TX 75160-1010

**11** Nonqualified plans

0.00

**13** Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐

**12** See instructions for box 12

AA    24000.00
DD    5328.00

**14** Other

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

CONFIDENTIAL                    BOKFS-000866

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 662031.61 | 662031.61 | 662031.61 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 5154.96 | - 5154.96 | - 5154.96 |
| Less Excess Wages | | - 538376.65 | |
| Taxable Wages | 656876.65 | 118500.00 | 656876.65 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **S  0**

SIT Res: **TXSIT  M  0**                    SIT Work: **TXSIT  M  0**

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2015 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2015 or if income is earned for services provided while you were an inmate at a penal institution. For 2015 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2015 and more than $7,347 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee

(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf

### Instructions for Employee

(continued from back of Copy C)

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**CONFIDENTIAL**                    **BOKFS-000867**

(including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2015, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590, Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

BOKFS-000868

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

W-2

**Form W-2 Wage & Tax Statement 2016**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                OMB No. 1545-0008

| **a** Employee's social security number | **1** Wages, tips, other compensation<br>533444.90 | **2** Federal income tax withheld<br>156658.51 |
|---|---|---|
| **c** Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>118500.00 | **4** Social security tax withheld<br>7347.00 |
| | **5** Medicare wages and tips<br>533444.90 | **6** Medicare tax withheld<br>10735.96 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips |
| **b** Employer identification number (EIN)<br>73-1275307 | Verification code | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>pley<br>          Drive<br><br>Dallas, TX 75214 | **11** Nonqualified plans<br><br>0.00 | **13** Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | **12** See instructions for box 12<br>AA          24000.00<br>DD           5484.00 | **14** Other |

| 15  State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

**Form W-2 Wage & Tax Statement 2016**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                                                 OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| | 533444.90 | 156658.51 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 118500.00 | 7347.00 |
| | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 533444.90 | 10735.96 |
| | 7 Social security tips | 8 Allocated tips |
| | 0.00 | 0.00 |

| b Employer identification number (EIN) | Verification code | 10 Dependent care benefits |
|---|---|---|
| 73-1275307 | | 0.00 |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ |
|---|---|---|
| ☐☐☐☐☐ pley<br>☐☐☐☐☐ Drive<br>Dallas, TX 75214 | 0.00 | |
| | 12 See instructions for box 12<br>AA     24000.00<br>DD     5484.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 539589.86 | 539589.86 | 539589.86 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 6144.96 | - 6144.96 | - 6144.96 |
| Less Excess Wages | | - 414944.90 | |
| Taxable Wages | 533444.90 | 118500.00 | 533444.90 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **S    0**        SIT Res: **TXSIT    M    0**        SIT Work: **TXSIT    M    0**

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2016 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2016 or if income is earned for services provided while you were an inmate at a penal institution. For 2016 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Verification Code.** If this field is populated, enter this code when it is requested by your tax return preparation software. It is possible your software or preparer will not request the code. The code is not entered on paper-filed returns.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2016 and more than $7,347 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

### Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

However, if you were at least age 50 in 2016, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000. Deferrals under code H are limited to $7,000.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5).

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**CONFIDENTIAL**                                                                **BOKFS-000873**

deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note:** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5).

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement.

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP.

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5).

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable).

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1).

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan.

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan.

**BB**—Designated Roth contributions under a section 403(b) plan.

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note:** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

BOKFS-000874

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

## W-2

**Form W-2 Wage & Tax Statement 2017**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service

OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation 406632.05 | 2 Federal income tax withheld 118473.82 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages 127200.00 | 4 Social security tax withheld 7886.40 |
| | 5 Medicare wages and tips 406632.05 | 6 Medicare tax withheld 7755.85 |
| | 7 Social security tips 0.00 | 8 Allocated tips 0.00 |
| b Employer identification number (EIN) 73-1275307 | 9 Verification code 6C03-3156-3BF6-BCA5 | 10 Dependent care benefits 0.00 |
| e Employee's name, address, and ZIP code<br><br>Charles P Ripley<br>          Drive<br><br>Dallas, TX 75214 | 11 Nonqualified plans 0.00 | 13 Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | 12 See instructions for box 12<br>AA          24000.00<br>DD          5208.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

EXHIBIT
96

exhibitsticker.com

**Form W-2 Wage & Tax Statement 2017**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation<br>406632.05 | 2 Federal income tax withheld<br>118473.82 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages<br>127200.00 | 4 Social security tax withheld<br>7886.40 |
| | 5 Medicare wages and tips<br>406632.05 | 6 Medicare tax withheld<br>7755.85 |
| | 7 Social security tips<br>0.00 | 8 Allocated tips<br>0.00 |
| b Employer identification number (EIN)<br>73-1275307 | 9 Verification code<br>6C03-3156-3BF6-BCA5 | 10 Dependent care benefits<br>0.00 |
| e Employee's name, address, and ZIP code<br><br>Charles P Ripley<br>_____ Drive<br><br>Dallas, TX 75214 | 11 Nonqualified plans<br><br>0.00 | 13 Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | 12 See instructions for box 12<br>AA        24000.00<br>DD        5208.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

CONFIDENTIAL

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 412743.01 | 412743.01 | 412743.01 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 6110.96 | - 6110.96 | - 6110.96 |
| Less Excess Wages | | - 279432.05 | |
| Taxable Wages (Reported on Form W2) | 406632.05 Box 1 of W-2 | 127200.00 Box 3 of W-2 | 406632.05 Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **S**  0        SIT Res: **TXSIT   M**  0            SIT Work: **TXSIT   M**  0

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2017 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You can't take the EIC if your investment income is more than the specified amount for 2017 or if income is earned for services provided while you were an inmate at a penal institution. For 2017 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you aren't subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.SSA.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2017 and more than $7,886.40 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,630.50 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

### Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the actual social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 9.** If you are e-filing and if there is a code in this box, enter it when prompted by your software. This code assists the IRS in validating the W-2 data submitted with your return. The code is not entered on paper-filed returns.

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan, or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2017, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note:** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5).

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement.

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP.

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan.

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5).

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable).

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5).

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1).

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan.

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan.

**BB**—Designated Roth contributions under a section 403(b) plan.

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**FF**—Permitted benefits under a qualified small employer health reimbursement arrangement.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note:** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

## W-2

**Form W-2 Wage & Tax Statement 2018**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury – Internal Revenue Service                    OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation 263382.50 | 2 Federal income tax withheld 69790.04 |
|---|---|---|
| c Employer's name, address, and ZIP code BOK Financial Securities, Inc. P.O. Box 2300 Tulsa, OK 74102-2300 USA | 3 Social security wages 128400.00 | 4 Social security tax withheld 7960.80 |
| | 5 Medicare wages and tips 263382.50 | 6 Medicare tax withheld 4389.49 |
| | 7 Social security tips 0.00 | 8 Allocated tips 0.00 |
| b Employer identification number (EIN) 73-1275307 | 9 Verification code 36AC-B2C1-10E4-263A | 10 Dependent care benefits 0.00 |
| e Employee's name, address, and ZIP code Charles P Ripley ___ Drive Dallas, TX 75214 | 11 Nonqualified plans 0.00 | 13 Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | 12 See instructions for box 12 AA   24500.00 DD   5724.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

EXHIBIT

97

CONFIDENTIAL

BOKFS-000883

**Form W-2 Wage & Tax Statement 2018**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                                                                OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation<br>263382.50 | 2 Federal income tax withheld<br>69790.04 |
|---|---|---|
| c Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | 3 Social security wages<br>128400.00 | 4 Social security tax withheld<br>7960.80 |
| | 5 Medicare wages and tips<br>263382.50 | 6 Medicare tax withheld<br>4389.49 |
| | 7 Social security tips<br>0.00 | 8 Allocated tips<br>0.00 |
| b Employer identification number (EIN)<br>73-1275307 | 9 Verification code<br>36AC-B2C1-10E4-263A | 10 Dependent care benefits<br>0.00 |
| e Employee's name, address, and ZIP code<br><br>Charles P Ripley<br>        Drive<br><br>Dallas, TX 75214 | 11 Nonqualified plans<br>0.00 | 13 Statutory   Retirement Third-party<br>employee   plan      sick pay<br>☐              ☑              ☐ |
| | 12 See instructions for box 12<br>AA          24500.00<br>DD          5724.00 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

CONFIDENTIAL

BOKFS-000884

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 268780.74 | 268780.74 | 268780.74 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 5398.24 | - 5398.24 | - 5398.24 |
| Less Excess Wages | | - 134982.50 | |
| Taxable Wages (Reported on Form W2) | 263382.50 Box 1 of W-2 | 128400.00 Box 3 of W-2 | 263382.50 Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **S**   0          SIT Res: **TXSIT**   **M**   0               SIT Work: **TXSIT**   **M**   0

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2018 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You can't take the EIC if your investment income is more than the specified amount for 2018 or if income is earned for services provided while you were an inmate at a penal institution. For 2018 income limits and more information, visit www.irs.gov/EITC. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you aren't subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 800-772-1213. You also may visit the SSA website at www.SSA.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2018 and more than $7,960.80 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,674.60 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 instructions and Pub. 505, Tax Withholding and Estimated Tax.

### Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See the Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in box 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 9.** If you are e-filing and if there is a code in this box, enter it when prompted by your software. The only valid characters are the letters A-F and the digits 0-9. This code assists the IRS in validating the W-2 data submitted with your return. The code is not entered on paper-filed returns.

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan, or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,500 ($12,500 if you only have SIMPLE plans; $21,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2018, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the instructions for Form 1040.

**Note:** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in box 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of groupterm life insurance over $50,000 (former employees only). See the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in box 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount also is included in box 1. It is subject to an additional 20% tax plus interest. See the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a taxexempt organization section 457(b) plan.

**FF**—Permitted benefits under a qualified small employer health reimbursement arrangement

**GG**—Income from qualified equity grants under section 83(i)

**HH**—Aggregate deferrals under section 83(i) elections as of the close of the calendar year

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note:** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

BOKFS-000886

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

## W-2

**Form W-2 Wage & Tax Statement 2019**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**

This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service        OMB No. 1545-0008

| | | |
|---|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation<br>228697.36 | **2** Federal income tax withheld<br>58826.62 |
| **c** Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>132900.00 | **4** Social security tax withheld<br>8239.80 |
| | **5** Medicare wages and tips<br>228697.36 | **6** Medicare tax withheld<br>3574.39 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips |
| **b** Employer identification number (EIN)<br>73-1275307 | **9** | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code | **11** Nonqualified plans<br><br>0.00 | **13** Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | **12** See instructions for box 12<br>AA      23104.19<br>DD      5892.00 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

**Form W-2 Wage & Tax Statement 2019**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service

OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 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 | 228697.36 | 58826.62 |
| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
| | 132900.00 | 8239.80 |
| BOK Financial Securities, Inc. | 5 Medicare wages and tips | 6 Medicare tax withheld |
| P.O. Box 2300 | 228697.36 | 3574.39 |
| Tulsa, OK 74102-2300 | 7 Social security tips | 8 Allocated tips |
| USA | 0.00 | 0.00 |
| b Employer identification number (EIN) | 9 | 10 Dependent care benefits |
| 73-1275307 | | 0.00 |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 13 Statutory employee / Retirement plan / Third-party sick pay |
|---|---|---|
| Charles P.Ripley | 0.00 | ☐ / ☑ / ☐ |
| 6507 Patrick Drive | | |
| Dallas, TX 75214 | 12 See instructions for box 12 | 14 Other |
| | AA      23104.19 | |
| | DD      5892.00 | |

| 15  State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 234337.60 | 234337.60 | 234337.60 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 5640.24 | - 5640.24 | - 5640.24 |
| Less Excess Wages | | - 95797.36 | |
| Taxable Wages | 228697.36 | 132900.00 | 228697.36 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: **S 0**      SIT Res: **TXSIT M 0**          SIT Work: **TXSIT M 0**

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2019 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You can't take the EIC if your investment income is more than the specified amount for 2019 or if income is earned for services provided while you were an inmate at a penal institution. For 2019 income limits and more information, visit www.irs.gov/EITC. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you aren't subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 800-772-1213. You also may visit the SSA website at www.SSA.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2019 and more than $8,239.80 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,836.30 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 instructions and Pub. 505, Tax Withholding and Estimated Tax.

### Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See the Form 1040 instructions to determine if you are required to report on Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in box 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan, or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $19,000 ($13,000 if you only have SIMPLE plans; $22,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $19,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2019, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the instructions for Form 1040.

**Note:** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A—**Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See the Form 1040 instructions.

**B—**Uncollected Medicare tax on tips. Include this tax on Form 1040. See the Form 1040 instructions.

**C—**Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D—**Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E—**Elective deferrals under a section 403(b) salary reduction agreement

**F—**Elective deferrals under a section 408(k)(6) salary reduction SEP

**G—**Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H—**Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the Form 1040 instructions for how to deduct.

**J—**Nontaxable sick pay (information only, not included in box 1, 3, or 5)

**K—**20% excise tax on excess golden parachute payments. See the Form 1040 instructions.

**L—**Substantiated employee business expense reimbursements (nontaxable)

**M—**Uncollected social security or RRTA tax on taxable cost of grouperm life insurance over $50,000 (former employees only). See the Form 1040 instructions.

**N—**Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.

**P—**Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in box 1, 3, or 5)

**Q—**Nontaxable combat pay. See the instructions for Form 1040 for details on reporting this amount.

**R—**Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S—**Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T—**Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V—**Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.

**W—**Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y—**Deferrals under a section 409A nonqualified deferred compensation plan

**Z—**Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount also is included in box 1. It is subject to an additional 20% tax plus interest. See the Form 1040 instructions.

**AA—**Designated Roth contributions under a section 401(k) plan

**BB—**Designated Roth contributions under a section 403(b) plan

**DD—**Cost of employer-sponsored health coverage. **The amount reported with code DD is not taxable.**

**EE—**Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a taxexempt organization section 457(b) plan.

**FF—**Permitted benefits under a qualified small employer health reimbursement arrangement

**GG—**Income from qualified equity grants under section 83(i)

**HH—**Aggregate deferrals under section 83(i) elections as of the close of the calendar year

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note:** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Charles P Ripley - 000007179 - BOK Financial Securities, Inc.

# W-2

**Form W-2 Wage & Tax Statement 2020**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**

This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service          OMB No. 1545-0008

| | | |
|---|---|---|
| **a** Employee's social security number | **1** Wages, tips, other compensation<br>181837.64 | **2** Federal income tax withheld<br>46264.91 |
| **c** Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>137700.00 | **4** Social security tax withheld<br>8537.40 |
| | **5** Medicare wages and tips<br>181837.64 | **6** Medicare tax withheld<br>2636.65 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>73-1275307 | **9** | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code | **11** Nonqualified plans<br><br>0.00 | **13** Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☐ |
| | **12** See instructions for box 12<br>AA      18446.96<br>DD      5580.00 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

1/4

**Form W-2 Wage & Tax Statement 2020**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                                          OMB No. 1545-0008

| | | |
|---|---|---|
| **a** Employee's social security number<br>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 | **1** Wages, tips, other compensation<br>181837.64 | **2** Federal income tax withheld<br>46264.91 |
| **c** Employer's name, address, and ZIP code<br><br>BOK Financial Securities, Inc.<br>P.O. Box 2300<br>Tulsa, OK 74102-2300<br>USA | **3** Social security wages<br>137700.00 | **4** Social security tax withheld<br>8537.40 |
| | **5** Medicare wages and tips<br>181837.64 | **6** Medicare tax withheld<br>2636.65 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>73-1275307 | **9** | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>Charles P.Ripley<br>6507 Patrick Drive<br><br>Dallas, TX 75214 | **11** Nonqualified plans<br><br>0.00 | **13** Statutory    Retirement Third-party<br>employee    plan     sick pay<br>☐       ☑       ☐ |
| | **12** See instructions for box 12<br>AA      18446.96<br>DD      5580.00 | **14** Other |

| 15  State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 188475.79 | 188475.79 | 188475.79 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 0.00 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 6638.15 | - 6638.15 | - 6638.15 |
| Less Excess Wages | | - 44137.64 | |
| Taxable Wages | 181837.64 | 137700.00 | 181837.64 |
| (Reported on Form W2) | Box 1 of W-2 | Box 3 of W-2 | Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT:  **S**  **0**          SIT Res:  **TXSIT**  **M**  **0**          SIT Work:  **TXSIT**  **M**  **0**

### Notice to Employee

**Do you have to file?** Refer to the Instructions for Forms 1040 and 1040-SR to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2020 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You can't take the EIC if your investment income is more than the specified amount for 2020 or if income is earned for services provided while you were an inmate at a penal institution. For 2020 income limits and more information, visit www.irs.gov/EITC. See also Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you aren't subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 800-772-1213. You may also visit the SSA website at www.SSA.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2020 and more than $8,537.40 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $5,012.70 in Tier 2 RRTA tax was withheld, you may also be able to claim a credit. See the Instructions for Forms 1040 and 1040-SR and Pub. 505, Tax Withholding and Estimated Tax.

### Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See the Instructions for Forms 1040 and 1040-SR to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in box 1, 3, 5, or 7. For information on how to report tips on your tax return, see the Instructions for Forms 1040 and 1040-SR.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove with adequate records that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. Use Form 4137 to figure the social security and Medicare tax owed on tips you didn't report to your employer. Enter this amount on the wages line of your tax return. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan, or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $19,500 ($13,500 if you have SIMPLE plans; $22,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $19,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2020, your employer may have allowed an additional deferral of up to $6,500 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the Instructions for Forms 1040 and 1040-SR.

**Note:** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040 or 1040-SR. See the Instructions for Forms 1040 and 1040-SR.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040 or 1040-SR. See the Instructions for Forms 1040 and 1040-SR.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the Instructions for Forms 1040 and 1040-SR for how to deduct.

**J**—Nontaxable sick pay (information only, not included in box 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See the Instructions for Forms 1040 and 1040-SR.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of groupterm life insurance over $50,000 (former employees only). See the Instructions for Forms 1040 and 1040-SR.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Instructions for Forms 1040 and 1040-SR.

**P**—Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in box 1, 3, or 5)

**Q**—Nontaxable combat pay. See the Instructions for Forms 1040 and 1040-SR for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See the Instructions for Forms 1040 and 1040-SR.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a taxexempt organization section 457(b) plan.

**FF**—Permitted benefits under a qualified small employer health reimbursement arrangement

**GG**—Income from qualified equity grants under section 83(i)

**HH**—Aggregate deferrals under section 83(i) elections as of the close of the calendar year

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax, and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note:** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

EXHIBIT 14

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Charles P. Ripley**<br>                    **Drive**<br>**Dallas, TX 75214** | From: | **Dallas District Office**<br>**207 S. Houston St.**<br>**3rd Floor**<br>**Dallas, TX 75202** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | **Juan F. Munoz,** | |
| **450-2018-06417** | **Intake Supervisor** | **(214) 253-2774** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**Belinda F. McCallister,**
**District Director**

NOV 0 1 2018
*(Date Mailed)*

cc:   **Human Resources Mgr.**
**Human Resources Mgr.**
**BOKFNANCIAL SECURITIES INC.**
**333 West Campbell Road**
**Richardson, TX 75080**

**Marilyn K. Lahr**
**LAW OFFICE OF MARILYN K. LAHR**
**3131 McKinney Avenue**
**Suite # 600**
**Dallas, TX 75204**

Enclosure with EEOC
Form 161-B (11/16)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***