## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CHARLES P. RIPLEY** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 3:19-CV-00577-S** |
| | § | |
| **BOK FINANCIAL CORPORATION, and** | § | |
| | § | |
| **BOK FINANCIAL SECURITIES, INC.** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY

Plaintiff files this, Plaintiff's Motion to Extend Discovery Deadline/Continuance and to Compel Discovery, asking this Court to grant Plaintiff and extension of the discovery deadline in this case, and to grant Plaintiff's Motion to Compel regarding discovery from Defendants, and in support of such request would show:

Plaintiff relies on the following in support of this Motion:

1. This Motion itself (Doc 35)
2. the Annex filed in support of Plaintiff's Unopposed Motion to Extend Time (Doc 33)
3. The Annex filed in support of this Motion (Doc 36)

## BACKGROUND FACTS IN SUPPORT OF MOTION TO EXTEND/CONTINUE

**A. Good cause exists for the extension of the discovery deadline and continuance, as Plaintiff has exercised diligence in seeking discovery, but has been stonewalled by Defendants in response to every attempt.**

**1.  The parties agreed to stay discovery to hold a settlement conference.**

This case has been pending since spring 2019, but in reality, discovery did not really get under way until recently due to an agreement by the parties to stay discovery pending a settlement conference, and the intervening pandemic.

In July, 2019, Plaintiff sent out written discovery seeking basic foundational facts and documents upon which to build future discovery.  Plaintiff received Defendants responses in August, and began reviewing the materials produced. (Exhibit B to Annex, Doc 33)  Plaintiff noticed Defendants had objected to producing certain documents as they were "confidential." Plaintiff immediately sent an email on or about August 13 stating Plaintiff would agree to the Court's standard order regarding confidentiality. (Exhibit C to Annex, Doc 33) Thereafter, the parties held a lengthy telephone call to discuss Defendants deficiencies in responding to Plaintiff's discovery.  The parties also discussed settlement and delaying further discovery pending a settlement conference in the hopes of avoiding unnecessary legal fees.  Neither party anticipated the length of time it would take to accomplish the settlement conference, or the intervening pandemic.

In that August 2019 call, Defendants asked Plaintiff to send Defendants a demand letter. Plaintiff pointed out in that call that Plaintiff had requested documents needed to accurately assess Plaintiff's full damages, including information on the commissions earned on accounts removed from Plaintiff, but Defendants had withheld that information as confidential, leaving Plaintiff in the dark as to full damages. Plaintiff again represented Plaintiff would execute a confidentiality order.  On August 26, 2019 Plaintiff prepared an agreed confidentiality order in conformity with this Court's standard order, signed it and sent it to Defendants, *and* asked when the documents withheld as "confidential" would be produced.  Plaintiff received no response from Defendants. Exhibit 1, Annex hereto Doc 36)

In the interim, the parties learned the earliest date for the settlement conference would be February 25, 2020. On or about October 26, 2019, Plaintiff forwarded a demand letter to Defendants reminding Defendants Plaintiff still had not received the confidential documents

related to Plaintiff's damages, and remained in the dark as to the full extent of Plaintiff's damages as a result. Defendants did not respond to Plaintiff's demand letter. (Exhibit 2, Lahr Verification, ¶1, Annex hereto Doc 36)

On December 3, 2019, Plaintiff sent Defendants an email reminding Defendants that Plaintiff had still not received the documents withheld as confidential, and requesting dates for depositions. Defendants responded that Counsel's mother had passed away, and informed Plaintiff she would respond when she returned "next week." Having recently lost her own best friend, Plaintiff's counsel immediately responded letting Defendants' counsel know she should take all the time she needed. (Exhibit C, Annex Doc 33)

With the settlement conference set for January 23, 2020, Plaintiff waited until January 13, 2020 to again reach out to Defendants regarding the needed documents. Defendants responded asking Plaintiff to agree to a new scheduling order (but keep the settlement conference set for January 23) and requested Plaintiff call regarding discovery. Plaintiff confirmed Plaintiff was agreeable to a new scheduling order, and was happy to discuss discovery. (Exhibit C, Annex Doc 33) The parties spoke on the phone, exchanged a new scheduling order. Shortly thereafter, on or about January 22, 2020 the parties received notice from Judge Horan that the settlement conference needed to be reset. The settlement conference was then moved to February 25, 2020.

In February, the parties submitted their agreed scheduling order to the Court, which was approved. On February 19, 2020, Defendants' counsel indicated she had an urgent health issue requiring surgery and needed to move the settlement conference. Plaintiff agreed to the request. (Exhibit 3, Annex hereto Doc 36) Thereafter, the pandemic hit, and all travel stopped. Nonetheless, the parties worked with Judge Horan's Courtroom Deputy to reschedule the settlement conference, which was ultimately set for and held on June 22, 2020.

Due to the delay in holding the settlement conference and the shut down due to the pandemic, Defendants again proposed a new scheduling order.  Plaintiff agreed, noting depositions via Zoom were far more time consuming than in person. (Exhibit 4, Annex hereto Doc 36) The parties submitted the new scheduling order to the Court on or about July 24, 2020, and it was signed by the Court.

Thereafter, on or about August 12, 2020 Plaintiff sent an email to Defendants reminding them there was quite a bit of outstanding discovery due to Plaintiff, and the need to move the case along. Defendants responded that they had already produced Plaintiff's "personnel file", and would produce some additional "emails." (Exhibit C, Annex Doc 33) In response, Defendants sent their first written discovery to Plaintiff.   Plaintiff responded in two separate emails, asking "where are the documents from our discovery sent nearly a year ago?" and reminding Defendants that Plaintiff's requests covered far more than Plaintiff's "personnel file" and that Defendants withheld information as "confidential", but had not produced anything since Plaintiff signed the confidentiality agreement.  (Exhibit C, Annex Doc 33)

On August 24, 2020, Defendants finally produced additional documents.  The production is not labeled in any manner, does not identify any documents as relating to any request for production or interrogatory, whether they had previously been withheld as confidential or were simply supplemental production, and thus, Plaintiff does not know exactly to which responses the materials pertain.  There are no documents that Plaintiff has been able to identify reflecting commissions paid on accounts removed from Plaintiff, nor is any information provided regarding formation of the partnership, any analysis regarding formation of the partnership, any analysis regarding removal of accounts, information about other wholesale removal of accounts, or the like. (Exhibit 2, Lahr Verification, ¶2, Annex hereto Doc 36)

On December 15 and 16, 2020, Plaintiff again reached out to Defendants regarding failure to produce documents, and also seeking dates for the depositions of several of Defendants' employees/executives. The parties discussed and agreed to request an extension of the scheduling order deadlines to complete discovery. (Exhibit C, Annex Doc 33)

**2. The pandemic**

When the parties agreed to stay discovery to hold a settlement conference, neither party foresaw either the length of time it would take to accomplish the conference, or the intervening pandemic.

As the pandemic began to develop, Plaintiff's counsel decided to remain in Indiana on March 14, 2020, instead of returning to Dallas as planned. Plaintiff's counsel has been residing in Indiana since prior to the pandemic to be near her parents, after her father developed a serious heart issue. Plaintiff travelled back and forth to Dallas regularly to maintain her law practice. After March 14, 2020, Plaintiff's counsel restricted her activities, especially travel, to avoid exposure to COVID, especially in light of her parents' higher risk category. Plaintiff's client was also in a high risk group, being over the age of 70. (Exhibit 2, Lahr Verification, ₱3, Annex hereto Doc 36)

The continuing restrictions and potential health risk relating to the pandemic affected Plaintiff's ability to complete discovery. In the fall of 2020, the parties discussed discovery, including depositions, and agreed it would be difficult to conduct depositions via Zoom. Plaintiff advised Defendants she was struggling with eye issues as a result of too much screen time. (Exhibit 2, Lahr Verification, ₱4, Annex hereto Doc 36) Thereafter, the parties agreed to a new scheduling order with the hopes of completing all depositions in person. The new discovery deadline, ultimately signed off on by the Court, was April 1, 2021.

**3.    Depositions -  Plaintiff's diligence, Defendants' stonewalling, delay, obfuscation.**

Even with the pandemic, Plaintiff has exercised diligence in trying to obtain discovery in this case. In nearly every instance, Plaintiff's diligence has been met with Defendants' stonewalling, delay, or obfuscation.  For example, very early on in these proceedings, Plaintiff submitted written discovery to obtain basic information upon which to build further discovery.  Defendants wholly failed to respond to the discovery, asserting "general" and "blanket" objections, and other improper "responses" to such discovery.  (Exhibit B, Annex Doc 33)  Plaintiff raised issues regarding Defendants' improper responses with Defendants on numerous occasions since their response was received.  Plaintiff's efforts were repeatedly met with silence, and occasionally with a request to address the issue at a later time, or a refusal to produce anything more.

With respect to depositions, although Plaintiff had initially requested depositions back in December, 2019, and again in January, 2020, Defendants had not provided any dates.  (Exhibit D, Annex Doc 33)  On or about December 15, 2020, Plaintiff reached out to Defendants regarding an extension of the discovery due to the continuing pandemic.  The parties agreed depositions would need to be in person, and agreed to an extension of the deadlines.  On or about January 2, 2021, Plaintiff (again) made known to Defendants those witnesses Plaintiff wanted to depose (various of Defendants' employees and executives), as well as her issues with Defendants' failure to produce all documents. With full knowledge of the discovery Plaintiff was requesting, Defendants agreed to a new discovery deadline of April 1, 2021, and the parties submitted an agreed order to this Court on January 20, 2021, which this Court signed on January 21, 2021. Defendants did not disclose to Plaintiff at that time that at least half of the month of March would be unavailable to complete those depositions, as Defendants and their counsel had "vacation plans."  (Exhibit D, Annex Doc 33)

On January 2, 2021, as things began to reopen, Plaintiff reached out to Defendants to set deposition schedules. That email was met with silence from Defendants. Plaintiff reached out again on February 3 and February 16, 2021 to schedule the requested depositions, pointing out repeatedly that time was slipping away. Defendants did not respond. (Exhibit C, Annex Doc 33)

On March 2, Defendants sent an email stating they would "look into" dates. Plaintiff responded she would be noticing the depositions for March 18, 19, 22 and 23. In a series of emails exchanged on that day and the next, Defendants advised for the first time that they would not entertain any depositions during the week of March 8 or March 18 through the 28. Defendants refused to consider any dates other than March 29-31, and then subsequently stated only March 29 would be available to Plaintiff. (Exhibit C, Annex Doc 33)

Although Plaintiff had previously requested dates for several key executives and former executives of Defendants, including Merideth Watson, Brett Dean and David Parr, Defendants never stated they would not produce these individuals, nor did they provide any contact information for those individuals. It was not until March 3 that Defendants stated they would not produce Watson, and were silent as to Dean and Parr, and still failed to produce any contact information. (Exhibit C, Annex Doc 33)

Plaintiff would further show that Defendants' stonewalling and obfuscation tactics did end with regard to scheduling depositions, but continued throughout the depositions themselves, unnecessarily extending the time needed to complete the depositions. For example, Plaintiff commenced the deposition of Jerry Williams at 10:15 a.m. and completed Williams' deposition at 12:51 p.m. Throughout the 2 ½ hour deposition, Defendants' counsel asserted over 200 objections as to form. The deposition is 116 pages long, with an objection on nearly every page, with some pages including two or three objections. Counsel's conduct during Polyak's deposition was

similar: the deposition is 220 pages long, and counsel objected on nearly every single page of the deposition, and on many pages multiple times. (See Exhibit E Annex Doc 33, WordIndex for Polyak and Williams for the words "form" and for "Dorwart") Some of the questions to which Defendants objected as to form were as simple and basic as "why do you assign accounts?" (Polyak p. 60:17-18) "Do you know if Mr. Ripley asked to form a partnership with Ms. Connor?" (Polyak 39:9-12) "Do you know if Ms. Connor asked to form a partnership with Mr. Ripley?" (Polyak 39:14-17) "Do you know how many accounts Ms. Connor brought to the partnership?" (Williams 47-8-10) "Do you know how many accounts she opened in the course of that partnership?" (Williams 47:17-19) "Were you aware at any time up until today that Tier 1 accounts had been removed from Mr. Ripley's book of business?" (Williams 46:22-25) "who decided the 50/50 split?" (Polyak 29:7-8) (Exhibit F, Annex Doc 33, depo transcript excerpts).

Plaintiff began the deposition of Nicholas Polyak at 2:20 p.m. Shortly after commencing Polyak's deposition, Plaintiff informed Defendants it was highly unlikely she would complete Polyak's deposition that day, and that she expected to complete the deposition the next morning. Further, Plaintiff's counsel informed Defendants she would not be able to depose Josh Wall until the following day, having not yet completed Polyak's deposition. (Exhibit 4, Annex hereto Doc 36)

At 7:30, Plaintiff had not yet completed Polyak's deposition, and agreed to adjourn the deposition for the day. Defendants flatly refused to present Polyak to complete his deposition the next morning. (Polyak Trans. P. 61:20-21, 219:17-22, 220:3-8.) Defendants also insisted several different times throughout Polyak's deposition that they were producing Josh Wall at 4:30 p.m. "as noticed", even though Plaintiff repeatedly stated she would not reach him that day, and that they would not make either Polyak or Wall available on March 30. (Polyak Trans. pp. 60:19-62:16,

220:3-8)  Defendants ultimately offered to produce Wall at 2:00 p.m. the next day, but continued to refuse to produce Polyak.  Since that time, Plaintiff sent an email to Defendants on or about April 20, 2021, and offered to complete Polyak's deposition and present Plaintiff to allow Defendants to complete his deposition.  Defendants did not respond.  (See Exhibit 5, Annex hereto, Doc 36)

As outlined above, Plaintiff experienced the same stonewalling with respect to documents. Defendants asserted improper objections, and wholly failed to produce all responsive documents, even where they had no objection.  Plaintiff bent over backward to avoid needing this motion, sending multiple requests for the additional documents, including emails sent 12/01/2019, 01/13/2020, 08/12/2020, 12/16/2020, and 04/20/2021.  (Exhibit C, Annex Doc 33) In spite of these many requests, Defendants have failed and refused to produce all responsive documents, even those to which it no longer has any objection as Plaintiff signed a confidentiality order.

4.      For the reasons set forth in Plaintiff's Motion to Compel below, Defendants have asserted improper objections to Plaintiff's discovery for the sole purpose of delaying, stonewalling, and obfuscating.  Such conduct justifies a continuance to allow Plaintiff to obtain such discovery.  To do otherwise would be to reward Defendants for their conduct in violation of the rules of this Court.

**B.  How such additional discovery will show a genuine issue of material fact exists.**

**1.  Plaintiff's claims**

As noted above, Plaintiff has asserted two different claims in this case, breach of contract/partnership agreement and age discrimination.  Some of the facts apply/overlap to both claims.  Plaintiff contends Defendants began harassing him with respect to his age as early as approximately 2014, when Defendants, through Meridith Watson, asked Plaintiff to enter into a

partnership with Rena Connor and mentor her, so that Plaintiff's accounts could be transferred to Connor "when Plaintiff retired." At the time of the request, Plaintiff had not been discussing retiring or retirement. To Plaintiff's knowledge, no other ISO was ever asked to open his book of accounts to a young sales assistant in order to facilitate transfer of those accounts upon that ISO's retirement, particularly when no discussion was being had regarding retirement. Indeed, Mr. Jhett who was closest to age to Plaintiff in the Richardson office was not asked to open his accounts to anyone, or partner with them to facilitate his retirement, even when he began discussing his retirement and ultimately retired.

Plaintiff contends to induce Plaintiff to form the partnership and introduce Connor to Plaintiff's high-level client relationships, Defendants promised they would not reduce Plaintiff's commissions or accounts. Defendants promised to pay Connor themselves, and not ask Plaintiff to pay any part   Plaintiff told Defendants he did not have any plans to retire, one way or the other. Defendants assured him that was not a problem.

After Plaintiff entered into the partnership and fulfilled his part of the bargain, mentoring Connor and introducing her to his many client contacts and helping her build relationships with them, as well as teaching her his many tricks of the trade, Defendants became frustrated with Plaintiff because he did not promptly retire. Defendants did not want to continue paying Connor, as they had agreed, and began demanding Plaintiff agree to pay part of Connor's compensation. When Plaintiff refused, citing the agreement, Defendants threatened Plaintiff with removing all of his accounts from him. Defendants thereafter not only reduced Plaintiff's commissions from 65% down to 40% but also reduced the overall commission percentage for the partnership.

At the start of January, 2018, after a very successful 2017, Connor resigned. Plaintiff's manager, Nicholas Polyak, was furious with Plaintiff. Polyak considered Connor like a daughter

to him, and a rising star at the company.  Indeed, Polyak injected himself into the partnership between Plaintiff and Connor, and negotiated with Plaintiff on Connor's behalf regarding the partnership.  Polyak blamed Plaintiff's refusal to retire or pay Connor out of his commissions for Connor's departure.  Polyak did not make a secret of the fact he saw Connor as the future and Plaintiff as the past.  Defendants then embarked on a course of action to pressure Plaintiff to retire. Polyak immediately began removing accounts from Plaintiff's book of business, without cause or justification.  He ultimately took away the vast majority of productive accounts Plaintiff had been handling for nearly a decade – relationships Plaintiff had developed for more than thirty years in the business.  Polyak recently claimed in his recent deposition that he did so at the direction of Brett Dean.

Polyak also began micromanaging Plaintiff's daily activities, was hypercritical of even the smallest of mistakes, required Plaintiff to provide detailed reporting and plans for carrying out his daily job duties, and brought up Plaintiff's retirement to Plaintiff and others in the office. Defendants pressured Plaintiff to make more sales in the secondary market, in addition to his work on primary transactions, and in spite of the fact Plaintiff had met every goal set for him. Defendants did not provide Plaintiff with any goals regarding secondary sales, nor did Defendants provide Plaintiff with any reporting on secondary sales.

Plaintiff contends Polyak's conduct violated many of the policies and practices of Defendants. Defendants had a policy and practice of not removing accounts from an ISO unless a client complained or there were performance issues regarding the account.  Defendants also have policy and practice of allowing ISOs to carry out their daily duties as they saw fit, including when and how to reach out to clients, and the like.  Defendants also have a policy and practice of allowing ISOs to determine their working hours, so long as they worked a full day and were achieving their

goals. Defendants have never restricted ISOs from making personal calls while on the desk. Defendants have a policy and practice of leaving it to the individual partners in any partnership to determine how commissions earned by the partnership are to be divided among them. Defendants also have a practice of not directing how the partners divide up their workload. Defendants have a practice of not requiring any particular balance between primary and secondary sales among Defendants' ISOs. Indeed, Plaintiff was hired to develop and grow primary sales, and was never required to accomplish any set amount of secondary sales. Defendants did not set out or state any required balance between primary and secondary sales for any of its ISOs. Some had more secondary sales, while others like Plaintiff had more primary transactions, and some had a balance of both.

When Plaintiff raised concerns about being pressured by Polyak, Polyak gave pretextual reasons for his actions. No one else in Plaintiff's division, regardless of age or (in)experience, was subjected to the scrutiny Plaintiff was subjected to after Connor's resignation.

After Plaintiff's commissions were reduced and accounts were taken away from him, on the heels of a year in which he received accolades every single month for his and Connor's stellar performance, and when other ISOs struggled to perform due to poor market conditions, Plaintiff's earnings fell precipitously. Plaintiff has lost in excess of a million dollars in commissions since the reductions and removals. The discovery Plaintiff seeks is directed toward developing each of the foregoing facts.

2.  The depositions of Nicholas Polyak, Meridith Watson, Brett Dean and David Parr

Plaintiff commenced the deposition of Nicholas Polyak on March 29, 2021, but did not complete the deposition. Defendants have refused to produce Polyak to complete the deposition. Polyak's additional testimony is important to Plaintiff's response to Defendants' Motion for

Summary Judgment, as Polyak has yet to testify on many of the foregoing facts. He has not yet testified as to why he removed accounts from Plaintiff, what information he based his decision on, what review he has done on the accounts, if any since their removal, if he conducted any similar investigation/analysis of accounts assigned to those in the office younger than Plaintiff, his negotiations on behalf of Connor, his relationship with Connor, the pressure he put on Plaintiff in an effort to force Plaintiff to retire, and the like. He also has not yet testified regarding the policies and practices within BOKFS, including those Plaintiff contends he violated, and only violated with respect to Plaintiff, including removing accounts from Plaintiff without any analysis, cause or justification (e.g. a request from a client), failing to assign accounts up for reassignment to Plaintiff when Plaintiff had existing, longstanding client relationships with those accounts, micromanaging Plaintiff's daily activities and decisions, screaming at Plaintiff, threatening to kill Plaintiff, discussing Plaintiff's "retirement" with other employees, targeting Plaintiff for different scrutiny and treatment, and the like. Plaintiff has not yet questioned Polyak regarding his many pretextual excuses for his actions regarding Plaintiff. (Exhibit 2, Lahr Verification, ¶5, Annex Doc 36)

Meridith Watson is also a key witness in this case with respect to both Plaintiff's breach of contract/partnership agreement claim, and Plaintiff's age discrimination claim. Meridith Watson, who at the time was a high level executive of Defendants, is the person who Plaintiff believes came up with the idea of a partnership between Plaintiff and Connor, and is one of the people who wanted Plaintiff to retire. Watson is the person who asked Plaintiff to enter into a partnership with Rena Connor. Watson told Plaintiff Defendants wanted him to mentor Connor so that she could take over his accounts upon his retirement. Watson set out the terms of the partnership and committed that Defendants would not alter Plaintiff's commissions or compensation if Plaintiff agreed to enter into the partnership under the terms set out by Watson. Plaintiff was receiving a

commission of 65% on all sales credits at the time, and had developed a full book of accounts, including many Tier 1 accounts. Watson agreed Defendants would pay Connor and not take anything from Plaintiff's commissions to compensate her. Watson also agreed not to reduce Plaintiff's book of accounts, as Connor was not bringing any accounts to the partnership. Watson's testimony regarding the formation of the partnership, the terms, and the commitments to Plaintiff are integral to establishing the terms of the partnership, and proving subsequent breach of those terms. Plaintiff assumes Watson is the person who has knowledge of why Plaintiff was asked to partner with Connor, what information Defendants looked at and/or analyzed, if any, in deciding to ask Plaintiff to partner with Connor, what analysis if any was done regarding Plaintiff's book of accounts in anticipation of formation of the partnership and the like.[1] (Exhibit 2, Lahr Verification, ⁋6, Annex Doc 36)

Plaintiff also believes Watson has information and knowledge regarding Defendants' anticipation of/plan for Plaintiff's retirement, the plan to hand Plaintiff's book of accounts over to Connor, as well as knowledge of the decision to breach the partnership agreement and reduce the overall commissions paid to the partnership and to reduce Plaintiff's commissions to pay Connor more, inasmuch as Watson was the person who made the proposal to Plaintiff. Plaintiff also believes Watson has information regarding Defendants' favoring Connor, the young protégé, over Plaintiff the "old guy who should retire", interfering/breaching the partnership agreement for the benefit of Connor and to the detriment of Plaintiff based solely on age, as well as the knowledge of the policy and practice within Defendants' municipal sales offices regarding partnerships and how they were treated and handled. Plaintiff also believes Watson has knowledge of and indeed

---

[1] Plaintiff asked who with Defendants was responsible for these issues, but Defendants failed to respond or identify anyone.

**PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY**

implemented and enforced many of the above references policies and practices violated by Polyak. (Exhibit 2, Lahr Verification, ⁋6, Annex Doc 36)

It is important to note Defendants have not produced any documents regarding Watson's activities related to the partnership, even though Polyak testified the oral agreement was memorialized in a document.[2]  (Exhibit 2, Lahr Verification, ⁋7, Annex Doc 36)


To the extent not covered above, Watson can also testify to Defendants policies and practices regarding reassignment of accounts, when and why it is done, how often it has been done, particularly on a large scale basis, how often it has been done to ISOs who are younger than Plaintiff, what analysis was done or should have been done prior to such removal, and how those accounts are reassigned upon removal.  Watson can testify to the size of various ISOs' book of accounts, whether the number of accounts assigned in a proper factor in removing accounts from ISOs, what accounts are considered Tier 1 accounts, what Tier 1 means, the value of such accounts, and the like.  He can also testify to the cost of removing such accounts from Plaintiff and the impact it can have on Plaintiff's commissions.  He can also testify to the difference between primary and secondary markets, how Defendants track those sales, whether all ISOs have a balance of primary versus secondary sales, how many have had accounts removed for not having a balance of sales in the secondary market, and the like  Again, Plaintiff believes the answer to that question will be zero, but Plaintiff is entitled to uncover evidence to show that he was treated differently than ever other ISO in the office based on his age and Defendants' desire to force him to retire. (Exhibit 2, Lahr Verification, ⁋6, Annex Doc 36)

---

[2] Plaintiff asked for such documents, but they have not been produced.

**PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY**                                                                            Page 15

Brett Dean is also an important witness.  He is the president of Defendant, and Plaintiff believes he was consulted regarding formation of the partnership and will have knowledge of the reason for the formation, what was considered, the terms of the partnership, as well as knowledge of the breach of the partnership agreement, why the breach occurred, what was considered in deciding to breach the partnership agreement, and whether there was a written memorialization of the partnership agreement.  Plaintiff contends these actions were all taken solely for the purpose of forcing Plaintiff to retire and hand his book of accounts to Connor, the young protégé, and but for his age, none of these actions would have been taken.  (Exhibit 2, Lahr Verification, ¶6, Annex Doc 36)

Dean can testify to the number of time Defendants have asked any other ISO to open their entire book of accounts to a brand new ISO, without additional accounts or compensation, asked them to train and mentor the ISO for the purpose of handing over all of the accounts to the younger ISO.  Plaintiff believes that number is zero, and that such request violates Defendants policies and practices carried out during Plaintiff's entire tenure with Defendants.  Dean can also testify to the policies and practices regarding removing accounts for ISOs without justification or cause, what analysis is done prior to any such removal, and the like.   (Exhibit 2, Lahr Verification, ¶6,  Annex Doc 36)

Importantly, Plaintiffs only learned on March 29, 2021 that Dean was the decision-maker regarding removal of accounts from Plaintiff after Connor decided to resign.  Again, Plaintiff sought this information at the outset of the case in 2019, but Defendants refused to answer the interrogatories inquiring into who made that decision.  Polyak provided Dean's name during his deposition on March 29.  It is Plaintiff's contention that the decision was made to force Plaintiff to retire.  Thus, Dean has highly relevant information, including why that decision was made, what

information he reviewed or relied on in making that decision, who provided him with such information, and the like. (Exhibit 2, Lahr Verification, ¶8, Annex Doc 36)

David Parr is also an important witness. Plaintiff believes Parr was involved with Watson in the decision to ask Plaintiff to form the partnership with Connor. (Again, Plaintiff makes an assumption here because Defendants have refused to answer Plaintiff's discovery on this topic.) Parr was in the meeting with Watson when he proposed the idea to Plaintiff. Plaintiff does not know if Parr did any analysis of Plaintiff's book of accounts, or provided any information to Watson, but should be permitted to explore those topics, as well as confirm what Parr recalls about the meeting to form the partnership.

### 3. Written discovery requests.

Plaintiff also needs the discovery sought in Plaintiff's written discovery requests to prove Plaintiff's claims. Those requests are tailored to Plaintiff's two claims, and seek relevant, essential information to present and prove Plaintiff's claims. For example, Plaintiff seeks basic information such as who made the decision to have Plaintiff form a partnership with Connor and why, what the terms of the partnership were, what promises were made to Plaintiff to induce him to enter into the partnership, who made the decision to remove accounts from Plaintiff upon Connor's resignation and why, what information did they analyze and who provided them with it, who Plaintiff's accounts were reassigned to and why, and what commissions were earned on those accounts after they were reassigned. (See Exhibit B, Annex Doc 33)

Plaintiff made every effort to obtain such information without Court intervention. Defendants have refused to comply. Defendants should not be rewarded for their stonewalling tactics by arguing the discovery deadline has expired, when Plaintiff was seeking such information well in advance of such deadlines.

Plaintiff also incorporates herein the factual background information contained in the below Motion to Compel with respect to why the discovery Plaintiff seeks in relevant.

## LEGAL ARGUMENT AND AUTHORITIES

Whether to grant an extension of a scheduling order deadline and/or a continuance is within the sound discretion of the Court, and the Court's judgment range is "exceedingly wide." *Streber v. Hunter,* 221 F.3d 701, 736 (5th Cir. 2000) The same standard for an extension of time is applied as for a continuance. The party making the request must show good cause, including that the deadlines could not reasonably be met despite due diligence of the movant. Rule 56(d) permits a court to grant a continuance in the context of a summary judgment hearing when the non-movant has not had the opportunity to conduct discovery that is essential to that party's opposition to a motion for summary judgment. See Fed. R. Civ. P. 56(d). See also Wright v. Blythe-Nelson, 2001 U.S. Dist. LEXIS 12420, 2001 WL 1012701, at 2 (N.D.Tex. Aug. 15, 2001) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 5, 106 S.Ct. 205, 91 L.Ed.2d 202 (1986)).

A Rule 56(f) motion must demonstrate:

(1) why the movant needs additional discovery, and

(2) how the additional discovery will likely create a genuine issue of material fact.

*See Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 534-35 (5th Cir. 1999) (citing *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993)).

As the foregoing facts show, Plaintiff here has met the criteria for moving for an extension of time/continuance. Plaintiff used diligence and good faith in pursuing discovery and has made many and repeated attempts to work with Defendants to obtain discovery in this case. Plaintiff has accommodated Defendants need to delay mattes on more than one occasion, and has accommodated even unreasonable demands Defendants have made regarding discovery.

Plaintiff has shown good cause for why Plaintiff has not been able to obtain/accomplish such discovery within the discovery period agreed to by the parties and approved by the Court in spite of Plaintiff's best efforts, including Defendants' bad faith efforts to stonewall and ignore Plaintiff. Plaintiff has demonstrated why the requested information is necessary to respond to Defendants' Motion for Summary Judgment.

Plaintiff has also shown (and further shows below), that Defendants conduct throughout discovery in this case has been in direct violation of the directives in the Federal Rules as well as those set out by the Northern District of Texas. Plaintiff did not choose this venue, having filed these proceedings in State court. Defendants chose this venue. Thus, it is wholly appropriate to hold Defendants to know obfuscation and stonewalling discovery in the course of proceedings in this Court will not be entertained or supported.

Finally, Plaintiff has shown while this case has been pending since 2019, the intervening pandemic occasioned a nearly year-long, unforeseen delay which was out of the parties hands. Plaintiff respectfully requests that this Court grant Plaintiff an extension of time/continuance to respond to obtain responses to Plaintiffs' discovery, take the necessary depositions and respond to Defendants' Motion for Summary Judgment. Plaintiff believes 90 days to complete discovery and take depositions should be more than adequate, assuming cooperation from Defendants regarding scheduling, and an additional 30 days thereafter to obtain the transcripts and respond to the motion.

## MOTION TO COMPEL

Pursuant to Rule 37(a)(3)(B), Plaintiff moves to compel Defendants to provide full and complete responses to Plaintiff's written discovery, including interrogatories as required by Rule 33, and Plaintiff's request for documents as required by Rule 34.

Plaintiff timely served written discovery on Defendants in July, 2019.  The discovery was narrowly tailored to seek relevant information relating to Defendants' two claims.  Defendants wholly failed to respond to such discovery.  Indeed, with respect to Plaintiff's interrogatories, Defendants did not provide a single response to any interrogatory other than Interrogatory 1 which asked who provided information to respond to the interrogatories.  Those interrogatory responses have never been supplemented.  Further, Defendants asserted improper "general" or "blanket" objections and "objections" which are not objections at all, including falsely asserting Defendants did not allow "partnerships", demanding Plaintiff provide "search parameters", and failing to produce confidential materials after Plaintiff executed a confidentiality agreement. (See Exhibit B, Annex Doc 33)

**ADDITIONAL FACTUAL BACKGROUND**

Plaintiff incorporates the above facts herein, and additionally would show:

In response to Plaintiff's initial tailored written discovery Defendants first asserted nine "general" and blanket objections prior to responding to the discovery, including objecting to producing any "privileged" information (general ojb. 1), "relevance" (general obj. 2), being required to produce anything beyond that required by the Federal Rules and by "FINRA" (general obj. 3),  "overly broad and unduly burdensome" because the requests seeks "all" documents (general obj. 4).  Defendants then state in "general objection 5" that the fact they asserted an objection does not mean that any such documents even exist (general obj. 5).  Objection 6 states Defendants are responding based on the "definitions contained within this section and its general objections." (general obj. 6).  Defendants next state in general objection 7 that they will only respond with information from the "relevant

time period, January 5, 2018 to the EEOC filing" (general obj. 7).  Defendants object to

Plaintiff's "format" instructions (general obj. 8).  And finally Defendants repeat their

objection to Plaintiff's time period and restrict their production to only "Applicable Time

Period", which Defendants deem to be 300 days preceding the "applicable Charge of

discrimination."  (See Exhibit B, Annex Doc 33)

Defendants then asserts additional general and blanket objections in response to

nearly every single one of Plaintiff's specific requests.  For example, in response to

Plaintiff's requests for production of documents, Defendants asserted the following blanket

objections:

1. Asserting a relevance objection (see Response to Requests 2-14, 16, 18-20, 22, 23)
2. asserting Defendants would only produce "reasonably responsive" documents (see Response to Requests 2-14, 16, 18, 20 23)
3. asserting an overly broad, unduly burdensome, harassing objection without identifying how or why such objection is appropriate (see Response to Requests 2-10, 13, 14, 16, 18, 22, 23)
4. asserting documents were being withheld pending a "confidentiality order" and/or a "protective order" (see Response to Requests 3-10, 13, 16, 18, 22)
5. asserting requests sought documents "outside the relevant time period" (see Response to Requests 2-4, 6, 11, 12, 14, 22)
6. asserting Defendants would limit their production to only those documents "maintained within the Human Resources Department" (see Response to Requests 2-4, 6, 14);
7. demanding Plaintiff contact Defendants to identify "a reasonable list of custodians and search terms and time periods" (see Response to Requests 5-12, 16, 18).

(See Exhibit B, Annex Doc 33)

In response to Plaintiff's interrogatories regarding the partnership Plaintiff formed with

Connor at Defendants' request, Defendants falsely asserted: "BOKFS does not utilize

partnerships" and provided no further information.  This statement is patently false. (See

Exhibit B, Annex Doc 33 - Response to Requests 5-7)

**PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY**                                                                                          Page 21

Defendants also "object" that "BOKFS clients and BOFKS client accounts do not belong to individual sales associates." (See Exhibit B, Annex Doc 33 -  Response to Requests 11-13, 16, 19)

In response to Plaintiff's interrogatories, Defendants make many of the same objections, including when responding to requests for information regarding the removal of accounts from Plaintiff, Defendants asserted the same *non sequitur* "objection": "BOKFS clients and BOFKS client accounts do not belong to individual sales associates." (See Exhibit B, Annex Doc 33 -  Response to Interrogatories 4 through 8)

Defendants also state in response to a number of requests that Defendants will produce documents from which Plaintiff can readily obtain such information.  (see Response to Interrogatories 4-6, 8, 9), but Defendants (1) did not produce such documents even after Plaintiff signed an order, (2) Defendants did not in any way label their discovery to identify those materials responsive to the interrogatories or set out the Bates numbers in their responses so as to make the documents readily identifiable, and (3) much of the requested information does not lend itself to being found in a document, for example, Interrogatory 4 asks Defendants to identify who had a role in deciding to remove accounts from Plaintiff in January 2018, and what their role was; Interrogatory 5 asked why accounts were removed (among other things), Interrogatory 6 asked Defendants to identify what information or data was reviewed or relied on in deciding to remove accounts from Plaintiffs. (See Exhibit B, Annex Doc 33)

## LEGAL ARGUMENT AND AUTHORITIES

A.  The scope of discovery for written interrogatories and requests for production.

Rule 26(b)(1) of the Federal Rule of Civil Procedure sets out the scope of discovery:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1).

Federal Rule 33 governs interrogatories and states any matter discoverable pursuant to Rule 26(b) may properly be inquired into through an interrogatory. It further states "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(a)(s)

Whether information sought is relevant is a very low threshold. To be relevant, the information need only be calculated to lead to the discovery of admissible evidence. *United States v. Tools & Metals, Inc.*, 2011 U.S. Dist. LEXIS 24688, 2011 WL 856928, at *2 (N.D. Tex. Mar. 11, 2011) The information itself need not be admissible, nor must it tend to prove or disprove a claim or defense or have strong probative force or value, to meet the relevance threshold. *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 280 (N.D. Tex. 2017) (Horan, J.).

Federal Rule 37(a)(4) requires that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond. FED. R. CIV. P. 37(a)(4).

Federal Rule 34(b) sets out how a party is to respond to requests for production of documents, including objections, and requires "an objection to part of a request must specify the part and permit inspection of the rest." The Rule also requires "a party must produce documents

as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request."

FED. R. CIV. P. 34(b)(2)(B) and (C).

A party seeking to resist discovery must not only assert a specific objection, but also bears the burden of proving such discovery fails the proportionality comparison test dictated by Rule 26(b)(1).

Further, the parties have an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. *Heller v. City of Dallas,* 303 F.R.D. 466 (N.D. Tex. 201) (Exhibit 6, Annex hereto Doc 36). That duty includes making a reasonable inquiry before asserting an objection to discovery. *Smith v. Our Lady of the Lake Hosp., Inc*., 960 F.2d 439, 448, 477 (5th Cir. 1992).

The *Heller* decision*,* a Dallas federal court decision written by Magistrate Judge Horan, gave a detailed analysis of the duty to comply with discovery requests and set out standards for practicing in the Northern District, which is instructive to most of the issues before this Court. The *Heller* court first noted all counsel have "an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith responses to legitimate discovery requests." *Heller, Id.* (citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1486 (5th Cir. 1990)). The *Heller* court noted the Fifth Circuit has commended the Texas Lawyers' Creed's command that an attorney "will not resist discovery requests which are not objectionable" and "will not make objections ... for the purpose of delaying or obstructing the discovery process," *Heller,* 303 F.R.D. at 476-477. Addressing the argument that attorneys must zealously represent their clients, the Court stated that obligation is not an excuse to abuse the discovery process and "must be tempered against counsel's duty not to abuse legal procedure. Thus, even if the client

directs counsel to respond to discovery requests in a certain manner, counsel has the ultimate obligation to ensure that the responses and objections are well grounded in fact and law." *Heller*, 303 F.R.D. at 477.

The court also highlighted the importance of specificity with respect to objections, holding the prohibition on blanket, vague or general objections have "long been established, as such objections make it impossible to know what, if anything, has been withheld. *Heller, supra* at 483. The court quoted the *Weems v. Hodnett*, No. 10-cv-1452, 2011 U.S. Dist. LEXIS 80746, 2011 WL 3100554, at *1 (W.D. La. July 25, 2011) opinion, which found objections which are not specific to the request are a waste of time:  "This is particularly true in cases like this where multiple 'general objections' are incorporated into many of the responses with no attempt to show the application of each objection to the particular request." *Heller,* 303 F.R.D. at 483. The *Heller* court also cited *Sonnino v. Univ. of Kan. Hosp. Auth*., 221 F.R.D. 661, 666-67 (D. Kan. 2004) with approval which held general or blanket objections "worthless for anything beyond delay of the discovery." Such objections are considered mere "hypothetical or contingent possibilities," where the objecting party makes "'no meaningful effort to show the application of any such theoretical objection' to any request for discovery."  *Heller,* 303 F.R.D. at 483.  The court went on to hold general or unsupported objections, even when asserted in response to specific requests, reflect the type of Rambo-style tactics which bring disrespect upon attorneys and the profession, and should be rejected out of hand.  *Heller,* 303 F.R.D. at 484.

Applying the requirements of the Federal Rules of Procedure and the *Heller* holding to the "objections" asserted by Defendants and complained of herein, none can be

**PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY**                                                                                  Page 25

sustained. All of Defendants objections are in direct violation of the Federal Rules, and have been deemed by courts in this district to be completely inappropriate as they are "a waste of time" and the kind of Rambo tactics that bring disrespect on the legal profession. *See Heller supra.*

Indeed, Defendants admit at the very outset that they have not done any inquiry into whether responsive documents even exist. See General Objection 5. Noting that Federal Rule 26(g)(1) requires a reasonable inquiry first be made, Judge Horan in *Heller* held attorneys are obligated to first ascertain if any responsive documents exist before asserting any objections. *Heller, supra* at 485. Judge Horan set out the following parameters for responding to discovery:

> • A party served with written discovery must fully answer each interrogatory or document request to the full extent that it is not objectionable and affirmatively explain what portion of an interrogatory or document request is objectionable and why, affirmatively explain what portion of the interrogatory or document request is not objectionable and the subject of the answer or response, and affirmatively explain whether any responsive information or documents have been withheld.
> • "In responding to [Rule 34] discovery requests, a reasonable inquiry must be made, and if no responsive documents or tangible things exist, *Fed. R. Civ. P. 26(g)(1)*, the responding party should so state with sufficient specificity to allow the Court to determine whether the party made a reasonable inquiry and exercised due diligence."

*Heller, supra* at

To the extent Defendants attempt to reference documents to respond to interrogatories, they have done so in an improper manner. Federal Rule 33 permits reference to documents in lieu of a response, but only in limited circumstances, with specific requirements. Rule 33 provides:

> (d) OPTION TO PRODUCE BUSINESS RECORDS. If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or

summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:

(1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

(2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Fed. R. Civ. P. 33(d).  Defendants did not meet a single requirement of Rule 33 with respect to referencing documents.

Because none of Defendants objections comply with the requirements of the Federal Rules, or the law governing practice before this Court, Plaintiff respectfully requests that this Court strike and/or overrule all objections and compel Defendants to fully respond to Plaintiff's written discovery on or before 15 days from the signing of an order to compel. Plaintiff further requests that Plaintiff be granted 90 days from the signing of an order to complete the above requested depositions, and an additional 30 days thereafter to respond to Defendants' Motion for Summary Judgment.

## REQUEST FOR ATTORNEYS' FEES

Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party ... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A).

**PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY**

Inasmuch as the *Heller* opinion was issued in 2014, long before these proceedings commenced, and inasmuch as Defendants selected this forum having removed this case from State to Federal court, Plaintiff respectfully requests that this Court order Defendants to pay Plaintiff's fees in preparing and filing this Motion. Plaintiff spent 20 hours researching the legal issues, gathering the evidence, and preparing this motion for filing. Plaintiff spent an additional 1 hour in past efforts to resolve these issues with Defendants, including sending twelve different emails and holding several different telephone conversations on the subject, which Plaintiff believes is reasonable under the circumstances. (See Exhibit 2, Lahr Verification, ¶9-10, Annex Doc 36)

## CONCLUSION

Based upon the foregoing good cause shown, Plaintiff respectfully requests that this Court grant Plaintiff an extension/continuance in this case, require Defendants to fully respond to all written discovery within 15 days of the signing of an order, grant Plaintiff an additional 90 days from the date of the signing of an order to complete the requested depositions, and an additional 30 days beyond that time to respond to Defendants Motion for Summary Judgment. Plaintiff further requests that this Court award Plaintiff attorneys' fees for the time incurred in researching and drafting this Motion.

Respectfully submitted,

*/s/ Marilyn K. Lahr*
Marilyn K. Lahr
Texas State Bar No. 11820950
Law Offices of Marilyn K. Lahr
NOTE: NEW OFFICE ADDRESS
2626 Cole Ave., Suite 300
Dallas, Texas 75204
Office: 214.528.4545/Cell: 214.335.6464
Fax 888-828-2856
mlahr@lahrlawfirm.com
**Attorney for Plaintiff Charles Ripley**



CHARLES RIPLEY, PLAINTIFF

## CERTIFICATE OF CONFERENCE

I, Marilyn K. Lahr, do hereby certify on this 2nd day of July, 2021, that I have attempted to confer with Defendants regarding the issues raised in the foregoing Motions on more than one occasion, including via email and telephone calls. I sent an email to Defendants' counsel, Erica Dorwart, requesting documents and moving to compel if the documents were not produced on at least December 13, 2019 (two emails), January 13, 2020, August 12 and 19, 2020, December 16, 2020, April 14, 2021, and today, July 2, 2021 (Exhibit 6, Annex hereto Doc 36). I sent emails regarding depositions on at least December 3, 2019, January 13, 2020, December 15, 2020, January 2, 2021, February 3, 2021, February 16, 2021, March 2-3, 2021, March 23-24, 2021, and today. Defendants did not withdraw their objections, produce responsive documents, or agree to the depositions Plaintiff is seeking. Plaintiff also set out in Plaintiff's Unopposed Motion for Extension of Time to Respond to Defendants' Motion for Summary Judgment (Doc. 32) most of the issues raised in this Motion. Defendants have not notified Plaintiff they agree to any issues raised herein. Finally, I called Defendants counsel, Erica Dorwart, on Friday June 25, 2021 to speak with her directly regarding the issues raised herein. She did not return my call that day, nor has she returned my call since that day.

Plaintiff therefore believes the issues cannot be resolved without court assistance and presents these motions.

_/s/ Marilyn K. Lahr_
Marilyn K Lahr

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was submitted to the court's electronic filing system for electronically transmission to the following parties via the Court's ECF system on July 2, 2021:

Worthy Walker
Texas Bar No. 24033308
Via email: wwalker@shackelford.law
SHACKELFORD, BOWEN,
MCKINLEY & NORTON, LLP
9201 N. Central Expressway, Fourth Floor
Dallas, Texas 75231
Telephone: (214) 780-1400
Facsimile: (214) 780-1401

## PLAINTIFF'S MOTION TO EXTEND DISCOVERY DEADLINE/CONTINUANCE AND TO COMPEL DISCOVERY

Page 29

Telephone: (214) 780-1400
Facsimile: (214) 780-1401
- and –
Erica Anne Dorwart, OBA #18367
Admitted to practice in the
Northern District of Texas on May 1, 2018
FREDERIC DORWART, LAWYERS
124 East Fourth Street
Tulsa, Oklahoma 74103
Via email:  edorwart@fdlaw.com
(918) 583-9922 (Tel.)
(918) 584-2729 (Fax)
ATTORNEYS FOR DEFENDANTS

*/s/ Marilyn K. Lahr*
Marilyn K. Lahr